**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **SE PROPERTY HOLDINGS, LLC,** ) | |
| ) | |
|     **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION 15-0033-WS-C** |
| ) | |
| **TAMMY T. CENTER,** *et al.*, ) | |
| ) | |
|     **Defendants.** ) | |

**ORDER**

This matter comes before the Court on plaintiff's Motion for Partial Summary Judgment (doc. 90). The Motion has been briefed and is ripe for disposition.

**I.      Background.**

    *A.      Nature of the Case.*

Plaintiff, SE Property Holdings, LLC ("SEPH"), brought this fraudulent transfer action seeking to have certain transfers of property made by Charles Trammell and Belinda Trammell (collectively, the "Trammells") set aside and declared null and void under Alabama law. Plaintiff's position is that the Trammells owe it millions of dollars pursuant to certain guaranties they executed in favor of SEPH's predecessor during the period of 2005-2007. When the borrowers defaulted on their loan repayment obligations, SEPH looked to the Trammells to make good on their guaranty commitment. Between 2011 and 2013, and after SEPH demanded payment from and filed suit against them, the Trammells transferred ownership of various assets (including a house on Lake Martin, a beach condominium unit in Baldwin County, tens of thousands of shares of UPS stock, and ownership interests in limited liability companies) to LLCs and other family members. Plaintiff maintains that, as a result of these transfers, the Trammells were left with assets valued far less than their debts.

Based on these allegations, SEPH has asserted claims under the Alabama Uniform Fraudulent Transfer Act, Ala. Code §§ 8-9a-1 *et seq.*, against the Personal Representative of the

Estate of Charles H. Trammell (the "Estate"),[1] Belinda R. Trammell, Amy T. Brown, Tammy T. Center, Trammell Family Orange Beach Properties, LLC ("Trammell Orange Beach"), and Trammell Family Lake Martin Properties, LLC ("Trammell Lake Martin").[2]  As pleaded in the First Amended Complaint, SEPH maintains that the following transfers by Charles and Belinda Trammell were fraudulent under Alabama law: (i) their execution of a deed to Trammell Orange Beach of the Baldwin County beach condominium unit in January 2011; (ii) their execution of a deed to Trammell Lake Martin of the Lake Martin house in January 2011; (iii) their transfer of a 90% ownership/membership interest in Trammell Orange Beach and Trammell Lake Martin to Brown and Center in December 2011, such that each LLC (which had previously been owned 50% by Charles Trammell and 50% by Belinda Trammell) was now owned 45% by Brown, 45% by Center, 5% by Charles Trammell, and 5% by Belinda Trammell; (iv) Charles Trammell's transfer of UPS stock to relatives or family-controlled LLCs in 2012; and (v) transfer upon Charles Trammell's death of his interest in the Trammells' principal residence and additional UPS stock shares to Belinda Trammell, leaving his Estate with a value of less than $200,000, some $5.8 million lower than Charles Trammell's net worth in 2008.  (Doc. 55, ¶¶ 19, 21, 23, 24, 28.)  Defendants Belinda Trammell, Center and Brown are alleged to have liquidated some of these fraudulently transferred assets and expended the proceeds for their own use and benefit. (*Id.*, ¶ 24.)

In the First Amended Complaint, SEPH parlays the foregoing allegations into claims of actual fraudulent transfer pursuant to Alabama Code § 8-9A-4(a) (Count One); constructive fraudulent transfer pursuant to Alabama Code § 8-9A-4(c) (Count Two); constructive fraudulent transfer pursuant to Alabama Code § 8-9A-5(a) (Count Three); and conspiracy (Count Four). SEPH now moves for summary judgment as to Count Three (and only Count Three) of the First

---

[1]       According to uncontradicted factual allegations in the First Amended Complaint, Charles Trammell died on or about October 24, 2013.  (Doc. 55, ¶ 2.)

[2]       Defendants Brown and Center are the adult daughters of Charles and Belinda Trammell.  Trammell Orange Beach and Trammell Lake Martin are family-held Alabama limited liability companies in which Charles Trammell, Belinda Trammell, Brown and Center have possessed various ownership/membership interests at various times.

Amended Complaint.[3]  Counts One, Two and Four are not implicated by plaintiff's Rule 56
Motion, and therefore will not be addressed herein.

      **B.**    ***Relevant Facts.*[4]**

          *1.*    ***The Loans and Guaranties.***

     Between 2005 and 2007, SEPH's predecessor (Vision Bank) entered into certain loan
agreements with companies called Bama Bayou, LLC (formerly known as Riverwalk, LLC) and
Marine Park, LLC, whereby those entities became indebted to Vision Bank (and, later, SEPH)
for certain commercial loans.  (Braswell Aff. (doc. 92, Exh. A), ¶ 4 & Exh. A-1.)[5]  In connection
with those loans, Riverwalk, LLC signed a promissory note for $6 million in Vision Bank's

---

       [3]      In their principal brief, defendants note that "SEPH then proceeds to argue only
on the basis of Ala. Code § 8-9A-5(a)," not § 8-9A-4(c).  (Doc. 100, at 2-3.)  Of course, that
limitation in plaintiff's summary judgment brief makes sense because the Motion for Partial
Summary Judgment is aimed solely at Count Three, which is a claim brought pursuant to § 8-
9A-5(a).  By contrast, Alabama Code § 8-9A-4(c) is the statutory basis for Count Two, as to
which no summary judgment motion has been filed.  The point is that, for purposes of this Order,
only § 8-9A-5(a) is germane to the analysis.

       [4]      The Court remains mindful of its obligation under Rule 56 to construe the record,
including all evidence and factual inferences, in the light most favorable to the nonmoving party.
*See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, defendants'
evidence is taken as true and all justifiable inferences are drawn in their favor.  Also, federal
courts cannot weigh credibility at the summary judgment stage.  *See Feliciano v. City of Miami
Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence
presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the
basis of credibility choices.").  Therefore, the Court will "make no credibility determinations or
choose between conflicting testimony, but instead accept[s] [defendants'] version of the facts
drawing all justifiable inferences in [their] favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th
Cir. 2008).

       [5]      The loans were made to finance a massive real estate development project in
Orange Beach, Alabama.  For example, a March 2, 2007 loan agreement between Vision Bank
and Marine Park, LLC, indicated that the borrower sought a loan of $5 million "for the
acquisition of that certain land located within the Bama Bayou development in the City of
Orange Beach … and for the construction thereon of a marine park consisting of a 500 seat
theatre, 1000 seat stadium and 134,000 gallon aquarium and related improvements … to be
known as GulfWorld Marine Park."  (Braswell Aff., Exh. A-1 at 14.)  And the Bama Bayou
project was conceived as a development on the north bank of the Intracoastal Waterway at its
intersection with the Foley Beach Express, incorporating commercial, retail, resort, residential,
marina, hotel and entertainment venues.  (Doc. 100, Exh. 2, at 4.)  Despite these loans, the Bama
Bayou and GulfWorld Marine Park developments never came to pass.

favor on March 24, 2005; Riverwalk, LLC signed a promissory note for $5 million in Vision Bank's favor on June 12, 2006; Bama Bayou, LLC signed a promissory note for $5 million in Vision Bank's favor on September 27, 2007; and Marine Park, LLC signed a promissory note for $5 million in Vision Bank's favor on March 2, 2007. (*Id.*) Those loans and notes were fully funded by Vision Bank and its participant banks. (Braswell Aff., ¶ 6.)

In connection with those loans, Charles and/or Belinda Trammell executed at least four guaranties in Vision Bank's favor. (Braswell Aff., ¶ 5.) First, on March 20, 2005, Charles Trammell executed a Limited Continuing Guaranty with respect to Riverwalk's indebtedness in the March 24, 2005 promissory note. (Braswell Aff., ¶ 5 & Exh. A-2.) In that guaranty, Charles Trammell agreed to be liable for up to $315,000 in principal of the note, 100% of all interest accruing at any time, and 100% of collection costs, expenses, and reasonable attorney's fees. (*Id.*, Exh. A-2 at ¶ 14.) Second, in May 2006 Charles Trammell and Belinda Trammell each executed Limited Continuing Guaranties with respect to Riverwalk's indebtedness in the June 12, 2006 promissory note. (Braswell Aff, ¶ 5 & Exh. A-3.) In those guaranties, the Trammells each agreed to be liable for up to $280,000 in principal of the note, 100% of all interest accruing at any time, and 100% of collection costs, expenses and reasonable attorney's fees. (*Id.*, Exh. A-3 at ¶ 14.) Third, on January 26, 2006, Charles and Belinda Trammell jointly executed a Limited Continuing Guaranty with respect to Marine Park's indebtedness in the March 2, 2007 promissory note. (Braswell Aff., ¶ 5 & Exh. A-4.)[6] In that guaranty, the Trammells agreed to be liable for up to $280,000 in principal of the note, 100% of all interest accruing at any time, and 100% of collection costs, expenses and reasonable attorney's fees. (*Id.*, Exh. A-4 at ¶ 14.) And fourth, on September 27, 2007, Charles and Belinda Trammell jointly executed a Limited Continuing Guaranty with respect to Bama Bayou's indebtedness in the September 27, 2007

---

[6]     It bears noting that, while SEPH (as Vision Bank's successor by merger) holds the Bama Bayou loans, notes and guaranties, the Marine Park, LLC promissory note was subsequently transferred to FNB Bank, which is not a party to these proceedings. (Braswell Aff., ¶ 15.) SEPH's objective is to collect on the Bama Bayou loans and guaranties, not the Marine Park loans and guaranties, which it no longer holds and which it has no direct interest in enforcing. Nonetheless, the Marine Park loan and guaranty are pertinent to the issues presented on summary judgment here. After all, Vision Bank held the Marine Park debt at the time of the challenged transfers, and the Trammells' financial obligations under the Marine Park guaranty bear on their solvency or lack thereof when the challenged transfers occurred.

promissory note. (Braswell Aff., ¶ 5 & Exh. A-5.)  In that guaranty, the Trammells agreed to be liable for up to $280,000 in principal of the note, 100% of all interest accruing at any time, and 100% of collection costs, expenses and reasonable attorney's fees. (*Id.*, Exh. A-5 at ¶ 14.)[7]

### 2.    *The Defaults and Plaintiff's Collection Efforts.*

Plaintiff's evidence is that, even though the loans had been fully funded, Bama Bayou, LLC and Marine Park, LLC defaulted under the loans and notes. (Braswell Aff., ¶ 6.)  Vision Bank subsequently demanded payment from the borrowers and guarantors, including Charles and Belinda Trammell. (*Id.*)  When payment was not forthcoming, Vision Bank sued Bama Bayou, Marine Park, Charles and Belinda Trammell, and others in the Circuit Court of Mobile County, Alabama, on January 16, 2009 (the "*Bama Bayou* Action").  The *Bama Bayou* Action remains pending today.  To date, it has not gone to trial; indeed, the Court's understanding is that no trial setting is in place at this time.

Pursuant to its collection efforts, on March 20, 2009, Vision Bank foreclosed on multiple parcels of real property that secured its loans to Bama Bayou and Marine Park, purchasing such property via credit bid. (*Id.*, ¶ 7.)  In the wake of that foreclosure, large deficiencies remained on both the Bama Bayou and Marine Park loans. (*Id.*)  Indeed, SEPH's calculations are that, as of September 23, 2016, Charles Trammell (or, more accurately, the Estate) was indebted to SEPH in the amount of $4,872,895 in principal and interest pursuant to his guaranties of Bama Bayou's indebtedness. (*Id.*, ¶ 8.)  SEPH further calculates that, as of the same date, Belinda Trammell was indebted to SEPH in the amount of $2,524,791.84 in principal and interest pursuant to her guaranty of Bama Bayou's indebtedness. (*Id.*)  Such calculations exclude costs of collection, which are claimed to be well in excess of a million dollars.

---

[7]    Charles Trammell also took on certain indebtedness obligations with respect to a $3 million loan that Vision Bank made to Sundance, LLC. (Braswell Aff., ¶¶ 9-10.)  In particular, he executed a Continuing Guaranty in Vision Bank's favor on September 19, 2007, whereby he agreed to be liable for up to $900,000 in principal. (*Id.*, ¶ 10 & Exh. A-7.)  When Sundance defaulted, litigation ensued. (*Id.*, ¶ 11.)  Pursuant to a compromise resolution of that litigation, Charles Trammell, Sundance and others executed a promissory note on February 12, 2012, wherein they collectively agreed to pay Vision Bank the sum of $428,118.22. (*Id.* & Exh. A-8.)  The Sundance note from February 2012 was paid in full in approximately January 2015. (Doc. 92, Exh. F, at #7.)

### 3.    *The Challenged Transfers.*

As noted, the claims asserted by SEPH herein focus on four specific transfers of property by Charles and Belinda Trammell.  Most of those transfers were made to defendants Brown and Center (their daughters), either directly or through entities established and controlled by the Trammells; however, SEPH also seeks relief on transfers made by Charles Trammell to Belinda Trammell upon the former's death.  Relevant facts pertaining to each such transfer include the following:

On January 26, 2011, after the *Bama Bayou* Action was underway, Charles and Belinda Trammell transferred ownership of their Baldwin County beach condominium unit to defendant Trammell Orange Beach, an Alabama limited liability company then owned 50% by Charles Trammell and 50% by Belinda Trammell.  (Doc. 92, Exh. F, at #8; doc. 92, Exh. M, at #8.)  On the same date, Charles and Belinda Trammell transferred ownership of their Lake Martin house to defendant Trammell Lake Martin, an Alabama limited liability company then owned 50% by Charles Trammell and 50% by Belinda Trammell.  (Doc. 92, Exh. F, at #8; doc. 92; Exh. M, at #8.)  The LLCs paid neither monetary consideration nor other property to the Trammells in exchange for these valuable transfers of real property.  (*Id.*)

Belinda Trammell testified that, when she and Charles Trammell formed the defendant LLCs, they had planned to give their daughters (defendants Center and Brown) an ownership interest in those entities.  (Doc. 92, Exh. E, at 53.)  Defendant Center confirmed her understanding that, as part of their estate planning, her parents intended to give Center and Brown an interest in those LLCs.  (Doc. 92, Exh. B, at 66.)  The Trammells followed up on this plan on or about December 12, 2011, with each of Charles and Belinda Trammell transferring a 22.5% ownership/membership interest in each of Trammell Orange Beach and Trammell Lake Martin to each of Center and Brown.  (Doc. 92, Exh. F, at #8; doc. 92, Exh. M, at #8.)  Pursuant to these December 2011 transfers, then, Trammell Orange Beach came to be owned 45% by Center, 45% by Brown, 5% by Charles Trammell, and 5% by Belinda Trammell.  The same was true of Trammell Lake Martin.  Again, both of those entities had previously been owned 50% by Charles Trammell and 50% by Belinda Trammell, with the daughters holding no ownership interest at all.  (*Id.*)  Brown and Center paid no money or property to their parents in consideration for these ownership interests in the LLCs.  Indeed, Center confirmed in her testimony that "[t]here was no money exchanged," that the transactions were set up as gifts, but

that Center and Brown "did do consideration with [their] emotional support and help" to their parents. (Doc. 92, Exh. B, at 78-79.)[8]  To that end, Charles and Belinda Trammell filed a gift tax return with the IRS for the 2011 tax year reporting gifts of a 22.5% interest in Trammell Orange Beach and Trammell Lake Martin given by each of them to each of Brown and Center. (Doc. 92, Exh. V.)

In April 2012, Charles Trammell transferred or caused to be transferred 12,551 shares of UPS stock that he owned individually to Trammell Orange Beach, and an additional 12,551 shares of UPS stock that he owned individually to Trammell Lake Martin. (Doc. 92, Exh. F, at #8; doc. 92, Exh. B, at 95; doc. 93, Exh. W, at 25.)  Collectively, those shares were valued at close to $2 million at the time of the subject transfers. (Doc. 93, Exh. BB, at 53.)[9]  There is some indication in the summary judgment record that those shares may have been funneled through Brown's and Center's hands before reaching the LLCs. (*Id.* at 52-58.)  Nonetheless, regardless of whether the transactions were direct or indirect, the net result was that Trammell transferred more than 25,000 shares of UPS stock from his personal holdings to the defendant LLCs (which were at that time owned 45% by Center, 45% by Brown, and just 5% each by Charles and Belinda Trammell) in April 2012.  No money or property changed hands as consideration for these UPS stock transfers, and Charles Trammell submitted a gift tax return in connection with same. (Doc. 92, Exh. B, at 96; doc. 93, Exh. BB, at 47-51.)

Charles Trammell died on October 24, 2013.  At the time of his death, his remaining UPS stock interests (which apparently totaled 8,798 shares) transferred to Belinda Trammell via a payable-on-death account. (Doc. 92, Exh. B at 17.)  Likewise, Charles Trammell's interest in the couple's primary residence passed to Belinda Trammell by operation of law in accordance with their joint tenancy. (*Id.* at 18.)  In the wake of those transfers, the assets remaining in the

---

[8]      In her deposition, Center elaborated as follows: "I'm sure at times I may have [paid money] to help them out.  But the support that I'm referring to is my father was very sick. … My father passed away with acute Leukemia.  So he was in and out of the cancer center, and blood transfusions. … The blood transfusions that my dad would have took four hours, the process. … So his care was very time consuming.  And we had to help my mom, because she couldn't handle that." (Doc. 92, Exh. B, at 29-30.)

[9]      The Court takes judicial notice that the closing price of UPS stock on April 30, 2012, was $78.14 per share.  Multiplied across the 25,102 shares that Charles Trammell transferred to the LLCs, that share price yields a valuation exceeding $1.9 million.

defendant Estate of Charles Trammell had a total valuation of $199,700.  (Doc. 92, Exh. C.)[10]
By way of comparison, Charles Trammell had notified Vision Bank in June 2009 that his
personal and jointly owned assets exceeded $4.5 million.  (Braswell Aff., ¶ 12 & Exh. A-9.)

The centerpiece of SEPH's argument on summary judgment is that the Trammells'
transfers of the beach condo and Lake Martin house to the defendant LLCs, and their transfers of
90% of their interests in the LLCs to defendants Center and Brown, were constructive fraudulent
transfers as a matter of law; and that Charles Trammell's transfers of 25,102 shares of UPS stock
to the defendant LLCs, and his transfers of his remaining shares of UPS stock and his interest in
his personal residence to Belinda Trammell upon his death, were likewise constructive
fraudulent transfers.  Those transactions lie at the heart of the pending Motion for Partial
Summary Judgment.

## II.    Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule
56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the
district court, by reference to materials on file, that there are no genuine issues of material fact
that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).
Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to
show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make
'a sufficient showing on an essential element of her case with respect to which she has the burden
of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v.
Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party
has met its burden, the court must stop short of weighing the evidence and making credibility
determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be
believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-
Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).

---

[10]    Those assets included Charles Trammell's 5% interest in Trammell Orange Beach
(valued at $80,000), his 5% interest in Trammell Lake Martin (valued at $90,000), a 1963
Chevrolet Impala (valued at $20,000), a pontoon boat (valued at $5,000), a 2006 Bombadier
Seadoo (valued at $3,000) and additional clothing and personal effects valued collectively at less
than $2,000.

"Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

## III.   Analysis.

### A.   Elements of § 8-9A-5(a) Cause of Action.

As noted, Count Three of the First Amended Complaint asserts a claim against defendants for constructive fraudulent transfer pursuant to Alabama Code § 8-9A-5(a).  That subsection provides as follows: "A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer." Ala. Code § 8-9A-5(a); *see also Baggett v. Baggett*, 870 So.2d 735, 739 (Ala.Civ.App. 2003) ("A constructive fraudulent transfer occurs when a debtor transfers assets to another without consideration, and the debtor was, or became, insolvent at the time of the transfer.") (citations omitted); *SE Property Holdings, LLC v. Braswell*, 2013 WL 4498700, *5 (S.D. Ala. Aug. 21, 2013) (under § 8-9A-5(a), "a transfer is fraudulent if the debtor did not receive 'reasonably equivalent value' and if the debtor was 'insolvent'").

To prevail on Count Three, then, SEPH must prove each of the following elements: (i) that SEPH is a creditor of Charles and Belinda Trammell; (ii) that SEPH's claim against Charles and Belinda Trammell arose before the transfers were made; (iii) that Charles and Belinda Trammell made the transfers without receiving a reasonably equivalent value in exchange; and (iv) that the Trammells were insolvent at the time or became insolvent as a result of the transfers. 1 *Ala. Pattern Jury Instr. Civ.* § 18.20 (3d ed.); *see also Lord Abbett Municipal Income Fund, Inc. v. Southern Farms, Inc.*, 2015 WL 9474287, *8 (M.D. Ala. Dec. 1, 2015) ("Under § 8-9A-5(a), Lord Abbett must establish (1) that its claim arose before the transfers were made, (2) that RDG-II made the transfers without receiving reasonably equivalent value in exchange, and (3) that RDG-II was insolvent at the time of the transfers or became insolvent as a result of the

transfers.").[11]   Inasmuch as defendants dispute SEPH's ability to establish any of these elements (much less all of them), the Court will consider each in turn.

> **B.**    ***The Existence of a Creditor/Debtor Relationship.***

The plain language of the Alabama Uniform Fraudulent Transfer Act (the "AUFTA") requires a creditor/debtor relationship as a prerequisite to a viable constructive fraudulent transfer claim.  *See* Ala. Code § 8-9A-5(a) ("a transfer made by a **debtor** is fraudulent as to a **creditor** …") (emphasis added).  The statute defines "creditor" as "[a] person who has a claim." Ala. Code § 8-9A-1(4).  The term "debtor" is defined as "[a] person who **is liable** on a claim." Ala. Code § 8-9A-1(6) (emphasis added).  And the AUFTA defines "claim" as "[a] right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Ala. Code § 8-9A-1(3).

To satisfy the debtor/creditor element of its § 8-9A-5(a) cause of action, SEPH presents evidence that the Trammells were indebted to it (or its predecessor, Vision Bank) at the time of the challenged transfers.  In particular, SEPH has come forward with competent record evidence to show each of the following: (i) SEPH's predecessor loaned millions of dollars to Bama Bayou, LLC from 2005 to 2007; (ii) in connection with those loans, Charles and Belinda Trammell executed multiple continuing guaranties in favor of SEPH's predecessor, pursuant to which they guaranteed payment of hundreds of thousands of dollars of principal on each loan, all unpaid and accrued interest on each loan, and all costs of collection, including reasonable attorney's fees; (iii) Bama Bayou defaulted on all of those loans; (iv) Charles and Belinda Trammell never paid SEPH or its predecessor the sums they had promised to pay in the continuing guaranties; and (v) the Trammells are presently indebted to SEPH in the sum of millions of dollars in principal, accrued interest and costs of collection.

These record facts are plainly sufficient to satisfy SEPH's initial burden on summary judgment of showing that it is a creditor and that the Trammells are debtors within the meaning

---

[11]    Notably, the transferor's intent is not relevant to the analysis of a claim brought under Alabama Code § 8-9A-5(a).  *See, e.g., McPherson Oil Co. v. Massey*, 643 So.2d 595, 596 (Ala. 1994) ("without regard to the actual intent of the grantor, the law infers constructive fraud when it appears that an indebted grantor has conveyed property to a family member without receiving valuable consideration").

the Alabama Uniform Fraudulent Transfer Act.  *See Clark*, 929 F.2d at 608 ("The moving party

bears the initial burden to show the district court, by reference to materials on file, that there are

no genuine issues of material fact that should be decided at trial.").  The foregoing facts (as to

each of which SEPH has made a showing via record evidence) would entitle SEPH to a directed

verdict if not contradicted at trial; indeed, those facts (if not rebutted) show that the Trammells

executed binding, enforceable guaranties in SEPH's favor, then failed or refused to pay when the

borrowers defaulted.[12]  Thus, SEPH has met its burden of making an affirmative showing of the

absence of a genuine issue of material fact for purposes of the debtor/creditor element.  *See Rich*

*v. Secretary, Florida Dep't of Corrections*, 716 F.3d 525, 530 (11th Cir. 2013) ("When the

*moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a

genuine issue of material fact: it must support its motion with credible evidence that would

entitle it to a directed verdict if not controverted at trial.") (citation omitted); *Burger King Corp.*

*v. E-Z Eating, 41 Corp.*, 572 F.3d 1306, 1313 (11th Cir. 2009) (summary judgment movant

"always bears the initial responsibility of … identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, which it believes demonstrate the absence of a genuine issue of material fact") (citation

omitted).

SEPH having met its initial burden as to the debtor/creditor element of its § 8-9A-5(a)

cause of action, the burden shifts to defendants to demonstrate the existence of genuine issues of

material fact.  *See Clark*, 929 F.2d at 608 (after movant meets initial burden, "the burden shift[s]

to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes

summary judgment").  In their brief, defendants state in conclusory fashion that "SEPH has

failed to prove that it has a right to payment from the Estate of Charles Trammell and Belinda

Trammell."  (Doc. 100, at 3.)  In the context of the relevant Rule 56 analysis, however, that

argument is unpersuasive.  SEPH's evidence shows that the Trammells made promises to pay

Vision Bank, that they failed to fulfill those obligations, that they transferred certain assets to the

---

[12]    Such guaranties are enforceable under Alabama law like any other contracts.  *See,*
*e.g., Eagerton v. Vision Bank*, 99 So.3d 299, 304 (Ala. 2012) ("Rules governing the
interpretation and construction of contracts are applicable in resolving a question as to the
interpretation or construction of a guaranty contract. … Absent fraud in the inducement, an
absolute guaranty will be enforced according to its terms …..") (citations omitted).

other defendants (the LLCs, Center and Brown) after SEPH attempted to enforce those promises to pay, and that they continue to owe SEPH millions of dollars today.  If no other evidence were presented at trial, that showing would establish that the Trammells were liable on SEPH's claim for payment.  Thus, that evidence (if uncontroverted) would entitle SEPH to a directed verdict on the issue of whether it was a "creditor" for AUFTA purposes, and whether the Trammells were "debtors" for AUFTA purposes, at the time of the challenged transfers.  Accordingly, defendants cannot withstand summary judgment on this point by making an unsupported blanket statement that SEPH has not proven a right to payment.  On the evidence before the Court, it has.  If there is other evidence casting doubt – or creating genuine issues of material fact – on the existence of such a right to payment, then it is incumbent on defendants to submit it as part of the summary judgment record.

Stated differently, to meet their burden and defeat SEPH's summary judgment motion, defendants must come forward with evidence demonstrating the existence of a triable issue of fact.  *See Rich*, 716 F.3d at 530 ("If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, comes forward with ***significant, probative evidence demonstrating the existence of a triable issue of fact***") (emphasis added and citation omitted).[13]  Of course, "[a] factual dispute is genuine only if a reasonable jury could return a verdict for the nonmoving party." *Information Systems and Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  Defendants allude to the question of SEPH's "right to payment" as one that "is being extensively litigated and vigorously contested in the" *Bama Bayou* Action in state court.  (Doc. 100, at 4.)  Merely making such a statement, however, does not discharge defendants' burden on summary judgment in this case.  To defeat summary judgment on the creditor/debtor element of Count Three, defendants must come forward with evidence demonstrating the existence of a triable fact on the question of

---

[13]     *See also Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010) ("Once the movant adequately supports its motion, the burden shifts to the nonmoving party to ***show that specific facts exist*** that raise a genuine issue for trial.") (emphasis added); *Burger King*, 572 F.3d at 1313 ("If the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the non-movant to show the existence of a genuine issue of fact."); *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006) ("To survive a motion for summary judgment, the nonmoving party must demonstrate that there is a genuine issue for trial.") (citation and internal quotation marks omitted).

whether the Trammells owed money to SEPH when the allegedly fraudulent transfers were made.  Defendants have cited no evidence.  They have explained neither the legal nor the factual grounds for their objections in the *Bama Bayou* Action to SEPH's claim for payment.[14]  Simply put, defendants have not met their burden on summary judgment here.  Accordingly, for Rule 56 purposes, the Court concludes that SEPH is entitled to judgment as a matter of law on the creditor/debtor element of its § 8-9A-5(a) claim set forth in Count Three of the First Amended Complaint.

### C.   *The Timing of Plaintiff's Claim and the Trammells' Transfers.*

The second element of SEPH's claim asserted under Alabama Code § 8-9A-5(a) is that plaintiff must establish that its claim "arose before the transfer was made."  The summary judgment record unambiguously demonstrates that this element is satisfied.  Plaintiff's evidence, which has been neither controverted nor opposed by defendants, reveals the following timetable: The Trammells executed guaranties in favor of Vision Bank in 2005, 2006 and 2007.  The borrower (Riverwalk / Bama Bayou) defaulted.  Vision Bank demanded payment from the Trammells and others.  When no such payment was forthcoming, Vision Bank filed suit against them in state court in January 2009.  The Trammells transferred their interests in the beach condo, the Lake Martin house, the LLCs, and the UPS stock during the period of January 2011 through October 2013.  Given this unrebutted factual showing, no reasonable finder of fact could conclude that SEPH's claim did not arise before the subject transfers were made.  This element of Count Three is plainly satisfied.  Defendants do not maintain otherwise.

---

[14]     It appears that defendants are placing all their eggs in the "right to payment" basket.  Certainly, it is true that, for purposes of establishing whether one is a debtor or creditor, the AUFTA defines "claim" as requiring a "right to payment."  *See* Ala. Code § 8-9A-1(3). However, the statute clarifies that the "right to payment" qualifies as a claim for AUFTA purposes "whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.*  It is not necessary for SEPH to have received a judgment in the *Bama Bayou* Action that the Trammells owed it money; rather, it suffices for SEPH to make an unrebutted showing in this action based on record facts that the Trammells owed money to SEPH (or its predecessor) when they made the subject transfers.  Plaintiff has made that affirmative showing here, and defendants have not discharged their burden of rebutting it with evidence showing the existence of a genuine factual dispute.

**D.** *Whether the Trammells Received a Reasonably Equivalent Value.*

The third element of a constructive fraud claim brought pursuant to Alabama Code § 8-9A-5(a) is that the Trammells must have made the transfers "without receiving a reasonably equivalent value in exchange for the transfer." This element is hotly debated in the parties' summary judgment briefs. For its part, SEPH relies on undisputed record facts that no money or property was given to Charles and Belinda Trammell in exchange for the beach condo and Lake Martin house when they transferred such real property to the LLCs; that no money or property was given to the Trammells in exchange for the 90% interest in the two LLCs that they transferred to their daughters (Center and Brown); and that no money or property was given to Charles Trammell in exchange for the thousands of shares of UPS stock that he transferred to the LLCs, or the remaining UPS stock and primary residence that he transferred to Belinda Trammell upon his death. In response, defendants criticize SEPH's argument as championing an excessively narrow definition of "value," and contend that the requisite value was exchanged in the form of support, tax savings and better asset management.

The appropriate analytical starting place is, of course, the statute itself. Alabama's version of the Uniform Fraudulent Transfer Act provides as follows: "Value is given for a transfer if, in exchange for the transfer, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise to furnish support to the debtor." Ala. Code § 8-9A-3(a). Where, as here, the transfers were made between family members, with the Trammells transferring property to their daughters (and/or to LLCs whose ownership was also largely transferred to those same daughters), the Alabama Supreme Court instructs that the "value" element must be scrutinized with particular care.[15]

---

[15]   *See, e.g., Reese v. Smoker*, 475 So.2d 506, 508 (Ala. 1985) ("The Court recognizes that conveyances of property between family members in the face of a pending suit against the transferor must be carefully scrutinized."); *Waddle v. Great Southern Phosphate Co.*, 63 So. 462 (Ala. 1913) ("Where the contract is between near relations, as between husband and wife, father and son, and the like, it will be subjected to a closer scrutiny … than if the parties to it were strangers. … Such purchases are so often made a cover for a debtor's property, are so frequently resorted to for the purpose of withdrawing his property from the reach of his creditors and preserving it for his own use, and they hold forth such temptations for fraud, that they require close scrutiny.") (citations omitted).

Significantly, it is incorrect to equate the AUFTA concept of "reasonably equivalent value" with the common-law notion of consideration. In the AUFTA constructive-fraud context, Alabama courts distinguish between "valuable consideration" (which does not give rise to a constructive fraudulent transfer) and merely "good consideration" (which can). *See, e.g., McPherson Oil Co. v. Massey*, 643 So.2d 595, 596 (Ala. 1994) ("[T]he law infers constructive fraud when it appears that an indebted grantor has conveyed property to a family member without receiving valuable consideration."); *Reese v. Smoker*, 475 So.2d 506, 508 (Ala. 1985) ("The term 'constructive fraud' is generally used in referring to those instances where a grantor, indebted at the time, conveys property on a good as distinguished from a valuable consideration."). Where, as here, the creditor has made a showing on summary judgment that the grantees paid no money or property to the grantors in exchange for the transferred asset, an inference of constructive fraud arises; therefore, defendants bear the burden of proving the existence of valuable and adequate consideration. *See McPherson Oil*, 643 So.2d at 596 ("When that inference of constructive fraud arises, the burden then shifts to the grantee to prove the existence of such consideration."); *Reese*, 475 So.2d at 508 ("The burden is upon the grantee to show a consideration both valuable and adequate.") (citation omitted).

In evaluating whether valuable – as opposed to simply good – consideration has been given for a challenged transfer, the Uniform Fraudulent Transfer Act as adopted in Alabama (and other jurisdictions, for that matter) contemplates that courts must examine the nature and adequacy of the consideration from the standpoint of the creditor, not that of the debtor or the transferee of the subject property. In that regard, the Comments to the Uniform Fraudulent Transfer Act clarify that "[v]alue is to be determined in light of the purpose of the Act to protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors. ***Consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition***." Uniform Fraudulent Transfer Act 1984, § 3, comment 2 (emphasis added). Courts have embraced this principle. As one federal court applying Alabama's version of the Uniform Fraudulent Transfer Act explained, "Whether a debtor received reasonably equivalent value is to be determined in light of the AUFTA's purpose – to protect creditors. … Accordingly, the value of consideration given for an alleged fraudulent transfer is determined from the standpoint of the

debtor's creditors." *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 667 (N.D. Tex. 2011) (citations omitted).[16]

Defendants' primary argument on summary judgment is that reasonably equivalent value was given by defendants Brown and Center for their parents' transfers of the beach condo, the Lake Martin house, the UPS stock and the LLCs because Brown and Center furnished "emotional support" to Charles and Belinda Trammell.  In particular, defendants rely on Center's deposition testimony that she and her sister provided emotional support to the Trammells while Charles Trammell was undergoing difficult blood transfusions and Belinda Trammell was experiencing health issues of her own.  The first, most glaring shortcoming with this argument is that Alabama's Uniform Fraudulent Transfer Act expressly excludes unperformed promises of support from the definition of "value" given for a transfer.  *See* Ala. Code § 8-9A-3(a) ("value does not include an unperformed promise to furnish support to the debtor").  Thus, promises of future support have been deemed insufficient as a matter of law to constitute "reasonably equivalent value" for a debtor's asset transfers to a third party.  *See, e.g., In re Ventimiglia*, 362 B.R. 71, 83 (Bankr.E.D.N.Y. 2007) ("In general, a promise of future support is not considered a fair equivalent of property transferred."); *Springfield Ins. Co. v. Fry*, 267 F. Supp. 693, 696

---

[16]     *See also In re TransTexas Gas Corp.*, 597 F.3d 298, 306 (5th Cir. 2010) ("To measure reasonably equivalent value, we judge the consideration given for a transfer from the standpoint of creditors. … The proper focus is the net effect of the transfers on the debtor's estate, [and] the funds available to the unsecured creditors.") (citations omitted); *In re Sergio*, 552 B.R. 9, 21 (Bankr.D. Mass. 2016) ("[A] determination of whether indirect benefits suffice as fair consideration turns on whether the debtor's net worth has been preserved and creditors' interests have not been injured as a result of the transfers.") (citation omitted); *In re David Cutler Industries, Ltd.*, 502 B.R. 58, 73 (Bankr.E.D. Pa. 2013) (for UFTA purposes, "the court determines whether value was received from the vantage of the creditor," and the "touchstone" of the "reasonably equivalent value" analysis is "whether the parties exchanged comparable realizable commercial value") (citation omitted); *In re Blixseth*, 489 B.R. 154, 184 (Bankr.D. Mont. 2013) ("in the context of the California Fraudulent Transfer Act … reasonably equivalent value must be determined from the creditors' standpoint, not from the debtor's"); *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 337 (S.D. Tex. 2008) (under Delaware's version of UFTA, "[t]he determination of whether the debtor received REV should be made from the standpoint of the debtor's creditors, by looking at the net effect of the transfer on the unsecured creditors"); *In re 3dfx Interactive, Inc.*, 389 B.R. 842, 863 (Bankr.N.D. Cal. 2008) ("Because the policy behind fraudulent conveyance law is to preserve assets of the estate, reasonably equivalent value is determined from the standpoint of the estate's creditors, it is not determined from the defendant's perspective.").

(N.D. Okla. 1967) ("ordinarily a transfer of property in consideration of future support is held to be invalid, at any rate, as to existing creditors whose rights are prejudiced by such transfer"); *American Surety Co. of New York v. Edwards & Bradford Lumber Co.*, 57 F. Supp. 18, 27 (N.D. Iowa 1944) ("That a conveyance by an insolvent in consideration of future support is void so far as it puts the property of the grantor out of the reach of creditors, is well settled.") (citation omitted).[17]

A larger, more fundamental problem with defendants' reliance on "emotional support" as constituting reasonably equivalent value for the transfer of millions of dollars of real property and UPS stock shares from the Trammells to their daughters lies in the legal requirement that value be viewed from the standpoint of the creditor, not the debtor.  As the above-cited authorities demonstrate, consideration having no utility from a creditor's vantage point may be "good" consideration supporting a valid contract, but it cannot constitute reasonably equivalent value under § 8-9A-5(a), as a matter of law.  Courts in Alabama and elsewhere routinely find no reasonably equivalent value where the consideration is cited as love and affection, a moral obligation, or some other intangible psychological benefit to the debtor, for the simple reason that such consideration (while it might be "good") lacks "value" from a creditor's standpoint, such that the exchange injures creditors' interests.  Pursuant to that line of reasoning, the Alabama Supreme Court has repeatedly "held that a conveyance given in return for 'love and

---

[17]     On summary judgment, defendants make much of the word "unperformed" in the statutory definition, insisting that there is no evidence that the support given by Brown and Center was "future support or [an] unperformed promise to furnish support."  (Doc. 100, at 18.) This argument is unavailing.  If, at the time the transfers were made, the support had already been given, then that support could not constitute valuable consideration absent evidence of a previous agreement (*i.e.*, Brown and Center agree to provide emotional support in 2009 and 2010, and the Trammells agree to transfer property to them in 2011), none of which is found in the summary judgment record.  If defendants are suggesting that Brown and Center's past support somehow created a moral obligation for the Trammells to transfer property to them, that argument fails as a matter of law.  *See, e.g., Rubenstein v. C.I.R.*, 134 T.C. 266, 277-78 (2010) ("Petitioner suggests that his father had a moral obligation to compensate him for his caregiving. The satisfaction of a moral obligation, however, does not constitute 'value' within the meaning of the FUFTA.").  Although they have been vague in their briefs, defendants' theory is apparently that the Trammells gave property to their daughters in exchange for their daughters providing emotional support to them thereafter.  That kind of "unperformed promise to furnish support" (at the time the transfer was made) cannot constitute reasonably equivalent value for AUFTA purposes, as a matter of law.

affection' is supported by 'good,' rather than 'valuable' consideration, and is thus a voluntary conveyance and void against existing creditors."  *McPherson Oil*, 643 So.2d at 596 (citations omitted); *see also Matter of Treadwell*, 699 F.2d 1050, 1051 (11th Cir. 1983) ("Even if the love and affection of the daughters for their father increased $4,000 worth, it is of no benefit to the creditors.  That his love and affection for them motivated the gift does not satisfy the intent of the statute, … [which is] to prevent the debtor from depleting the resources available to creditors through gratuitous transfers of the debtor's property."); *In re Earle*, 307 B.R. 276, 292 n.7 (Bankr.S.D. Ala. 2002) ("The Court notes that conveyances made only in return for 'love and affection' are deemed to be made for good, but not valuable, consideration under Alabama state law for fraudulent transfer purposes.").[18]  Simply put, then, any promises by Brown and Center

---

[18]        Courts in other states construing similar language drawn from the Uniform Fraudulent Transfer Act or its analogues have likewise cast a jaundiced eye on arguments that a family member's love, affection, emotional support or psychic satisfaction may amount to a "reasonably equivalent value" for fraudulent transfer purposes.  *See, e.g., In re Marlar*, 252 B.R. 743, 760 (8th Cir. BAP 2000) ("Since the question of fair consideration as it pertains to an alleged fraudulent conveyance must be determined from the standpoint of creditors … it is clear that no fair equivalent is exchanged when the conveyance is simply for natural love and affection.  The creditor's interest will not be protected since the debtor's property has departed without any fair equivalent taking its place.") (citation omitted); *Federal Refinance Co. v. Klock*, 352 F.3d 16, 24 (1st Cir. 2003) ("And although [debtor's] brief includes a perfunctory assertion that the transfer was in fact adequately supported by the love and affection of his children, he points us to no case law that suggests that, for purposes of the UFCA, such intangibles may supplant money, property, or satisfaction of an antecedent debt as fair consideration."); *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 574 (Tex. 2016) ("[L]ove and affection, and other types of consideration that have no utility from a creditor's viewpoint, do not confer value for an exchange.  Rather, consideration must go beyond some speculative, ephemeral[,] psychic satisfaction to constitute value or reasonably equivalent value.") (internal quotation marks and footnotes omitted); *United States v. Major*, 551 B.R. 531, 541 (M.D. Fla. 2016) ("transfers of money or property to a family member in exchange for 'love and affection' do not constitute reasonably equivalent value"); *Mann v. Hanil Bank*, 920 F. Supp. 944, 954 (E.D. Wisc. 1996) ("These benefits, to constitute 'reasonably equivalent value' under the Wisconsin statute, must go beyond some speculative, ephemeral psychic satisfaction that might result from doing a favor for a friend."); *In re Young*, 152 B.R. 939, 949 (D. Minn. 1993) ("emotional support received in exchange for a transfer, without more, cannot satisfy the requirement for reasonably equivalent value"); *In re Simione*, 229 B.R. 329, 335 (Bankr.W.D. Penn. 1999) ("where a conveyance of property is made in consideration of an agreement to support the grantor in the future, it is invalid as to creditors if by the conveyance the grantor renders himself unable to pay his debts") (citation omitted); *In re Guerrera*, 225 B.R. 32, 36 (Bankr.D. Conn. 1998) ("[i]t has been determined that intangible, psychological benefits do not constitute reasonably equivalent (Continued)

to provide emotional support to their parents subsequent to the subject transfers, or any gratitude, love, affection or sense of moral obligation felt by the Trammells for their daughters' past support, may or may not constitute "good" consideration for the transfers, but they do not and cannot as a matter of law rise to the level of "valuable" consideration from the standpoint of creditors, which is the operative query in a constructive fraudulent transfer analysis.

Defendants' alternative arguments for "reasonably equivalent value" fare no better. Specifically, they maintain that the Trammells received reasonably equivalent value in the form of "tax savings" and "better asset management."  (Doc. 100, at 17.)  To support this theory, defendants point to a letter from the Trammells' lawyer dated January 11, 2010, in which the lawyer advised the Trammells that "[b]eginning a gifting program with your children, grandchildren, and in-laws could also help lower estate taxes, protect assets, and allow better asset management."  (Doc. 100, Exh. 5, at 3.)  The problem, once again, is that the Trammells' creditors (and, particularly, SEPH) did not benefit from these transfers in the specified (or any) ways.  That the Trammells may have enjoyed favorable tax treatment and "better asset management" (whatever that means)[19] by transferring their beach condo, their Lake Martin

---

value") (citations and internal quotation marks omitted); *Doe v. Ewing*, 517 N.W.2d 849, 850-51 (Mich.App. 1994) ("Gifts or the satisfaction of moral obligations do not constitute equivalent value for purposes of determining whether the conveyance was fraudulent."); *Jahner v. Jacob*, 252 N.W.2d 1, 5-6 (N.D. 1977) ("Love and affection is a sufficient consideration for a deed. … But 'love and affection' is not that 'fair consideration' required by [the UFCA]. … [C]onveyances to family members for love and affection have frequently been held fraudulent as to creditors.") (citations omitted); *Royal Indem. Co. v. McClendon*, 323 P.2d 1090, 1092 (N.M. 1958) ("By the weight of authority a transfer of property in consideration of future support is held to be invalid when the rights of existing creditors are thereby prejudiced.").  And the Comments to the Uniform Fraudulent Transfer Act on the topic of "value" explain that "[t]he definition does not specify all the kinds of consideration that do not constitute value for the purposes of this Act – *e.g.*, love and affection."  Uniform Fraudulent Transfer Act 1984, § 3, comment 2.

[19]  By all appearances, "better asset management" is another way of saying "place your assets beyond the reach of your creditors," which is precisely the sort of practice that the AUFTA was enacted to prevent.  And if "tax savings" were valuable consideration under the AUFTA, then no transfer could ever be constructively fraudulent as long as it funneled assets from a more wealthy to a less wealthy family member.  That result would frustrate the statute's purpose.

-19-

house, their LLC interests, and their UPS stock shares to their daughters had no utility – and yielded absolutely no value – for their creditors.  Under the AUFTA, "value" is gauged in light of the statute's purpose of protecting creditors from being prejudiced by the depletion of a debtor's assets.  The above-cited transfers served to deplete the Trammells' assets to a considerable degree, with no countervailing utility or benefit to creditors; therefore, notions of "tax savings" and "better asset management" from the Trammells' perspective do not furnish the necessary reasonably equivalent value or valuable consideration necessary to pass muster under § 8-9A-5(a).[20]

For all of the foregoing reasons, the Court finds on this record as a matter of law that the Trammells did not receive a reasonably equivalent value for any of the subject transfers.  Therefore, SEPH has satisfied the third element of its claim for constructive fraudulent transfer set forth in Count Three of the First Amended Complaint.

###### E.    Whether the Trammells Were Insolvent at the Time of the Transfers.

The fourth element of a constructive fraudulent transfer cause of action brought under § 8-9A-5(a) is that plaintiff must establish that "the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer."  Ala. Code § 8-9A-5(a).  The statute provides that

---

[20]     Defendants' reliance on *In re Northlake Foods, Inc.*, 715 F.3d 1251 (11th Cir. 2013), for the proposition that tax benefits constitute reasonably equivalent value for a transfer is misplaced.  In *Northlake Foods*, the Eleventh Circuit reiterated that "[t]he purpose of voiding transfers unsupported by reasonably equivalent value is to protect creditors against the depletion of a bankrupt's estate," but that a transfer should not be voided where "the debtor's net worth has been preserved, and the interests of the creditors will not have been injured by the transfer."  *Id.* at 1255-56.  Under the specific circumstances alleged in the pleading, the *Northlake Foods* panel concluded that this test was satisfied.  Here, however, the test is not satisfied.  Notwithstanding their purported goals of "tax savings" and "better asset management," the Trammells depleted their assets without preserving their net worth, all at great injury to their creditor, SEPH.  Whatever tax benefits the Trammells might have enjoyed from their "gifting program" did not redound to the benefit of their creditors or preserve assets from which SEPH could collect the millions of dollars owed by the Trammells; to the contrary, those transfers drained the Trammells' coffers without replacing the transferred assets with anything approaching equivalent value.  Under *Northlake Foods*, the result of the analysis in this case is thus unchanged.  Also, it bears noting that the reasonably equivalent value issue in *Northlake Foods* was being addressed at the pleadings stage, not at summary judgment. Unlike the Court in the case at bar, the Eleventh Circuit in *Northlake Foods* was constrained to accept as true all factual allegations in the complaint (including benefit allegations set forth in the pleading), and did not have access to the clarifying vehicle of discovery to make a reasonably equivalent value determination.

"[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."  Ala. Code § 8-9A-2(a); *see also Kaye*, 453 B.R. at 668 ("Under the AUFTA, a debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.") (citation and internal quotation marks omitted).  On summary judgment, the parties vigorously dispute whether the AUFTA's test for "insolvency" was satisfied at the time of the subject transfers.

In an attempt to bypass the need to weigh the Trammells' debts and assets at the time of the transfers, SEPH invokes the statutory presumption of insolvency, to-wit: "A debtor who is generally not paying his debts as they become due is presumed to be insolvent."  Ala. Code § 8-9A-2(b).  However, SEPH has not made a showing on summary judgment sufficient to support a conclusion as a matter of law that the Trammells were "generally not paying [their] debts as they bec[a]me due."  The only evidence submitted by SEPH on this point is testimony that the Trammells did not fulfill their guaranty obligations when Vision Bank demanded payment in or around early 2009.  (*See* Braswell Aff., ¶¶ 6-8.)  That showing leaves many relevant questions unanswered.  As the comments to the Uniform Fraudulent Transfer Act explain:

> "In determining whether a debtor is paying its debts generally as they become due, the court should look at more than the amount and due dates of the indebtedness.  The court should also take into account such factors as the number of the debtor's debts, the proportion of those debts not being paid, the duration of the nonpayment, and the existence of bona fide disputes or other special circumstances alleged to constitute an explanation for the stoppage of payments."

Uniform Fraudulent Transfer Act 1984, § 2, comment 2.  On the summary judgment record presented, the Court has no information about the number of the Trammells' debts, the proportion of those debts not being paid, the duration of nonpayment and so on.  On this record, the Court likewise cannot evaluate whether the Trammells did or did not have "bona fide disputes or other special circumstances" that might have influenced their stoppage of payments on the Bama Bayou / Riverwalk and Marine Park loans.[21]  Simply put, SEPH (as the movant on

---

[21]     The Court is aware, of course, that a central issue being litigated in the *Bama Bayou* Action pending in state court since 2009 is whether the Trammells were actually indebted on the subject guaranties, and if so to what extent.  On the summary judgment record presented, the Court cannot evaluate whether the Trammells' dispute over liability in the *Bama Bayou* Action is or is not grounded in a bona fide dispute.  On this fragmentary evidentiary showing, the Court cannot make a definitive finding on summary judgment as to whether the Trammells were generally paying their debts as they became due.

summary judgment) has not come forward with proof that there is no genuine issue of material fact and that the Trammells were generally not paying their debts as they became due at the time of the challenged transfers of the beach condo, the Lake Martin house, the LLC interests, the primary residence and the UPS stock.  As such, the Court cannot find on summary judgment that AUFTA's presumption of insolvency set forth at Alabama Code § 8-9A-2(b) is applicable here.

In the absence of a statutory presumption of insolvency, the critical question for purposes of the insolvency element is whether the sum of the Trammells' debts was greater than their assets at a fair valuation at the time of the subject transfers.  To shoulder its summary judgment burden, SEPH presents evidence tabulating in detail Charles and Belinda Trammell's assets and liabilities immediately after each challenged asset transfer (*i.e.*, the beach condo and Lake Martin house transfers on January 26, 2011; the LLC membership interest transfers on December 12, 2011; the UPS stock transfer on April 25, 2012; and the UPS stock and principal residence transfer on October 24, 2013).  In its principal brief, SEPH offers charts summarizing the evidence for each line item of assets and liabilities.  (Doc. 91, at 13-21.)  In each instance, SEPH's evidence reflects that Charles and Belinda Trammell's liabilities exceeded their assets by a wide margin after the transfer took place, so as to satisfy the statutory definition of insolvency.[22]

In response, defendants advance three specific criticisms against the validity of SEPH's calculations of the Trammells' assets and liabilities.  First, defendants contend that the liability figures used by SEPH are inflated by millions of dollars in interest and collection costs on the Bama Bayou debt that they believe the Mobile County Circuit Court will set aside in the *Bama Bayou* Action.  This objection centers on a ruling issued by Circuit Judge Stewart in *Bama Bayou* on October 26, 2016, setting aside certain foreclosure sales performed by Vision Bank in

---

[22]     Specifically, SEPH's calculations (again, grounded in cited record evidence) show that as of January 26, 2011, Charles Trammell's assets were fairly valued at $2.81 million while his debts were $4.58 million; that on the same date, Belinda Trammell's assets were fairly valued at $0.35 million while her debts were $1.68 million; that as of December 12, 2011, Charles Trammell's assets were fairly valued at $2.71 million as compared to debts of $6.02 million; that on the same date Belinda Trammell's assets were fairly valued at $0.31 million as compared to debts of $2.24 million; that as of April 25, 2012, Charles Trammells' assets were fairly valued at $0.83 million, while his debts were $5.36 million; and that after the transfers upon his death on October 24, 2013, Charles Trammell's Estate's assets were $29,700 as compared to debts of $6.61 million.

March 2009.  (Doc. 100, Exh. 1.)  After commencing the *Bama Bayou* Action in January 2009, Vision Bank foreclosed on real property securing its loans to Bama Bayou and Marine Park, and ultimately purchased that property through credit bids.  (Braswell Aff., ¶ 7.)  Judge Stewart ruled in October 2016 that Vision Bank's credit bids were "on their face so grossly inadequate as to shock the judicial conscience," and that "the extremely low bids at the foreclosure sale raise the presumption of unconscionableness and the grossly inadequate prices coupled with substantial evidence of misconduct justifies setting aside the foreclosure sale."  (Doc. 100, Exh. 1, at 2.)  On that basis, she "set[] aside the foreclosure sale and declare[d] the foreclosure deeds null, void and of no force and effect."  (*Id.*)

Defendants' argument is that SEPH's liability calculations for insolvency purposes fail to take into account the effect of the state court order, whose likely corollary (according to defendants) is that interest and collection costs accruing after those March 2009 foreclosure sales will be set aside.[23]  In so arguing, defendants point to provisions in the relevant mortgage documents for the real property on which foreclosures were set aside, which provisions specify that the status quo will be restored if foreclosure proceedings are determined adversely to the lender.[24]  If the status quo must be restored, then that implies that SEPH should not be able to claim as costs of collection the attorney's fees it incurred in the foreclosure battle.[25]  At the very

---

[23]     Defendants posit that one effect of the "grossly inadequate" credit bids by Vision Bank was to create the illusion of millions of dollars in indebtedness that did not exist (or would not have existed had Vision Bank made reasonable, fair bids at the foreclosure sales).  Thus, according to defendants, interest was computed based on the grossly inflated debt figure, and collection costs were incurred in the course of SEPH's attempts to defend its "grossly inadequate" credit bids and collect that grossly inflated debt figure.  And the resulting inflated interest and collection costs were plugged into the asset/liability analysis by SEPH as proof of the Trammells' insolvency here.

[24]     Representative of those clauses is the following contract language: "In case the Lender shall have proceeded to enforce any right or remedy under this Mortgage by foreclosure … and such proceedings … shall have been determined adversely to the Lender, then and in every such case ***the Borrower and the Lender shall be restored to their former positions and rights hereunder*** … as if no such proceeding had been taken."  (Doc. 100, Exh. 3, § 2.14 (emphasis added).)

[25]     There is also a reasonable argument to be made that accrued interest should be ratcheted downward because the amount of principal remaining on the loans would have been substantially lower had Vision Bank made reasonable bids at the foreclosure sales.  The
(Continued)

least, Judge Stewart's ruling in the *Bama Bayou* Action appears to affect the "liability" side of the ledger for Charles and Belinda Trammell in significant and material ways, yet SEPH's calculations do not take it into account.

Second, defendants maintain that SEPH's asset/liability calculations are flawed because the liability side of the ledger includes hundreds of thousands of dollars of attorney's fees whose reasonableness is contested. Recall that, as part of the Limited Continuing Guaranties they signed, the Trammells agreed to be responsible for Vision Bank / SEPH's costs of collection, including "reasonable" attorney's fees.[26] On their face, these agreements limit the Trammells' exposure to only those attorney's fees that are "reasonable." Even if such a limitation were not supplied by contract terms, it would be implied by Alabama law as a matter of public policy.[27] As a general proposition, "[t]he starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1350 (11th Cir. 2008) (internal citations and quotation marks omitted). Defendants correctly observe that SEPH has made no such evidentiary showing of reasonableness, but instead appears to have lumped all attorney's fees it

─────────────────────

counterargument, however, is that "status quo" could be construed as meaning that interest accrues on the full amount of principal (unreduced by any actual or hypothetical foreclosure sale proceeds) from March 2009 through the present day. In that event, of course, accrued interest (and, hence, the Trammells' liabilities) would be higher, not lower, than SEPH's calculations. The Court expresses no opinion as to the proper means of implementing the "status quo" provisions in the mortgages in light of the ruling in the *Bama Bayou* Action setting aside the foreclosure sales as unconscionable.

[26]     For example, in the May 2006 guaranties they executed as to the Riverwalk loan, each of Charles and Belinda Trammell agreed to the following provision: "Guarantor agrees to pay reasonable actual attorney's fees and all other costs and expenses which may be incurred by the Bank in the enforcement of this Guaranty." (Doc. 92, Exh. A-3 at ¶ 10.) Other relevant guaranties include similar language.

[27]     *See, e.g., Willow Lake Residential Ass'n, Inc. v. Juliano*, 80 So.3d 226, 241 (Ala.Civ.App. 2010) ("Alabama law reads into every agreement allowing for the recovery of attorney's fees a reasonableness limitation."); *Branch Banking and Trust Co. v. Howard*, 2013 WL 951652, *6 (S.D. Ala. Mar. 8, 2013) ("Alabama law imposes a reasonableness constraint on all fee-shifting contracts, as a matter of public policy.").

has incurred into the "costs of collection" column as a conclusory total on the liability side of the ledger.

Third, defendants take aim at SEPH's "assets" calculations by asserting that SEPH has systematically excluded the Trammells' interests in limited liability companies, to-wit: Gulf World, LLC; Bama Bayou, LLC; Trammell Family Orange Beach Properties, LLC; and Trammell Family Lake Martin Properties, LLC. Particularly significant, defendants argue, is Gulf World, LLC, the entity that purportedly owns the Bama Bayou parcels as to which the foreclosure sales were set aside by the *Bama Bayou* order. Because those foreclosure sales were set aside, defendants reason, Gulf World must be construed as owning those parcels (which are worth millions of dollars) at all relevant times, including the dates of the challenged transfers by the Trammells.[28] The result, defendants maintain, is that the "asset" side of the ledger proposed by SEPH in its insolvency analysis drastically understates the Trammells' assets at the time of the challenged transfers.[29]

---

[28]     As evidence of the value of the parcels, defendants refer to pleadings from the *Bama Bayou* Action, which in turn cite appraisals showing those parcels were valued at a minimum of $25,697,000 as of April 2009. (Doc. 100, Exh. 2, ¶ 166.) Such evidence is not admissible in its present form; nonetheless, it is properly considered on summary judgment because all indications are that defendants can reduce it to admissible form (via the appraisals and/or appraisers themselves) at trial. *See* Rule 56(c)(2), Fed.R.Civ.P. (recognizing that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"); *Brannon v. Finkelstein*, 754 F.3d 1269, 1277 n.2 (11th Cir. 2014) (hearsay statement "should be considered on summary judgment here because it can be reduced to an admissible form at trial").

[29]     SEPH's counterarguments are not persuasive on summary judgment. First, SEPH argues that the Trammells' interests in the LLCs do not qualify as "assets" within the meaning of the AUFTA. In particular, plaintiff reasons that the statute defines an "asset" as "[p]roperty of a debtor," but excludes "[p]roperty to the extent it is generally exempt under nonbankruptcy law." Ala. Code § 8-9A-1(2)(b); *see also Wheeler Bros. Inc. v. Jones*, 167 F. Supp.3d 1283, 1301 (M.D. Ala. 2016) ("The definition of 'asset' under Ala. Code § 8-9A-1 states that it is property of the debtor but does not include property to the extent that it is exempt under non-bankruptcy law."); *Flirt v. Kirkpatrick*, 175 So.2d 755, 758 (Ala. 1965) ("A sale or other disposition of property which is by law exempt from payment of debts cannot be impeached by creditors as fraudulent, since creditors cannot be deemed concerned with property not subject to their demands."). A basic defect with this argument is that the Trammells waived any exemptions that might otherwise be available. *See, e.g.*, doc. 92, Exh. A-3, ¶ 10 ("Guarantor hereby waives any rights of exemption, both as to personal and real property, under the Constitution or laws of the United States, the State of Alabama, or any other state or jurisdiction as to any debt, liability or (Continued)

The cumulative effect of all of these objections is to create considerable uncertainty as to whether "the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation," as necessary to establish insolvency under the AUFTA. An example illustrates the point. On January 26, 2011 (the date on which the Trammells transferred their interests in the beach condo and the Lake Martin house to family-owned LLCs), the summary judgment record reflects Charles Trammell's debts consisted of $1.775 million in principal that he guaranteed on the Bama Bayou, Marine Park and Sundance debts, plus interest and collection costs. (Braswell Aff., ¶ 13.) Plaintiff's evidence identifies $1,818,806.09 in accrued interest and late fees, as well as $977,332.53 in costs of collection. But the October 26, 2016 order in the *Bama Bayou* Action

---

obligation hereunder."). By all appearances, the effect of that waiver is to render the Trammells' interests in LLCs not "generally exempt under nonbankruptcy law" because they are not exempt at all. Even if those waivers were not enforceable or were otherwise invalid, SEPH's argument that an interest in an LLC is not an AUFTA "asset" fails because it proves too much. Among the transfers that SEPH seeks to have set aside as fraudulent in these proceedings are the Trammells' transfers of 90% of their interests in Trammell Orange Beach and Trammell Lake Martin to their daughters in October 2011. If those interests in LLCs are not AUFTA "assets" (and SEPH has argued that LLC interests do not count as AUFTA assets for purposes of the insolvency analysis), then there was no AUFTA "transfer," which the statute defines as "[e]very mode … of disposing of or parting with *an asset or an interest in an asset*." Ala. Code § 8-9A-1(13) (emphasis added); *see also Wheeler Bros.*, 167 F. Supp.3d at 1301 ("[t]he plain language of the AUFTA says that a transfer has to be of an asset"). If there were no AUFTA "transfer," then no cause of action for constructive fraudulent transfer is available to SEPH under § 8-9A-5(a). Simply put, SEPH cannot have it both ways. An interest in an LLC is either an "asset" or it is not. Plaintiff's Count Three is predicated on such an interest being an "asset," which directly contradicts its attempts to argue otherwise in its insolvency analysis. SEPH's second counterargument is that defendants have not proven the value of those LLC interests or even whether Belinda Trammell has an interest in Gulf World, LLC. But as summary judgment movant, SEPH bears the initial burden of showing what the Trammells' assets are and how they are valued. If SEPH concedes that Charles Trammell had an interest in Gulf World at the time of the subject transfers, then it must make an affirmative showing on summary judgment to value that interest. If SEPH contends that Belinda Trammell has no interest in Gulf World, then it likewise must make such a showing. It has not done so; therefore, the evidentiary burden does not shift to defendants to come forward with evidence showing genuine issues of material fact on those matters. At any rate, there is evidence in the summary judgment record that "the value of Mr. Trammell's interest in Gulf World, LLC is a function of the value of the assets of the LLC, which mainly consist of millions of dollars in real property and damages from the lawsuit pending in Mobile County." (Doc. 92, Exh. G, at #2.) Those statements can be reduced to admissible form at trial, and therefore are properly considered on summary judgment as supporting a genuine issue of material fact.

likely reduces both interest and costs of collection, and SEPH offers no evidence as to reasonable estimates of those figures in the wake of the judicially-undone foreclosures.  Moreover, SEPH's collection cost figures appear to consist primarily of attorney's fees as to which no showing of reasonableness has been made.  Thus, for summary judgment purposes, we know only that Charles Trammell's debts included some amount of interest and collection costs.  We do not know – and, on this record, cannot hazard a reasonable estimate – how much.  On the asset side of the equation, SEPH identifies $27,033 that Charles Trammell held in joint bank accounts, $29,700 in automobiles and other personal property, $78,500 in his share of his personal residence, and $2,675,063 in UPS stock shares.  (Doc. 91, at 13.)  But SEPH does not identify Charles Trammell's interests in LLCs, much less assign any fair market valuation to those interests.  The resulting gaps on both the liabilities and assets side of the equation preclude the Court from making any definitive determination at this time as to whether Charles Trammell was insolvent after transferring the beach condo and Lake Martin house to family-owned LLCs.  This analysis would yield similar results for summary judgment purposes at each of the critical junctures for both Charles and Belinda Trammell.

In light of the foregoing, the Court finds that there are genuine issues of material fact as to whether defendants Charles Trammell and Belinda Trammell were insolvent at the time of the challenged transfers.  Because insolvency is a necessary element of proof for Count Three (a cause of action asserted pursuant to Alabama Code § 8-9A-5(a)), that finding precludes entry of summary judgment at this time.[30]

## IV.   Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

1.      Plaintiff's Motion for Partial Summary Judgment (doc. 90) is **granted in part**, and **denied in part**;

2.      Because the summary judgment record reveals no genuine issues of material fact, the Motion is **granted** as to the following elements of Count Three: (i) SEPH's

---

[30]      *See Sibille v. Davis*, 2016 WL 1178662, *9 (M.D. Ala. Mar. 25, 2016) ("[T]he value of the property is a disputed issue of fact. Therefore, the court cannot calculate, on the basis of undisputed facts, whether … he became insolvent as a result of the October 2012 transfers.  Accordingly, summary judgment will be denied as to Sibille's claims that the October 2012 transfers were constructively fraudulent.").

status as a creditor and the Trammells' status as debtors; (ii) the timing of SEPH's claim against the Trammells (*i.e.*, that it arose before the subject transfers were made); and (iii) that the Trammells made the transfers without receiving a reasonably equivalent value. Those issues having been resolved on summary judgment, they need not and will not be litigated at trial, pursuant to Rule 56(g), Fed.R.Civ.P.;

3. The Motion is **denied** as to the insolvency element of Count Three. The evidence and argument at trial on Count Three will be limited to the questions of whether Charles and Belinda Trammell were insolvent within the meaning of Alabama Code § 8-9A-2 at the time of, or became insolvent as a result of, the challenged transfers. The Court will also accept evidence and argument on the question (raised for the first time on summary judgment in defendants' brief) of whether Charles Trammell's death effected "transfers" of his interest in the primary residence and remaining UPS stock to Belinda Trammell within the meaning of the AUFTA;[31]

4. Review of the court file confirms that on September 26, 2016, Magistrate Judge Cassady entered an Order (doc. 89) referring this case to mediation. On October

---

[31] The Court did not address that issue on summary judgment because it was unnecessary to do so to resolve in full the issues raised in SEPH's Motion. The Court also questions the need to address whether those transfers were constructively fraudulent at all in order to afford complete relief to SEPH in this litigation. The assets ostensibly transferred from Charles Trammell to Belinda Trammell upon the former's death consisted of an $81,000 interest in the couple's personal residence and UPS stock valued at $831,323.02 (8,798 shares priced at $94.49 on October 24, 2013). (Doc. 91, ¶ 52.) These transfers are different than the others at issue in this litigation because they were made from one debtor to another, rather than from a debtor to a third-party person or entity. If plaintiff's position is ultimately vindicated at trial, then Belinda Trammell is indebted to SEPH in an amount exceeding $2 million. (Braswell Aff., ¶ 8.) Logic and common sense suggest that SEPH could use the assets transferred to her upon Charles Trammell's death in its efforts to collect on that debt, without ever needing to litigate whether the passage of those assets to her upon her husband's death constitutes a "transfer" for AUFTA purposes. Stated differently, it is not readily apparent on this record why it matters whether the 8,798 shares of UPS stock and the ownership interest in the residence are deemed property of the Estate of Charles Trammell or property of Belinda Trammell. Either way, they would appear to be assets reachable by SEPH to collect on the underlying debt. The Court will entertain briefing and/or argument on this threshold question at an appropriate time.

21, 2016, Judge Cassady entered a follow-up Order (doc. 97) providing that the parties must conduct their first mediation conference by no later than November 10, 2016.  Although that deadline expired more than seven weeks ago, it appears the parties have not complied.  They are **ordered** to **show cause**, on or before **January 5, 2017**, why they have not conducted a mediation session to date (if in fact they have not).  The Court understands that a mediation scheduled for November 10, 2016 was canceled at the eleventh hour due to an "emergency scheduling conflict" with the mediator (doc. 101), but it is unclear whether the parties ever rescheduled mediation in the intervening seven weeks; and

5.      This action remains set for a Final Pretrial Conference before the undersigned on **January 10, 2017** at **10:00 a.m.**, with nonjury trial to follow during the **February 2017** term.  The Court is aware of defendants' Motions to Continue and to Stay (docs. 102 & 107), and anticipates ruling on same in short order.  The parties must file their Joint Pretrial Document by no later than **January 6, 2017**.


DONE and ORDERED this 30th day of December, 2016.


s/ WILLIAM H. STEELE

CHIEF UNITED STATES DISTRICT JUDGE