# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **SE PROPERTY HOLDINGS, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 15-0033-WS-C** |
| | ) | |
| **TAMMY T. CENTER,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

A non-jury trial was held in this matter before the undersigned on May 8 – 10, 2017. Pursuant to Rule 52(a)(1), Fed.R.Civ.P., the Court now finds the facts specially and states its conclusions of law separately.

**I.      Nature of the Case.**

This fraudulent transfer action was brought by plaintiff, SE Property Holdings, LLC, against a host of defendants, including Tammy T. Center, both in her individual capacity and in her capacity as Personal Representative of the Estate of Charles H. Trammell; Belinda R. Trammell; Amy T. Brown; Trammell Family Orange Beach Properties, LLC; and Trammell Family Lake Martin Properties, LLC. Plaintiff contends that defendants Charles and Belinda Trammell became indebted to it pursuant to certain guaranties executed between 2005 and 2007. Plaintiff's position is that after payment was demanded and formal collection proceedings were underway against them, Charles and Belinda Trammell systematically transferred assets (including a beach condominium unit, a lake house, thousands of shares of UPS stock, and the family residence) to other defendants, including their adult daughters (Tammy Center and Amy Brown) and family-controlled limited liability companies (Trammell Family Orange Beach Properties, LLC and Trammell Family Lake Martin Properties, LLC) between 2011 and 2013.

Of the four claims asserted by plaintiff, three are causes of action under the Alabama Fraudulent Transfer Act, Ala. Code §§ 8-9A-1 *et seq.* (the "AUFTA"). Specifically, Count I is a claim for actual fraudulent transfer, in violation of Ala. Code § 8-9A-4(a). Counts II and III are

AUFTA claims for constructive fraudulent transfer, in violation of Ala. Code § 8-9A-4(c) and § 8-9A-5(a), respectively. And Count IV is a common-law claim for civil conspiracy under Alabama law. All claims are asserted against all defendants.

The triable issues of law and fact joined in this matter are confined to those delineated in the Joint Pretrial Document, as incorporated in the Order on Pretrial Conference (doc. 135).[1] To the extent that any party may seek adjudication of a claim or defense not identified in the Joint Pretrial Document, such a request is denied because the Joint Pretrial Document "shall constitute the final statement of the issues involved in this action, govern the conduct of the trial, and form the basis for any relief afforded by the Court." (Doc. 135, at 2.)[2] In resolving such triable issues, the Court has reviewed and considered the following: (i) all argument presented, testimony and exhibits admitted into evidence during the three-day bench trial; (ii) the parties' Trial Briefs (docs. 152 & 153) and Post-Trial Briefs (docs. 176 & 177); (iii) the Joint Pretrial Document (doc. 129) filed on January 6, 2017; (iv) the undersigned's previous legal, procedural and evidentiary rulings in the case, including without limitation the summary judgment Order (doc. 122) entered on December 30, 2016; the Order (doc. 150) entered on January 30, 2017 denying reconsideration of the Order on summary judgment; the Order (doc. 54) granting plaintiff's motion for leave to amend the Complaint; and (v) other portions of the court file as appropriate.[3]

---

[1]    The lone exception to this restriction is the amendment authorized by the Order (doc. 148) entered on January 26, 2017. That Order provided as follows: "Section I of the Joint Pretrial Document is hereby **amended** to include the following language at the end of the paragraph: 'SEPH also seeks punitive damages against the Defendants. Defendants contend punitive damages are not recoverable in this case.' In all other respects, the Joint Pretrial Document remains unchanged." (Doc. 148, at 2.)

[2]    The Order on Pretrial Conference confirms that "[d]ispositive legal issues that are not contained in the parties' Joint Pretrial [Document], or in any amendments to that document expressly permitted by order of the Court, will not be considered." (*Id.*)

[3]    At the close of plaintiff's evidence at trial, defendants submitted a written Motion for Judgment as a Matter of Law and accompanying Brief in Support. The Clerk of Court has scanned those materials and they are part of the court file. As indicated on the record at the time the Motion was submitted, the Court declined plaintiff's request for judgment as a matter of law "based on limited evidence and partial presentation of evidence." (Doc. 173-1, at 153.) This determination effectively **denied** defendants' Motion pursuant to Rule 52(c), Fed.R.Civ.P., which authorizes a district court in a non-jury trial to "decline to render any judgment until the close of the evidence." *Id.* Moreover, the Court notes that defendants' Motion was incorrectly (Continued)

## II. Findings of Fact.

### A. *The Loans and Guaranties.*

Between March 2005 and September 2007, Vision Bank (the predecessor of plaintiff, SE Property Holdings, LLC) made a series of four loans totaling $21 million in principal to the developers of commercial real estate development projects in Baldwin County, Alabama known as Bama Bayou and Marine Park. Each of those loans was accompanied by contract documents including promissory notes, mortgages, loan agreements and guaranty agreements. Most of the particulars of those contract documents are not material to the issues joined in this fraudulent transfer action. In summary, however, the four Vision Bank loans consisted of the following: (i) a March 2005 loan to Riverwalk, LLC in the amount of $6 million; (ii) a June 2006 loan to Riverwalk, LLC in the amount of $5 million; (iii) a September 2007 loan to Bama Bayou, LLC in the amount of $5 million; and (iv) a March 2007 loan to Marine Park, LLC in the amount of $5 million.[4]

Charles Trammell was an investor in Bama Bayou, LLC.[5] In this capacity, he was asked by Vision Bank to complete a Personal Financial Statement ("PFS") as part of the underwriting

---

brought pursuant to Rule 50(a), Fed.R.Civ.P., which applies only to jury trials, rather than Rule 52(c), which applies to non-jury trials. *See, e.g., Hepsen v. Resurgent Capital Services, LP*, 383 Fed.Appx. 877, 884 (11th Cir. June 17, 2010) ("As the Court has explained and as Rule 50 clearly states, a Rule 50 motion applies only in civil cases tried to a jury."); *Smith v. Haden*, 872 F. Supp. 1040, 1043 (D.D.C. 1994) ("By its terms Rule 50 only applies in cases tried to a jury. … Therefore, it is not appropriate to make a Rule 50 motion in a bench trial or for the Court to rule on such a motion."). The Court has considered the arguments and authorities presented in defendants' Motion for Judgment as a Matter of Law insofar as they were renewed or developed in defendants' 43-page Post-Trial Brief (doc. 176).

[4]     For all purposes relevant to this litigation, Bama Bayou, LLC and Riverwalk, LLC are one and the same entity. At some point, Riverwalk, LLC changed its name to Bama Bayou, LLC. That entity will be referred to as "Bama Bayou" in this Order, without regard to whether it was nominally known as Riverwalk or Bama Bayou at a given point in time.

[5]     The precise ownership and financing structure of the underlying real estate development entities is not important to the specific issues joined for trial here. As a general proposition, however, Charles Trammell was an investor in, and a member of, a limited liability company called Gulf World, LLC. That entity and an unrelated entity called Mitchell Riverwalk, LLC formed Bama Bayou, LLC, of which Marine Park, LLC was a wholly-owned (Continued)

process for the aforementioned loans. Charles Trammell submitted such a statement with an effective date of January 31, 2005. The January 2005 PFS reflected that Charles Trammell owned no assets in his own name, but that all his assets – including more than $4.5 million in securities (mostly UPS stock), more than $800,000 in cash, and nearly $1 million in real estate – were jointly held by Charles Trammell and his wife, Belinda Trammell. Both Charles and Belinda Trammell signed that PFS, expressly representing that the information therein was true and complete. The PFS also included an affirmative representation by the Trammells – directly above their signatures – that Vision Bank "may consider this statement as continuing to be true and correct until a written notice of a change is given to you by the undersigned." No written notices of material changes to Charles or Belinda Trammell's assets were furnished to Vision Bank at any time.[6]

In connection with the four Bama Bayou / Marine Park loans as described above, Charles Trammell executed four corresponding Limited Continuing Guaranties in favor of Vision Bank, to-wit: (i) a guaranty in the amount of $315,000 in principal for the March 2005 Bama Bayou loan; (ii) a guaranty in the amount of $280,000 in principal for the June 2006 Bama Bayou loan; (iii) a guaranty in the amount of $280,000 in principal for the March 2007 Marine Park loan; and (iv) a guaranty in the amount of $280,000 in principal for the September 2007 Bama Bayou loan.[7] Because Charles Trammell's January 2005 PFS reflected that all of his assets were jointly

---

subsidiary. Belinda Trammell held no ownership or membership interest in any of these entities at any relevant time.

[6] In June 2009, several years after execution of the underlying loans and guaranties, Charles Trammell submitted another PFS to Vision Bank. The June 2009 PFS listed some $2.4 million in jointly owned real estate holdings, plus almost $2 million in marketable securities (UPS stock) solely owned by Charles Trammell. Also of note, the June 2009 PFS did not list Charles Trammell's interest in Gulf World LLC as an asset with any value. Both Charles and Belinda Trammell signed the June 2009 PFS, with the same representations about the truth and completeness of the information therein, as well as authorizing Vision Bank to consider the PFS to be true and correct until they provided written notice of change.

[7] Charles Trammell also executed a fifth guaranty in favor of Vision Bank for a related entity in the Bama Bayou / Marine Park real estate development project. Specifically, on September 19, 2007, he signed a guaranty in the principal amount of $900,000 for a loan that Vision Bank made to Sundance LLC, which was an entity formed to develop townhomes. The Sundance guaranty is relevant to these proceedings only insofar as it affects Charles Trammell's (Continued)

owned with Belinda Trammell, Vision Bank required her to sign guaranties as well. Belinda Trammell executed her own separate Limited Continuing Guaranty in favor of Vision Bank in the amount of $280,000 in principal for the June 2006 Bama Bayou loan. Additionally, Belinda Trammell executed two of the same Limited Continuing Guaranties signed by her husband, namely, the $280,000 guaranty for the March 2007 Marine Park loan and the $280,000 guaranty for the September 2007 Bama Bayou loan.[8]

All of the Limited Continuing Guaranties executed by Charles Trammell and/or Belinda Trammell contained several provisions of substantial import to this litigation. For example, Paragraph 3 of each guaranty authorized Vision Bank to prosecute an action under that particular guaranty irrespective of whether the bank brought action against the borrower or any other guarantor. Paragraph 4 specifically provided that Vision Bank was not obliged to satisfy any

---

balance sheet on the dates of the challenged transfers. At any rate, the Sundance loan went into default in or about December 2010, and Vision Bank filed suit against Sundance LLC, Charles Trammell, and the other Sundance guarantors on January 24, 2011. A settlement of that lawsuit was achieved in February 2012, pursuant to which Sundance LLC and the loan guarantors (including Charles Trammell) signed a settlement agreement, as well as a settlement note in favor of Vision Bank in the principal amount of $428,118.22, to be paid in 35 monthly installments of $3,633.06, with a balloon payment of the entire remaining balance in the 36th and final installment.

[8]    At trial, the parties sparred at length over whether Belinda Trammell actually executed the two guaranties also signed by Charles Trammell as to the March 2007 and September 2007 loans. Defendants argued that her signature was a forgery on those two documents, and Belinda Trammell testified that she did not sign them. Nonetheless, the Court finds by a preponderance of the evidence presented that she did execute the two contested Limited Continuing Guaranties (Plaintiff's Exhibits 13 & 14). In making that factual finding, the Court does not credit Belinda Trammell's denial, given the numerous record indicators to the contrary. For example, Belinda Trammell's signature was notarized by a notary public on both documents, she had admitted signing those documents in her answer and her interrogatory responses filed in the state-court lawsuit, and she had similarly admitted that she signed those guaranties in sworn deposition testimony. A party's admissions in pleadings are ordinarily binding. *See, e.g., Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1177 (11th Cir. 2009) ("The general rule [is] that a party is bound by the admissions in his pleadings.") (citation omitted). Belinda Trammell's only proffered explanation for these glaring inconsistencies – that she was "nervous" and "messed up" in her deposition – is unsatisfactory. More broadly, defendants have articulated no persuasive justification for why Belinda Trammell and her legal representatives would have conceded for years in various legal proceedings and under oath that she did execute those guaranties, only to reverse course and deny it now.

conditions precedent, such as resorting to any other security or remedy for the collection of the underlying indebtedness. Paragraph 14 provided that, in addition to the specified portion of the principal on the underlying loan, the guarantor was responsible for "100% of all interest on the Loan accrued or accruing at any time … prior to the payment-in-full by Guarantor of his or her liability," and for "100% of all other costs and expenses (include reasonable actual attorney's fees) of collection relating to all principal, interest and other charges under the Note." And Paragraph 15 confirmed that "[e]ach Guarantor's liability hereunder shall be joint and several," with the guaranty's provisions to be binding on the guarantor's heirs, executors and administrators. (Plaintiff's Exhibits 10-14.)

The Trammells were not the only guarantors of the Bama Bayou and Marine Park loans. To the contrary, there were a total of 15 guarantors (either individuals or married couples) who guaranteed different amounts of principal on the loans, ranging from a high end of $6 million in principal in the aggregate for guarantor John Saint to a low end of $875,000 in principal in the aggregate for guarantors such as Stephen and Jennifer Lawler.[9] Each of these 15 sets of guarantors executed guaranties obligating them to be responsible for 100% of the accrued interest on the loan and 100% of the attorney's fees and other costs of collection for the loan.

Plaintiff, SE Property Holdings, LLC ("SEPH"), is the successor by merger for Vision Bank, and now holds certain assets of Vision Bank, including all of the Bama Bayou notes and guaranties described above. To be clear, SEPH is not the holder of the note and guaranties on the March 2007 loan to Marine Park, LLC; rather, those assets have been transferred to an unrelated third party, FNB Bank. As such, Charles and Belinda Trammells' guaranties with

---

[9]     The names of the guarantors and amounts guaranteed are set forth in Plaintiff's Exhibit 118, which was admitted into evidence over plaintiff's objection. That evidentiary ruling was accompanied by an important limitation. Plaintiff's Exhibit 118 is an October 15, 2009 letter from Vision Bank's counsel to counsel for certain debtors or guarantors. That letter and its attachments set forth a global settlement demand for all guarantors, including a spreadsheet listing amounts demanded of each guarantor in compromise of Vision Bank's pending claims. The settlement demand component of Plaintiff's Exhibit 118 is inadmissible pursuant to Rule 408, Fed.R.Evid. In admitting the Exhibit, the Court did so for the limited purpose of receiving into evidence the first five columns of data on page 3 (*i.e.*, the identities and principal amounts guaranteed by each guarantor). As stated on the record at trial, the Court has not considered any other aspect of Plaintiff's Exhibit 118 (and particularly the fact or details of the settlement demands set forth therein) for any purpose.

respect to the Marine Park loan are relevant to these proceedings only insofar as they affect their balance sheets as of the dates of the challenged asset transfers.

### B. The Defaults and the Bama Bayou Action.

Vision Bank fully funded all four of the 2005-2007 loans to Bama Bayou LLC and Marine Park, LLC, as described above. Within a short time, however, the borrowers breached their repayment obligations on the loans. In December 2008, Vision Bank sent demand letters (with copies to the Trammells, as guarantors) for the three Bama Bayou loans and the Marine Park loan, demanding payment in full by December 30, 2008. For each loan, the event of default was based on the maturity of the note, the borrower's failure to make payment, and Vision Bank's unwillingness to extend the maturity date further.[10]

The borrowers and guarantors failed to make payment in full on the Bama Bayou and Marine Park loans by the specified deadline. Accordingly, on January 16, 2009, Vision Bank filed two collection lawsuits in the Circuit Court of Mobile County, Alabama, one relating to the Bama Bayou loans and the other related to the Marine Park loan. Those collection lawsuits will be referred to collectively herein as the "*Bama Bayou* Action." Charles and Belinda Trammell are named defendants in those actions, along with the borrowers and the other guarantors. In both actions, Vision Bank asserted claims for breach of the loan agreements, promissory notes and guaranties.

In March 2009, Vision Bank foreclosed on the mortgaged real property accompanying each Bama Bayou and Marine Park loan. Vision Bank purchased the property in foreclosure, and thereafter maintained the property as assets of the bank.[11] Even after taking into account the proceeds of the March 2009 foreclosure sales, there remained substantial deficiencies in the outstanding debt for each of the subject loans; therefore, the *Bama Bayou* Action proceeded against the borrowers and guarantors as Vision Bank endeavored to collect on those deficiencies.

---

[10] Vision Bank had extended and renewed those loans multiple times on a short-term basis in 2007 and 2008 to accommodate the borrowers' ultimately fruitless efforts to obtain financing and cash through other potential lenders and equity partners.

[11] At no time within one year after the foreclosure sales did Bama Bayou, Marine Park, or Scott Raley (the manager of Gulf World, LLC and co-manager of Marine Park, LLC) undertake any action to redeem the subject real estate from foreclosure using the available procedures and mechanisms under Alabama law.

For their part, Bama Bayou, LLC and the guarantors interposed certain counterclaims against Vision Bank in the *Bama Bayou* Action. Among those counterclaims were numerous claims of wrongful foreclosure.[12] In October 2015, Mobile County Circuit Judge Stewart entered an Order holding that the guarantors (including the Trammells) "do not have standing to assert a claim for wrongful foreclosure against the Lenders because they have no legally protected interest in the property foreclosed upon." (Plaintiff's Exh. 141, at 10.) An evidentiary hearing in the *Bama Bayou* Action limited to the borrowers' wrongful foreclosure claims was held in May 2016. Following that hearing, on October 26, 2016, Judge Stewart entered an order finding "the extremely low bids at the foreclosure sale raise the presumption of unconscionableness and the grossly inadequate prices coupled with substantial evidence of misconduct justifies setting aside the foreclosure sale." (Defendants' Exh. 1, at 2.) On that basis, she "set[] aside the foreclosure sale and declare[d] the foreclosure deeds null, void and of no force and effect." (*Id.*)[13]

The *Bama Bayou* Action remains pending today in Mobile County Circuit Court, with SEPH being the named plaintiff as the successor by merger of Vision Bank. No trial on the merits of SEPH's claims for breach of the loan agreements and guaranties has taken place to date, nor have the parties indicated that a trial setting is imminent.

### C. *The Challenged Transfers.*

---

[12] The Fourth Amended Counterclaim from the *Bama Bayou* Action was not admitted into evidence at trial. However, Scott Raley testified to the existence of the counterclaims alleging wrongful foreclosure. Aside from wrongful foreclosure, the Court understands from the original defendants' offers of proof and from previous iterations of the counterclaims that were admitted into evidence that the guarantors (including the Trammells) contended that agents of Vision Bank made false statements that fraudulently induced them to sign the guaranties, and that there was a lack of consideration for the guaranties. The Court further understands that Bama Bayou brought a counterclaim against Vision Bank for breach of contract, based on allegations that Vision Bank had promised to continue providing unlimited funding to the Bama Bayou project indefinitely.

[13] In her October 2015 ruling, Judge Stewart expressly determined that, under Alabama law and the terms of the mortgages, "the only remedy for wrongful foreclosure based on a grossly-inadequate foreclosure bid by the Lender in this case is to judicially set aside the foreclosure." (*Id.*) This ruling negates any argument by the borrowers or guarantors that an available remedy for wrongful foreclosure in the *Bama Bayou* Action would be cancellation or elimination of the underlying debt.

### 1. *Circumstances Leading to Transfers.*

Charles and Belinda Trammell amassed substantial personal wealth pursuant to Charles' long and successful career with United Parcel Service ("UPS"). According to a Personal Financial Statement the Trammells submitted to Vision Bank, as of June 15, 2009, Charles Trammell had over $4.5 million in assets, including UPS stock in his own name valued at $1,983,698; an Orange Beach condominium unit jointly held with Belinda Trammell valued at $1,200,000; a lake house jointly held with Belinda Trammell valued at $1,003,000; and a personal residence in Montgomery jointly held with Belinda Trammell valued at $225,000. But those assets were vulnerable to the Trammells' creditors. Since January 2009, the Trammells had been named defendants in the *Bama Bayou* Action where they faced potential liability on the Bama Bayou and Marine Park guaranties reaching into the millions of dollars.[14] Moreover, Charles Trammell knew as of January 2011 that further litigation with Vision Bank was imminent on the Sundance loan, as to which he had executed a guaranty in the amount of $900,000 in principal; indeed, Vision Bank had sent him a notice of default and demand for payment under that guaranty on December 1, 2010.

Aside from their legal obligations under the Bama Bayou, Marine Park and Sundance guaranties, for which payment had been demanded by Vision Bank upon the borrowers' default but for which the Trammells had refused to pay, Charles and Belinda Trammell diligently paid their debts as they became due. They maintained an excellent credit rating, and were never late on payments for matters such as mortgage debt, car lease payments, credit card debt, utility bills, tax bills, and other routine expenses. Excepting their guaranty obligations, the Trammells paid their bills in a timely, conscientious and complete manner.

As of January 2011, Charles Trammell had experienced serious health problems for quite some time. He had been diagnosed with a blood disorder in or about early 2008, for which he required blood transfusions with increasing frequency and which caused him to become progressively weaker. That medical condition ultimately claimed his life on October 24, 2013.

---

[14]     The guaranties signed by Charles Trammell on the Bama Bayou and Marine Park loans limited his total principal liability to $1,155,000. Likewise, the guaranties signed by Belinda Trammell on those loans limited her total principal liability to $840,000. But those guaranties also exposed the Trammells to liability for 100% of the accrued interest on the loans, as well as 100% of all costs of collection, including attorney's fees.

The Court does not find, however, that Charles Trammell's medical condition reached a crisis point in or shortly before January 2011. While the evidence at trial established an ongoing decline in his health in the last six years of his life, there was no evidence suggesting that things took a turn for the worse in January 2011, that he received a new or particularly unfavorable prognosis in January 2011, or that there were any material changes in his health condition at that time, as compared with the previous four years. What did change in the weeks leading to January 2011 was that Charles Trammell received a notice of default and demand for payment from Vision Bank relating to the Sundance guaranty (for which his personal exposure, counting interest and collection costs, was in excess of $1 million) on or about December 1, 2010. The spectre of imminent Sundance litigation added to Charles Trammell's considerable financial burdens, given that he and Belinda Trammell were already defendants in multi-million dollar litigation for guaranties they had signed in connection with the Bama Bayou and Marine Park loans.

On January 4, 2011, Charles Trammell met for the first time with a Prattville estate planning attorney named Robert Burton. The intake form submitted by Trammell for that first consultation listed Vision Bank as the "Name of Adverse Party." The single page of notes in Burton's file from the January 4 meeting listed the Trammells' most valuable assets (*i.e.*, the lake house, the beach condo, the residence and the UPS stock) and income, and also referenced the ongoing and anticipated Vision Bank litigation, including (i) notations that Bama Bayou owed $10 million and that Sundance owed $3 million; and (ii) identification of the attorney representing the Trammells' interests in the *Bama Bayou* Action. On or about January 11, 2011, Burton followed up with an email to the Trammells attaching what he called an "Estate Planning Options letter," which was a slightly customized form letter reciting estate tax law status and proposing options like new wills, equalizing assets for estate tax purposes, powers of attorney, living wills, health care proxies and the like. On the final page of the January 11 letter, Burton mentioned the possibility of "[b]eginning a gifting program with your children, grandchildren, and in-laws" in order to "help lower estate taxes, protect assets, and allow better asset management," and recommended the use of LLC membership interests for that purpose. (Defendants' Exh. 18, at 3.)

Nine days later, on January 20, 2011, Charles Trammell sent an email to Burton concerning the LLC idea mentioned in Burton's January 11 letter. After proposing a name for

the LLC and suggesting that "the largest share" possible be given to his children and grandchildren, Trammell wrote the following: "If you feel we should use one property, then I would most want it to be the Trillium lake house on Longpine Drive for that is the one I would most 'like to protect'. I received an email that the 2nd investment in Orange Beach will be going into litigation." (Plaintiff's Exh. 81.) Although defendants endeavored to explain away these adjacent sentences as mere unrelated bulletpoints,[15] the Court rejects such a strained interpretation. Under a straightforward reading of Charles Trammell's email of January 20, 2011, he sought to use an LLC vehicle to "protect" his assets from potential exposure in imminent and ongoing litigation. He did not indicate that the lake house was the property he most wanted his children and grandchildren to receive as part of an estate-planning exercise; rather, Charles Trammell wrote that he most wanted to "protect" the lake house, and in the very next breath mentioned a likely imminent lawsuit against him for a failed Orange Beach investment. The implication is clear: Charles Trammell was trying to structure his assets in such a way that Vision Bank could not reach them even if it reduced to judgment its claims against Charles and Belinda Trammell for breach of guaranty obligations relating to the Bama Bayou, Marine Park and Sundance projects.[16]

Also located in Burton's file are several other pages of notes in his own handwriting that shed light on their discussions concerning the Trammells' litigation exposure, at the same time that Burton was setting up LLCs for Charles and Belinda Trammell. In particular, on a page of notes that states the phrases "Trammel [sic] Family Lake Martin, LLC" and "Trammel [sic] Family Orange Beach, LLC," Burton wrote the following: (i) "Bama Bayou lawsuit filed," (ii) "Sundance no lawsuit yet," (iii) "14 investors 2 died a couple of bankrupt," and (iv) named the

---

[15]     The Court does not credit that testimony from defendant Tammy Center, who by her own admission was "speculating" as to the meaning of that email, while offering a construction that is contrary to the plain text of that correspondence, taken as a whole.

[16]     As it happens, Charles Trammell's prediction in the January 20 email that "the 2nd investment in Orange Beach will be going into litigation" was accurate. Just four days later, on January 24, 2011, Vision Bank filed suit against Charles Trammell, Sundance, LLC and the other guarantors in Mobile County Circuit Court for breach of loan agreements, promissory notes and guaranties in connection with the Sundance loan.

attorney representing the Trammells' interests in the *Bama Bayou* Action.[17] Elsewhere in his notes, Burton wrote "Call Lit. Attorney" and "Stock gift (not good idea?)." Because Burton did not have litigation expertise, he wanted to "bounce it off somebody," meaning check with litigation counsel as to the legality and propriety of the proposed transfer of the Trammells' assets (and particularly millions of dollars of UPS stock) into new family-held LLCs, given the pending and threatened litigation against the Trammells. Burton was unfamiliar with the law of fraudulent transfers and did not know what a constructive fraudulent transfer was. After speaking with litigation counsel, but without requesting that any analysis of the fraudulent transfer issue be done, Burton notified the Trammells that there was a risk the proposed asset transfers might be set aside.

In the course of the ensuing asset transfers from Charles Trammell and Belinda Trammell, Charles Trammell was making the decisions. For her part, Belinda Trammell accompanied her husband to at least two of the meetings with Burton. As of January 2011, she was well aware of the Bama Bayou debt, the Marine Park debt, and the pending lawsuits against the Trammells as guarantors for those debts. She was also aware of the Sundance debt. Belinda Trammell signed the documents creating the LLCs and effectuating transfers of her ownership interests in particular assets, and Burton explained the meaning and effect of those documents to her before she did so. By contrast, the preponderance of the evidence does not show that defendants Tammy Center and Amy Brown were aware of the enormous potential liability their parents were facing in litigation pertaining to the Bama Bayou, Marine Park and Sundance loans. Defendants Center and Brown did not participate substantively in their parents' meetings with Burton, but only met with him one time to sign the relevant documents. Defendant Center did not even know what an LLC was, and defendant Brown was never called to testify, although she was present in the courtroom during trial. The Court does not find on this record that Center and Brown were cognizant that their parents' transfers of assets to them through LLC vehicles would or might protect those assets from collection by Vision Bank in the event of a judgment against Charles and Belinda Trammell in the pending litigation relating to their guaranties.

---

[17] Burton contacted one of the lawyers representing the Trammells' interests in one or more of the Vision Bank lawsuits. He called them to talk about the lawsuits; however, the record is devoid of any specifics of that conversation.

## 2. *The January 2011 Transfers.*

On January 26, 2011, just two days after Vision Bank sued Charles Trammell for breach of his $900,000 guaranty on the Sundance loan, Charles and Belinda Trammell signed Articles of Organization forming two Alabama limited liability companies, named Trammell Family Orange Beach Properties, LLC ("Trammell Orange Beach") and Trammell Family Lake Martin Properties, LLC ("Trammell Lake Martin"). As to each LLC, both Charles and Belinda Trammell were listed as members and organizers. For Trammell Orange Beach, the Trammells' daughter Tammy T. Center (also a named defendant herein) was designated as manager. For Trammell Lake Martin, the Trammells' daughter Amy T. Brown (another named defendant herein) was designated as manager. The Articles of Organization were recorded in probate court (Trammell Orange Beach in Elmore County, Trammell Lake Martin in Montgomery County).

The very same day that the two LLCs were created, the Trammells executed Warranty Deeds to effectuate the transfer of certain real estate holdings into the LLCs. The first transfer involved a condominium unit known as Unit 501, Perdido Place, and located in Orange Beach, Alabama (the "Perdido Place Condo").[18] As of January 2011, the Trammells owned the Perdido Place Condo free and clear, with no mortgage on the property. Pursuant to a Warranty Deed dated January 26, 2011, Charles and Belinda Trammell conveyed the Perdido Place Condo to Trammell Orange Beach. The second transfer involved the Trammells' Trillium lake house on Longpine Drive (the "Lake House"). As of January 2011, the Trammells owned the Lake House free and clear, with no mortgage on the property. Pursuant to a Warranty Deed dated January 26, 2011, Charles and Belinda Trammell conveyed the Lake House to Trammell Lake Martin.[19]

The Trammells caused both Warranty Deeds to be recorded in the appropriate county's Probate Court, which was necessary to render those transfers effective against third party

---

[18] The Trammells had originally acquired the Perdido Place Condo in March 2004, pursuant to a Warranty Deed specifying that the property was conveyed to Charles and Belinda Trammell "as tenants in common with equal interests during the period of their concurrent lives, and, upon the death of either of them, the remainder to the survivor of said Grantees, in fee simple, forever." (Defendants' Exh. 23, at 1.)

[19] Undisputed evidence at trial reflected that, as of January 26, 2011, the Lake House was fairly valued at $830,000, and the Perdido Place Condo was fairly valued at $645,000.

creditors. However, the Trammells did not undertake to notify Vision Bank of those January 2011 transfers of significant assets, as they had promised to do in the Personal Financial Statement they had executed in June 2009.

### 3.     *The December 2011 Transfers.*

The second set of transfers occurred on December 12, 2011. Prior to that date, Trammell Orange Beach and Trammell Lake Martin had been owned 50% by Charles Trammell and 50% by Belinda Trammell. On December 12, 2011, that all changed. Pursuant to a First Amendment to the Operating Agreement for each LLC, the Trammells transferred and assigned the lion's share of their interest in the two LLCs to their daughters, Center and Brown.[20] Specifically, each of Charles and Belinda Trammell transferred a 22.5% membership interest in each of Trammell Orange Beach and Trammell Lake Martin to each of Center and Brown. In the immediate aftermath of those December 2011 transfers, then, Trammell Orange Beach was owned 45% by Center, 45% by Brown, and just 5% by each of Charles and Belinda Trammell. The same was true of Trammell Lake Martin. Again, both entities had previously been owned 50% by Charles Trammell and 50% by Belinda Trammell, with the daughters holding no membership interest at all. Brown and Center paid no money or property to their parents in exchange for the transfer/assignment of these membership interests in the subject LLCs.[21]

Following the December 2011 transfers, nothing changed in terms of the family's usage of the Perdido Place Condo or the Lake House. The Trammells and their daughters did not use those properties any more or any less than they had previously. There is no indication that the Trammells' access to, use of, or enjoyment of the Perdido Place Condo or the Lake House were

---

[20]     Those First Amendment to Operating Agreement documents were signed by Charles Trammell, Belinda Trammell, Brown and Center as members, and by the appropriate daughter as manager of the LLC.

[21]     At trial, Center testified that she and her sister had been in charge of taking care of the properties and helped take care of their parents, which she said meant the world to Charles and Belinda Trammell. The Court has previously ruled on summary judgment in this case that such non-financial support does not constitute "reasonably equivalent value" for purposes of the Alabama Fraudulent Transfer Act. (*See* doc. 122, at 14-19.) Defendants did not offer any new or different evidence that would warrant revisiting the conclusion that the Trammells did not receive a reasonably equivalent value from their daughters in exchange for the subject transfers, including the December 2011 transfers of LLC membership interests and the April 2012 transfers of thousands of shares of UPS stock.

in any way curtailed, altered or diminished following their transfer of 90% of their ownership interests in such real property to Brown and Center via membership interest in Trammell Orange Beach and Trammell Lake Martin. Also, the Trammells did not undertake to notify Vision Bank of those December 2011 transfers of 90% of their ownership interests in the Perdido Place Condo and the Lake House to their children, as they had promised to do in the Personal Financial Statement they had executed in June 2009.

From an accounting standpoint, the Trammells and their daughters treated the December 2011 transfers of LLC membership interests as a gift. In gift tax returns filed in October 2013, the Trammells reported to the Internal Revenue Service gifts to each daughter in the amount of $697,050.[22]

### 4. *The April 2012 Transfers.*

Following the transfers of the Perdido Place Condo and the Lake House, the only substantial assets listed by Charles Trammell on the June 2009 PFS that he still owned were his joint interest with Belinda Trammell in their residence on Short Line Drive in Montgomery, Alabama; and tens of thousands of shares of UPS stock, which he owned individually. On April 30, 2012, Charles Trammell transferred nearly three-quarters of his UPS stock to Belinda Trammell, Brown and Center. The recipients of those stock shares paid no money or property to Charles Trammell in exchange for his transfer of those shares into the subject LLCs in which they held 95% ownership interests.

Those transfers were accomplished in the following manner: Charles Trammell transferred 12,551 shares of UPS stock to Trammell Orange Beach, and another 12,551 shares of UPS stock to Trammell Lake Martin. At a then-effective share price of $78.325, the fair market value of those stock transfers to the LLCs was $1,966,114.15. Given the ownership structure of the LLCs (45% Brown, 45% Center, and 5% each for Charles and Belinda Trammell), the effect of the April 2012 transfers was to gift 11,296 shares of UPS stock to Center, 11,296 shares to

---

[22] The reported gift amounts were based on the appraised value of the underlying real property. Real estate appraisals obtained by the Trammells showed that, as of December 31, 2011 (just 19 days after the subject transfers occurred), the Perdido Place Condo was valued at $624,000 and the Lake House was valued at $925,000. Thus, each daughter's 45% interest in the Perdido Place Condo was valued at $280,800 ($624,000 x .45) and each daughter's 45% interest in the Lake House was valued at $416,250 ($925,000 x .45). The sum of those two figures is $697,050, the amount reported to the IRS on the gift tax returns.

Brown, and 1,255 shares to Belinda Trammell.[23]  Once again, the Trammells completed gift tax returns reporting these transfers to Center and Brown, at a valuation of $884,759 to each on the date of the gift.  Using the same methodology, the fair value of the UPS stock transferred to Belinda Trammell in April 2012 was $98,297 (1,255 shares x $78.325/share).  At no time did Charles Trammell undertake to report to Vision Bank (or SEPH, its successor by merger) that he had transferred to his wife and daughters nearly $2 million in UPS stock previously listed as assets on his June 2009 Personal Financial Statement.

### 5.    *The October 2013 Transfers.*

Charles Trammell died on October 24, 2013, at the age of 69.  Defendant Tammy Center is the personal representative of his estate.  Upon Charles Trammell's death, two particular assets were transferred directly to his widow, Belinda Trammell, outside of probate.  First, Charles and Belinda Trammell had jointly owned their residence on Short Line Drive (the "Short Line Residence") in Montgomery, Alabama for nearly 30 years.  The Warranty Deed dated October 24, 1986 conveying that property to them reflected that Charles and Belinda Trammell owned the Short Line Residence "for and during their joint lives and upon the death of either of them, then to the survivor of them in fee simple, and to their heirs and assigns of such survivor forever, together with every contingent remainder and right of reversion."  (Defendants' Exh. 26.)  Thus, by operation of that 1986 deed, upon Charles Trammell's death, Belinda Trammell owned the Short Line Residence in fee simple.[24]  Second, at the time of his death, Charles Trammell held 8,798 shares of UPS stock.  All of those shares passed to Belinda Trammell pursuant to a payable-on-death arrangement.  *See generally* Ala. Code § 5-24-1(13) (defining "POD

---

[23]    For the sake of clarity, the arithmetic works as follows:  Charles Trammell transferred 12,551 shares of UPS stock to each LLC.  Brown and Center each held a 45% interest in each LLC, so they each received 5,648 shares from each transfer (12,551 x .45).  Belinda Trammell held a 5% interest in each LLC, so she received 627.5 shares from each transfer (12,551 x .05).  And Charles Trammell also held a 5% interest in each LLC, so he effectively retained ownership in 627.5 shares from each transfer  (12,551 x .05).  Multiplying these figures by two (to account for the identical transfers to each LLC) yields the total transfer amounts for each recipient.

[24]    The appraised value of the Short Line Residence at the time of Charles Trammell's death was $158,000.  Thus, a transfer of his half interest in that real property to his wife, assuming one occurred, would be fairly valued at $79,000.

-16-

designation" as the designation of "[a] beneficiary in an account payable on request to one party during the party's lifetime and on the party's death to one or more beneficiaries").[25] Belinda Trammell paid no money or property to Charles Trammell's estate in exchange for such transfers.

Following those transfers, the total assets remaining in Charles Trammell's estate (the "Estate") were valued at less than $200,000. According to an itemized list that Center prepared or caused to be prepared in her capacity as personal representative, the Estate's assets consisted of the following: (i) Charles Trammell's 5% interest in Trammell Lake Martin, valued at $90,000; (ii) Charles Trammell's 5% interest in Trammell Orange Beach, valued at $80,000; (iii) automobiles and watercraft valued at $28,000; and (iv) miscellaneous items and effects valued at $1,700.[26]

### D. The Debtors' Financial State Resulting from Transfers.

A critical issue for this constructive fraudulent transfer analysis concerns the assets and liabilities of each of Charles and Belinda Trammell at the times of the challenged asset transfers. In the interest of clarity, the relevant findings of fact will be set forth separately for each transferor at the time of each of their asset transfers.[27]

#### 1. Charles Trammell's Assets and Liabilities at Relevant Times.
##### a. December 2011.

---

[25] The average share price for UPS stock on the date of Charles Trammell's death was $94.79. Thus, the transfer of 8,798 shares to Belinda Trammell pursuant to the payable-on-death arrangement is fairly valued at $833,962.42 (8,798 shares x $94.79/share).

[26] At the end of 2014, Center and Brown purchased Charles Trammell's 5% membership interest in both Trammell Lake Martin and Trammell Orange Beach. A valuation was done that pegged those 5% interests as being worth approximately $40,000 each, which was then discounted by approximately 25%. SEPH has asserted no claims in this action that those 2014 transfers of Charles Trammell's remaining 5% membership interest in the two LLCs were fraudulent, in violation of the AUFTA, or otherwise improper or unlawful.

[27] The Court does not make findings of fact itemizing the Trammells' assets and liabilities as of January 26, 2011. As discussed *infra*, the January 26 transfers of the Perdido Place Condo and Lake House to the LLCs do not qualify as constructive fraudulent transfers under Alabama law for a different reason; therefore, it is unnecessary to examine the Trammells' solvency *vel non* as of January 26 for purposes of the constructive fraudulent transfer analysis.

As discussed *supra*, on December 12, 2011, Charles Trammell transferred a 22.5% membership interest in Trammell Orange Beach to Center, a 22.5% membership interest in Trammell Orange Beach to Brown, a 22.5% membership interest in Trammell Lake Martin to Center, and a 22.5% membership interest in Trammell Lake Martin to Brown. As a result of these transfers, Charles Trammell retained only a 5% interest in each LLC. Based on defendants' valuation of the Perdido Place Condo at $624,000 and the Lake House at $925,000 as of December 2011, and given that the LLCs had no substantial assets or liabilities at that time other than the real property, Charles Trammell's 5% interest in Trammell Orange Beach was fairly valued at **$31,231** ($624,000 x .05, plus 5% of cash on hand) and his 5% interest in Trammell Lake Marin was fairly valued at **$46,313** ($925,000 x .05, plus 5% of cash on hand) as of December 12, 2011.

The other assets owned by Charles Trammell as of the December 12, 2011, and the fair market valuations of each, were as follows: (i) a half interest in the Short Line Residence (**$81,000**, based on a $162,000 appraised value); (ii) a half interest in the Trammells' cash on hand and in joint bank accounts (**$31,387**); (iii) a half interest in the Trammells' automobiles and other assets (**$29,700**); and (iv) 36,026 shares of UPS stock (**$2,574,418**, based on a share price of $71.46). Thus, immediately after the December 2011 transfers of LLC membership interests to his daughters, Charles Trammell's total assets were fairly valued at **$2,794,049**.

In terms of liabilities, Charles Trammell owed half of the Trammells' outstanding mortgage on the Short Line Residence, or **$8,571**. All of his remaining liabilities relate to the three Bama Bayou guaranties, the Marine Park guaranty and the Sundance guaranty.[28] As of December 12, 2011, Charles Trammell owed **$1,535,917** (which includes $315,000 in principal plus $1,220,917 in accrued interest) on the March 2005 Bama Bayou guaranty. With respect to

---

[28]     By the terms of those guaranties, Charles Trammell was responsible for all costs of collection (including reasonable attorney's fees) on both the guaranties themselves and the underlying loans. Because there was no evidence presented as to the accrued costs of collection at any particular time, the Court excludes that category of liabilities from the analysis. In so doing, however, the Court makes no determinations that SEPH is not entitled to recover those attorney's fees and other costs of collection from the Trammells pursuant to the subject guaranties. The liabilities analysis as it relates to those guaranties will address principal owed and accrued interest, because SEPH established by a preponderance of the evidence at trial what those principal and accrued interest amounts were for each such guaranty as of each of the relevant asset transfer dates.

the May 2006 Bama Bayou guaranty, Charles Trammell owed a total of **$1,532,222** (including $280,000 in principal plus $1,252,222 in accrued interest) as of December 12, 2011. With respect to the September 2007 Bama Bayou guaranty, Charles Trammell owed a total of **$1,269,587** (including $280,000 in principal plus $989,587 in accrued interest) as of December 12, 2011. With respect to the Marine Park guaranty, Charles Trammell owed a total of **$1,905,909** (including $280,000 in principal plus $1,625,909 in accrued interest) as of December 12, 2011. And with respect to the Sundance guaranty, Charles Trammell owed a total of **$1,385,341** (including $900,000 in principal plus $485,341 in accrued interest) as of December 12, 2011. Thus, as of December 2011, Charles Trammell's total liabilities were **$7,637,547**.[29]

### b.    April 2012.

On or about April 30, 2012, Charles Trammell transferred 25,102 shares of UPS stock from his personal holdings into the LLCs. Upon completing those transfers, his remaining assets consisted of the following: (i) a 5% interest in Trammell Orange Beach fairly valued at **$81,448** ($645,000 x .05, plus 5% of cash on hand and newly-transferred UPS stock shares); (ii) a 5% interest in Trammell Lake Martin fairly valued at **$91,708** ($850,000 x .05, plus 5% of cash on hand and newly-transferred UPS stock shares); (iii) a half interest in the Short Line Residence (**$81,000**, based on a $162,000 appraised value); (iv) a half interest in the Trammells' cash on hand and in joint bank accounts **($30,766)**; (v) a half interest in the Trammells' automobiles and other assets **($29,700)**; and (iv) 8,798 shares of UPS stock (**$689,103**, based on a share price of $78.325). Thus, immediately after the April 2012 transfers of UPS stock to the LLCs, Charles Trammell's total assets were fairly valued at **$1,003,725**.

With respect to liabilities, Charles Trammell owed the following sums as of April 30, 2012: (i) half of the Trammells' outstanding mortgage on the Short Line Residence, or **$6,572**; (ii) **$1,682,167** (including $315,000 in principal and $1,367,167 in accrued interest) on the March 2005 Bama Bayou guaranty; (iii) **$1,682,222** (including $280,000 in principal and $1,402,222 in accrued interest) on the May 2006 Bama Bayou guaranty; (iv) **$1,388,101**

---

[29]    The Court understands, of course, that defendants have asserted various legal arguments that these liabilities must be discounted to reach fair valuation. The discounting issue will be discussed in the "Conclusions of Law" portion of the Order, with respect to weighing the relative magnitudes of the assets and liabilities for each of Charles and Belinda Trammell as of each of the relevant transfer dates.

(including $280,000 in principal and $1,108,101 in accrued interest) on the September 2007 Bama Bayou guaranty; (v) **$2,101,856** (including $280,000 in principal and $1,821,856 in accrued interest) on the Marine Park guaranty; and (vi) **$412,144** on the post-judgment settlement note relating to the Sundance guaranty.[30]  Thus, as of April 30, 2012, Charles Trammell's total liabilities were **$7,273,062**.

*c.*        *October 24, 2013 (Estate).*

Upon his death on October 24, 2013, Charles Trammell's interest in the Short Line Residence and his remaining 8,798 shares of UPS stock went to Belinda Trammell as payable on death.  With the completion of those transfers, his remaining assets consisted of the following: (i) a 5% interest in Trammell Orange Beach fairly valued at **$92,566** ($660,000 x .05, plus 5% of cash on hand and previously transferred UPS stock shares); (ii) a 5% interest in Trammell Lake Martin fairly valued at **$102,634** ($859,000 x .05, plus 5% of cash on hand and previously transferred UPS stock shares); and (iii) a half interest in the Trammells' automobiles and other assets (**$29,700**).  Thus, immediately after the October 2013 transfers of UPS stock and the half interest in the Short Line Residence, the total assets in Charles Trammell's Estate were fairly valued at just **$224,900**.

With respect to liabilities, Charles Trammell owed the following sums as of October 24, 2013: (i) **$2,274,750** (including $315,000 in principal and $1,959,750 in accrued interest) on the March 2005 Bama Bayou guaranty; (ii) **$2,290,000** (including $280,000 in principal and $2,010,000 in accrued interest) on the May 2006 Bama Bayou guaranty; (iii) **$1,868,306** (including $280,000 in principal and $1,588,306 in accrued interest) on the September 2007 Bama Bayou guaranty; (iv) **$2,895,803** (including $280,000 in principal and $2,615,803 in accrued interest) on the Marine Park guaranty; and (v) **$390,502** (including $387,723 in principal and $2,779 in accrued interest) on the Sundance post-judgment settlement note.  Thus, as of October 24, 2013, the Estate's total liabilities were **$9,719,361**.

---

[30]        Recall that Vision Bank reached a settlement of its lawsuit against Sundance, LLC, Charles Trammell, and the other Sundance guarantors in February 2012.  Pursuant to that settlement, Trammell (along with Sundance and the other guarantors) had executed a settlement note in favor of Vision Bank in the amount of $428,118.22, to be paid in 36 monthly installments.  This development had the effect of reducing Charles Trammell's liability under the Sundance guaranty to the total then-outstanding balance on the settlement note.

## 2. *Belinda Trammell's Assets and Liabilities as of December 2011.*[31]

As discussed *supra*, on December 12, 2011, Belinda Trammell transferred a 22.5% membership interest in Trammell Orange Beach to Center, a 22.5% membership interest in Trammell Orange Beach to Brown, a 22.5% membership interest in Trammell Lake Martin to Center, and a 22.5% membership interest in Trammell Lake Martin to Brown. As a result of these transfers, Belinda Trammell retained only a 5% interest in each LLC. Based on defendants' valuation of the Perdido Place Condo at $624,000 and the Lake House at $925,000 as of December 2011, and given that the LLCs had no substantial assets or liabilities at that time other than the real property, Belinda Trammell's 5% interest in Trammell Orange Beach was fairly valued at **$31,231** ($624,000 x .05, plus 5% of cash on hand) and her 5% interest in Trammell Lake Marin was fairly valued at **$46,313** ($925,000 x .05, plus 5% of cash on hand) as of December 12, 2011.

The other assets owned by Belinda Trammell as of the December 12, 2011, and the fair market valuations of each, were as follows: (i) a half interest in the Short Line Residence (**$81,000**, based on a $162,000 appraised value); (ii) a half interest in the Trammells' cash on hand and in joint bank accounts (**$31,387**); (iii) **$154** in a Wachovia/Wells Fargo bank account; (iv) a UBS retirement account valued at **$172,141**; and (v) a half interest in the Trammells' automobiles and other assets (**$29,700**). Thus, immediately after the December 2011 transfers of LLC membership interests to her daughters, Belinda Trammell's total assets were fairly valued at **$391,926**.

---

[31]     At trial, SEPH presented evidence of Belinda Trammell's assets and liabilities as of various other transfer dates, including April 2012 (when Charles Trammell transferred thousands of shares of UPS stock to the LLCs) and October 2013 (when Charles Trammell's remaining UPS stock and interest in the Short Line Residence went to Belinda Trammell pursuant to payable-on-death arrangements). The Court need not and does not make findings of fact concerning Belinda Trammell's assets and liabilities on those dates because there is no evidence that she transferred any assets to anyone then. The only transfers by Belinda Trammell that SEPH challenges herein are (i) her January 2011 transfer of ownership interests in the Perdido Place Condo and Lake House to the LLCs (which the Court finds are not constructively fraudulent under the AUFTA without regard to Belinda Trammell's solvency *vel non*); and (ii) her December 2011 transfer of membership interests in the LLCs. Thus, the only date for which an accounting of Belinda Trammell's assets and liabilities is material to the AUFTA claims in this action is December 12, 2011.

On the liability side of the ledger, Belinda Trammell owed half of the Trammells'
outstanding mortgage on the Short Line Residence, or **$8,571**. Her remaining liabilities relate to
the two Bama Bayou guaranties and the Marine Park guaranty she had executed. With respect to
the May 2006 Bama Bayou guaranty, Belinda Trammell owed a total of **$1,532,222** (including
$280,000 in principal plus $1,252,222 in accrued interest) as of December 12, 2011. With
respect to the September 2007 Bama Bayou guaranty, Belinda Trammell owed a total of
**$1,269,587** (including $280,000 in principal plus $989,587 in accrued interest) as of December
12, 2011. And with respect to the Marine Park guaranty, Belinda Trammell owed a total of
**$1,905,909** (including $280,000 in principal plus $1,625,909 in accrued interest) as of December
12, 2011. Thus, as of December 12, 2011, Belinda Trammell's total liabilities were **$4,716,289**.

**III.    Conclusions of Law: Liability.**

  *A.    Threshold Liability Issues Common to All AUFTA Causes of Action.*

At trial and in post-trial briefing, defendants have raised certain legal objections that
apply with equal force to all of Counts I, II and III, SEPH's causes of action asserted under the
Alabama Uniform Fraudulent Transfer Act. The Court will resolve those threshold issues first,
then undertake a specific claim-by-claim analysis.

  *1.    AUFTA Liability as to Non-Debtor / Non-Transferor Defendants.*

A recurring theme in defendants' Post-Trial Brief is that defendants Center, Brown,
Trammell Orange Beach and Trammell Lake Martin cannot be liable under the AUFTA, as a
matter of law. (*See* doc. 176, at 3, 6, 7, 18, 26-27, 30-31, 33.) In a typical iteration of this
refrain, defendants posit that there can be no AUFTA liability unless one is a debtor, and there is
no evidence that Center, Brown, or the LLCs were "debtors" within the meaning of the AUFTA.
They point out that SEPH introduced no evidence at trial suggesting that Center, Brown and the
LLCs ever owed SEPH or Vision Bank anything. They reason that SEPH has not challenged any
asset transfers made by Center, Brown and the LLCs. On the basis of these observations,
defendants contend that the transferee defendants cannot be liable under the AUFTA because
"Amy Brown, Tammy Center, and both Family LLCs are not debtors and did not transfer any
assets under AUFTA." (*Id.* at 18.)

This argument hinges on the incorrect premise that AUFTA liability can be visited only
on "debtors" and "transferors." On its face, the statute does not restrict liability to transferors of

fraudulently transferred assets; to the contrary, it expressly provides for remedies against transferees, as well. Pertinent statutory language includes the following:

> "[T]o the extent a transfer is voidable in an action by a creditor under Section 8-9A-7(a)(1), the creditor may recover judgment for the value of the asset transferred … or the amount necessary to satisfy the creditor's claim, whichever is less, or judgment for conveyance of the asset transferred. ***The judgment may be entered against***:
>
> "(1)  ***The first transferee of the asset or the person for whose benefit the transfer is made***; or
>
> "(2)  ***Any subsequent transferee*** other than a good faith transferee who took for value or from any subsequent transferee."

Ala. Code § 8-9A-8(b) (emphasis added). More generally, where statutory remedies include avoidance of a transfer, injunction against further disposition of assets and so on, logic and common sense dictate that transferees must be valid AUFTA defendants in order for such remedies to take effect. Abundant case law supports the proposition that defrauded creditors have a right of action against fraudulent grantees.[32] More fundamentally, it is well settled that "[t]he purpose of the AUFTA is to prevent fraudulent transfers of property by a debtor who intends to defraud creditors by placing assets beyond their reach." *Thompson Properties v. Birmingham Hide & Tallow Co.*, 839 So.2d 629, 632 (Ala. 2002). That statutory purpose would

---

[32]  *See generally Husky Int'l Electronics, Inc. v. Ritz*, --- U.S. ----, 136 S.Ct. 1581, 1588, 194 L.Ed.2d 655 (2016) (referencing "the now-common understanding that a conveyance which hinders, delays or defrauds creditors shall be void as against the recipient unless that party received it in good faith and for consideration") (citation and internal marks omitted); *Reese v. Smoker*, 475 So.2d 506, 508 (Ala. 1985) ("Once constructive fraud is alleged in a family transaction, the grantee has the burden of proving the bona fide character of the underlying transaction."); *Rochell v. Oates*, 2 So.2d 749, 752 (Ala. 1941) ("A court of equity follows the proceeds of the property, and affords a remedy by turning the legal owner into a trustee for the benefit of creditors.") (citation omitted); *American Nat'l Bank & Trust Co. v. Powell*, 178 So. 21, 30 (Ala. 1937) ("If the fraudulent grantee has disposed of the property, or any part of it, she may be forced to account for the reasonable value thereof at the time and place she received it, and a personal judgment may be rendered against here therefor, the same as if she were not the wife of the grantor."); *Cotton Energy Corp. v. Smith*, 718 So.2d 1142, 1145 (Ala.Civ.App. 1998) (concluding that it was proper "to require a fraudulent grantee, as the trustee of the property, to preserve the property intact and to account for any proceeds received from or through the property during the time the fraudulent grantee held the property," and finding reversible error where trial court discharged fraudulent grantee from the case and refused to order attachment and sale of property).

be frustrated if the defrauded creditor's only remedy was against the debtor who had already placed the assets beyond the creditor's reach, with no recourse against the recipient/holder of those assets beyond the creditor's reach. Defendants' argument thus contravenes not only the plain statutory language, but also the *raison d'être* of the AUFTA.

In light of the foregoing, the Court rejects defendants' legally unfounded contention that defendants Center, Brown and the LLCs are categorically entitled to dismissal of Counts I through III (the AUFTA causes of action) because they are not debtors and did not transfer assets under AUFTA. Rather, SEPH may be entitled to monetary and equitable remedies against the transferees if the Court finds the transfers to have been fraudulent under applicable law. Accordingly, the transferees are properly joined in this action and named as defendants in the AUFTA claims.

### 2. Whether the Perdido Place Condo Is an AUFTA "Asset."

Next, the Court resolves the legal issue raised by defendants as to whether the Perdido Place Condo constitutes an "asset" for purposes of the AUFTA. By statute, the term "asset" means "[p]roperty of a debtor," subject to certain exclusions. Ala. Code § 8-9A-1(2). One such exclusion from the definition of asset is "[a]n interest in property held in tenancy in common for life with cross contingent remainder to the survivor in fee to the extent it is not subject to process by a creditor holding a claim against only one tenant." Ala. Code § 8-9A-1(2)(c).

Defendants' position is that the Perdido Place Condo falls within the § 8-9A-1(2)(c) exclusion. The argument is not without superficial appeal. After all, the exclusion generally applies to an "interest in property held in tenancy in common for life with cross contingent remainder to the survivor in fee." The March 2004 Warranty Deed establishing the Trammells' interests in the Perdido Place Condo reflects that the property was conveyed to Charles and Belinda Trammell "as tenants in common with equal interests during the period of their concurrent lives, and, upon the death of either of them, the remainder to the survivor of said Grantees, in fee simple, forever." Those aspects of the deed and statutory language match up.

But the § 8-9A-1(2)(c) exclusion requires more than a tenancy in common for life with cross contingent remainder to the survivor in fee. It also provides that such an interest (which the Trammells undeniably held in the Perdido Place Condo) is excluded from the scope of the AUFTA definition of an "asset" only if that interest "is not subject to process by a creditor holding a claim against only one tenant." So that, then, is the critical question: Was Charles

Trammell's interest in the Perdido Place Condo subject to process by a creditor holding a claim against only him? For that matter, was Belinda Trammell's interest in the Perdido Place Condo subject to process by a creditor holding a claim against only her? If these questions are answered affirmatively, then those individual tenants' interests in the Perdido Place Condo are an AUFTA asset. If they are answered negatively, however, then the individual tenants' interests in that property are not an AUFTA asset.[33] This is where defendants' argument breaks down. They state in conclusory fashion that "[t]he Orange Beach Condominium was not subject to process by a creditor holding a claim against only one tenant." (Doc. 176, at 17.) But they offer no authority or legal analysis whatsoever to support that bald conclusion. The undersigned's research suggests that the interests of a tenant in common (at least as to the tenant's life estate in an undivided one-half interest in the real property) in Alabama are levyable by a creditor holding a claim against only one tenant.[34]

_____

[33] This is not an arbitrary distinction. As the Official Commentary to the Uniform Fraudulent Transfer Act explains, restrictions on levyability of interest in certain property "are limitations on the rights and remedies of unsecured creditors, and it is therefore appropriate to exclude property interests that are beyond the reach of unsecured creditors from the definition of 'asset' for purposes of this Act." *Uniform Fraudulent Transfer Act 1984*, § 1, at comment 2. The Commentary hastened to add that "[t]he levyable interest of such a tenant [whether a joint tenant, tenant in common, or tenant by the entirety] is included as an asset under this Act." *Id.*

[34] *See, e.g., Uniform Fraudulent Transfer Act 1984*, § 1, at comment 2 ("A creditor of a joint tenant or tenant in common may ordinarily collect a judgment by process against the tenant's interest …."); Ala. Code § 6-9-40(1) ("Executions may be levied … [o]n real property to which the defendant has a legal title or a perfect equity, … or in which he has a vested legal interest in possession, reversion or remainder, whether he has the entire estate or is entitled to it in common with others."); *Yates v. Guest*, 416 So.2d 973, 976 (Ala. 1982) ("Joe L. Yates and Florene Yates own the two parcels of real estate as tenants in common for the joint lives of the co-tenants with indestructible cross-contingent remainders. This gives Guest the opportunity to levy against the interest of Joe Yates in the two parcels."); *Shrout v. Seale*, 250 So.2d 592, 594 n.2 (Ala. 1971) ("The title of a tenant in common, is also subject to execution; and, the purchaser would hold, with the other tenants, as a tenant in common.") (citations omitted); *In re Livingston*, 804 F.2d 1219, 1220 (11th Cir. 1986) (where debtor and wife held property as a tenancy in common for life with a cross-contingent remainder of survivorship, holding that the bankruptcy trustee "may force a sale of debtor's complete interests in said property, along with his wife's life estate interest; however, her contingent remainder interest of survivorship is not subject to sale without her approval"); *see generally United States v. Craft*, 535 U.S. 274, 279-80, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002) ("Tenants in common may each unilaterally alienate their shares through sale or gift or place encumbrances upon these shares."); *Porter v. Porter*, 472 So.2d 630, 632 (Ala. 1985) ("the interest held by tenants in common is devisable and (Continued)

Notwithstanding the foregoing, the Court finds that defendants' "tenancy in common" argument is academic. Here is why: Even if defendants were correct about the law of tenancies in common as it relates to creditor's rights to levy and execution, the § 8-9A-1(2)(c) exclusion only excludes from the AUFTA definition of asset "[a]n interest in property held in tenancy in common." This is not a case in which Charles Trammell merely transferred his interest in the Perdido Place Condo as a tenant in common. This is not a case in which Belinda Trammell merely transferred her interest in the Perdido Place Condo as a tenant in common. This is a case in which they both transferred the Perdido Place Condo itself, in fee simple.[35] That interest in real property in fee simple is undoubtedly an AUFTA "asset" beyond the purview of the Ala. Code § 8-9A-1(2)(c) exclusion. Moreover, the December 2011 transfer by the Trammells of 90% of their ownership interest in Trammell Orange Beach (the LLC whose single asset was the Perdido Place Condo) to their daughters – by which they effectively transferred a 90% ownership interest in the Perdido Place Condo – was a transfer of a membership interest in an LLC, not a transfer of an interest in property held in a tenancy in common. That membership interest is plainly an "asset" for AUFTA purposes.[36]

---

descendible"); *Lee v. Lee,* 122 So.2d 139, 142 (Ala. 1960) ("One tenant in common of real estate can convey his separate interest therein without being joined by the other tenants in common."). The Alabama Comment to § 8-9A-1 of the AUFTA reflects that, as to tenancies in common for life with cross contingent remainder to the survivor in fee, only "such cross contingent remainders are not subject to levy and sale under execution." Ala. Code § 8-9A-1, at Alabama Comment 2. The life estate portion of that tenancy in common would indeed be subject to levy and sale.

[35]     The Warranty Deed dated January 26, 2011, reflects that the Trammells transferred the Perdido Place Condo to Trammell Orange Beach "TO HAVE AND TO HOLD Unto the said GRANTEE, its successors or assigns, forever." (Plaintiff's Exh. 40.)

[36]     Defendants' argument fails for yet another reason, too. The commentary to the Uniform Fraudulent Transfer Act explains that the definition of "asset" is designed to "require[] exclusion of interest in property held by tenants by the entirety that are not subject to collection process by a creditor *without a right to proceed against both tenants … as joint debtors*." *Uniform Fraudulent Transfer Act 1984*, § 1, at comment 2 (emphasis added). This is not a case where SEPH lacked a right to proceed against both tenants. To the contrary, SEPH did have a right to proceed against both Charles Trammell and Belinda Trammell as guarantors who were jointly and severally liable. This is simply not a case in which we should be concerned about the rights of one tenant in common where the creditor's right to execution was limited to the (Continued)

For all of the foregoing reasons, the Court concludes that the § 8-9A-1(2)(c) exclusion from the statutory definition of "asset" has no application here. Defendants' transfers of the Perdido Place Condo to the LLC, and of membership interests in that LLC to their daughters, were transfers of assets subject to the AUFTA.

### 3. Whether the Short Line Residence Transfer Is an AUFTA "Transfer."

The final preliminary issue as to the AUFTA causes of action is whether the conveyance of the Short Line Residence to Belinda Trammell upon Charles Trammell's death on October 24, 2013 constitutes a "transfer" for AUFTA purposes.[37]

To recap the relevant facts, Charles and Belinda Trammell acquired the Short Line Residence on or about October 24, 1986. The Warranty Deed conveying that property to them provided that the Trammells owned it "for and during their joint lives and upon the death of either of them, then to the survivor of them in fee simple …." Charles and Belinda Trammell held the Short Line Residence as joint tenants with rights of survivorship for 27 years. Upon Charles Trammell's death, Belinda Trammell owned the Short Line Residence in fee simple.

SEPH contends that the death of Charles Trammell effectuated a "transfer" of his interest in the Short Line Residence to Belinda Trammell for AUFTA purposes. In its Post-Trial Brief, however, SEPH advances no argument in support of this proposition, but generically refers the Court to three of its earlier filings exceeding 50 pages in length, with no pinpoint citations.

---

interests of the co-tenant. Here, the creditor had the right to levy against both co-tenants' interests, thereby removing the Perdido Place Condo from the parameters of the § 8-9A-1(2)(c) exclusion.

[37] Although they had done so earlier, defendants do not maintain in their Post-Trial Brief that the transfer of Charles Trammell's remaining 8,798 shares of UPS stock to Belinda Trammell does not qualify as an AUFTA transfer. At any rate, given the broad statutory definition of "transfer" and the evidence that those UPS shares were held entirely by Charles Trammell until his death, at which time they passed entirely to Belinda Trammell, who had previously held no interest in those UPS shares, the Court readily finds that event to constitute a transfer within the expansive parameters of the statutory definition. The transfer of UPS shares to Belinda Trammell upon her husband's death was an involuntary mode of disposing of an asset previously held by Charles Trammell, and was therefore a transfer under the AUFTA. *See* Ala. Code § 8-9A-1(13) (defining "transfer" as "[e]very mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset").

(Doc. 177, at 8 n.7.)[38]  Thus, SEPH has unhelpfully invited the Court to comb its previous briefs in search of supporting arguments that may be embedded therein.  Upon review of those filings, it appears that SEPH is pinning its hopes on the breadth of the statutory definition of the term "transfer."  (*See* doc. 91, at 25; doc. 109, at 16.)  Indeed, the AUFTA defines a "transfer" as "[e]very mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance."  Ala. Code § 8-9A-1(13).  Notably, SEPH identifies no decisional authority bolstering the proposition that the death of a joint tenant with rights of survivorship gives rise to an AUFTA "transfer," even under that broad statutory framework.

More importantly, SEPH's argument misses the mark because of the mechanics of what actually happens to a joint tenancy when one joint tenant dies.  It is hornbook law that "[u]pon the death of one joint tenant, that tenant's share in the property does not pass through will or the rules of intestate succession; rather, the remaining tenant or tenants automatically inherit it." *United States v. Craft*, 535 U.S. 274, 280, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002) (citations omitted).  Under well-settled Alabama law, "[A] joint tenant's property interest in the tenancy … does not pass into the tenant's estate upon death if he or she is survived by another joint tenant. Instead, the property interest is extinguished and the surviving tenant owns the property in fee under the conveying instrument."  *Ex parte Arvest Bank*, --- So.3d ----, 2016 WL 4943250, *13 (Ala. Sept. 16, 2016).  The Alabama Supreme Court has emphasized that the termination of the decedent's property interest is not properly viewed as such interest passing from decedent to survivor.  The surviving joint tenant takes full ownership not because the decedent passed an interest to her, but rather because the conveying instrument (*i.e.*, the 1986 Warranty Deed) so provided.  As the *Arvest* Court explained:

"Alabama cases are united with other authorities in indicating that the last survivor of a joint tenancy takes full ownership under the conveying instrument,

---

[38]     The only discussion presented by SEPH on this point in its Post-Trial Brief is a statement that "[n]otably, the residence was titled as a joint tenancy, which is subject to process by a creditor holding a claim against only one tenant."  (Doc. 177, at 8 n.7.)  While the rights of a creditor holding a claim against only one tenant of a tenancy in common are undoubtedly relevant to the AUFTA definition of "asset," plaintiff does not explain how – or if – they have any relevance to whether an AUFTA "transfer" has occurred.

not because the deceased joint tenant passed an interest to the surviving joint tenant. … ***Death does not enlarge or change the estate.*** Death terminates [the deceased joint tenant's] interest in the estate. ***It is rather a falling away of the tenant from the estate than the passing of the estate to others***."

*Id.* at \*13 n.8 (citations omitted and emphasis added). What this means is that, upon Charles Trammell's death, his interest in the Short Line Residence was extinguished, along with any encumbrances on such interest. The entire estate in the Short Line Residence vested in Belinda Trammell on October 24, 2013 not because Charles Trammell's interest passed to her, but because his interest ceased and he fell away from the estate, leaving Belinda Trammell to assume sole ownership by virtue of the 1986 deed. *Id.* at \*8 ("[T]he entire estate in the property vested in Evelyn at Raymond's death because Raymond's interest ceased at that time. The judgment lien did not attach to Evelyn's interest because she assumed sole ownership of the property by virtue of the deed; Raymond's interest did not pass to her."). Belinda Trammell's ownership of the entire estate is simply a continuation, or extension, of the same interest in the Short Line Residence she had held since 1986. *See Toma v. Toma*, 163 P.3d 540, 544-45 (Okla. 2007) ("The title of the deceased joint tenant terminates and vests *eo instanti* (i.e. immediately) in the survivor. Because joint tenants are seized of the whole while alive, the survivor's interest is simply a continuation, or extension, of his/her existing interest. … [T]he surviving joint tenants take under the original grant, not from the deceased.").

In terms of the AUFTA framework, Charles Trammell's death could not have effectuated a fraudulent transfer of his interest in the Short Line Residence to Belinda Trammell because, as a matter of Alabama law, nothing passed from Charles Trammell to Belinda Trammell. Stated differently, Belinda Trammell's interest in the Short Line Residence was neither enlarged nor changed in any way. Her husband's death simply caused his interest to fall away, leaving her with full ownership under the terms of the 1986 Warranty Deed. This is not, and cannot reasonably be viewed as, a "transfer" of something from Charles Trammell to Belinda Trammell. SEPH points to nothing in the statutory language, the official commentary, or the interpretive authorities in Alabama or any other state that has adopted the Uniform Fraudulent Transfer Act supporting a legal determination that an AUFTA "transfer" can occur where no property and no

interest in property passes from the debtor to a transferee.[39]  This Court declines to be the first to read the Alabama statute so counterintuitively.

For all of the foregoing reasons, the Court concludes that Charles Trammell's death did not effectuate a "transfer" for AUFTA purposes of his interest in the Short Line Residence to Belinda Trammell.  There being no AUFTA "transfer," SEPH's claims for relief directed at Belinda Trammell's fee-simple ownership of the Short Line Residence after October 24, 2013 are not cognizable, as a matter of law.  There was no AUFTA violation when Belinda Trammell became owner of the Short Line Residence in fee simple upon her husband's death; rather, her taking of full ownership was outside the purview of the statute.

### B. *Count I: Actual Fraudulent Transfer (Ala. Code § 8-9A-4(a)).*

In Count One, SEPH brings a claim for actual fraudulent transfer, pursuant to Alabama Code § 8-9A-4(a).  That section provides that "[a] transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor."  Ala. Code § 8-9A-4(a).  Thus, to prevail on this cause of action, SEPH must show by a preponderance of the evidence "[t]hat the plaintiff is a creditor of the debtor;" and "[t]hat the debtor transferred an

---

[39]    As defendants point out, at least one state supreme court has interpreted an analogous provision in its version of the Uniform Fraudulent Transfer Act in a manner contrary to SEPH's position. *See Mahlin v. Goc*, 547 N.W.2d 129, 132 (Neb. 1996) ("Because no transfer occurs at the time of a joint tenant's death, we determine that under the facts of this case, the Uniform Fraudulent Transfer Act's definition of 'transfer' does not apply.").  That said, the Court is aware from its own research that New York state courts have opined that the death of a joint tenant is a transfer under the Uniform Act.  *See, e.g., Gallagher v. Kirschner*, 220 A.D.2d 948, 949-50 (N.Y.A.D. 3 Dept. 1995) ("Even where the transfer occurs by operation of law upon the death of a joint tenant, a creditor may recover the interest transferred, as a fraudulent transfer, if … the transfer rendered the deceased debtor's estate insolvent.") (citations omitted).  But the New York result appears to stem from a feature in that state's law under which "the surviving joint tenant may not rely on succession to the deceased's half interest as a bar to enforcement." *Kozyra v. Goldstein*, 550 N.Y.S.2d 229, 231 (1989).  In Alabama, by contrast, such succession indeed operates as a bar to enforcement.  *See Arvest*, 2016 WL 4943250, at *13 ("Because it is clear that Raymond and Evelyn created a joint tenancy with a right of survivorship in the September 11, 2012, deed, and because Raymond's interest in the property to which Iberia's judgment lien attached was extinguished upon his death, Iberia has no interest in the property.").

asset or an interest in an asset with the actual intent to injure, delay or defraud the plaintiff or any other creditor of the debtor." *Ala. Pattern Jury Instr. Civ.* § 18.22 (3d ed.).[40]

### 1.    *Creditor/Debtor Relationship.*

There is no *bona fide* disagreement that, for purposes of these AUFTA claims, SEPH is a "creditor" and Charles and Belinda Trammell are "debtors." The Court made an express finding to that effect pursuant to Rule 56(g), Fed.R.Civ.P., in the Order on Summary Judgment dated December 30, 2016.[41] Defendants admit in their Post-Trial Brief that "Only Sonny Trammell and Belinda Trammell are 'debtors' of SEPH." (Doc. 176, at 6.) At any rate, the Court readily finds that SEPH established by a preponderance of the evidence at trial, principally through the testimony of Jennifer Corbitt and accompanying exhibits, that Belinda Trammell and the Estate of Charles Trammell are both debtors of SEPH today, and that the Trammells were debtors of SEPH and/or Vision Bank when the challenged transfers occurred.[42]

---

[40]    In the Joint Pretrial Document, the parties agreed that the legal elements of SEPH's actual fraudulent transfer claim are as set forth in § 18.22 of the Alabama Pattern Jury Instructions for civil actions. (Doc. 129, at 3.)

[41]    The December 30 Order explained that the AUFTA defines "creditor" as "[a] person who has a claim" and "debtor" as "[a] person who is liable on a claim," where a "claim" is "[a] right to payment, whether or not the right is reduced to judgment, … disputed [or] undisputed." (Doc. 122, at 10.) The December 30 Order examined record evidence that SEPH's predecessor had loaned millions of dollars to Bama Bayou, that the Trammells had executed guaranties in favor of SEPH's predecessor on those loans, that Bama Bayou had defaulted on the loans, that SEPH's predecessor had demanded payment from the guarantors (including the Trammells), that Charles and Belinda Trammell had refused to pay, and that the Trammells were then indebted to SEPH for the guarantied principal portion, plus all accrued interest and collection costs. (*Id.* at 10-11.) Defendants made no showing on summary judgment to demonstrate the existence of genuine issues of fact as to whether SEPH had a "right to payment" from the Trammells, and hence whether a creditor/debtor relationship existed as between them. (*Id.* at 11-13.)

[42]    In their Post-Trial Brief, defendants suggest that Belinda Trammell is not a debtor of SEPH because (i) "Mrs Trammell denied executing two of the three guarantees SEPH claims she executed;" (ii) "Mrs. Trammell asserted a counterclaim against SEPH in the [*Bama Bayou* Action] for violation of ECOA in connection with its requirement that she provide a guarantee," and that if this counterclaim succeeds, "she will have no obligation to SEPH;" and (iii) "Mrs. Trammell testified that they thought they were going to win the Bama Bayou case brought against them." (Doc. 176, at 7-8.) None of these arguments are persuasive. As to the first, the Court has made a finding of fact that, in accordance with her multiple sworn, counseled admissions and her inability to explain same, Belinda Trammell executed all three guaranties. (Continued)

### 2. *"Actual Intent" and Badges of Fraud.*

The critical issue for Count One, then, is whether the Trammells "transferred an asset or an interest in an asset with the actual intent to injure, delay or defraud the plaintiff or any other creditor." *Ala. Pattern Jury Instr. Civ.* § 18.22 (3d ed.) "Actual fraud denotes the actual mental operation of intending to defeat or delay the rights of the creditor." *Cox v. Hughes*, 781 So.2d 197, 201 (Ala. 2000) (citation omitted). The determination of "actual intent" is a multifactor query. *See, e.g., Aliant Bank v. Davis*, 198 So.3d 508, 512 (Ala.Civ.App. 2015) ("The trial court

---

Second, with regard to the ECOA counterclaim in the *Bama Bayou* Action, defendants have failed to develop that issue, either factually or legally, in any meaningful way in this action. The Court will neither "guess" nor accept on faith defendants' apparent optimism that Belinda Trammell's ECOA counterclaim is meritorious. On this record, the undersigned is hard-pressed to perceive how any viable claim for violation of the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 *et seq.*, might arise from Vision Bank's requirement that Belinda Trammell sign guaranties despite her non-involvement in Bama Bayou, LLC and Marine Park, LLC, where her husband (who was involved in those business ventures) had represented to Vision Bank in a Personal Financial Statement that <u>all</u> of his assets were jointly held with Belinda Trammell. *See generally* 15 U.S.C. § 1691(b)(1) ("It shall not constitute discrimination for purposes of this subchapter for a creditor … to make an inquiry of marital status if such inquiry is for the purpose of ascertaining the creditor's rights and remedies applicable to the particular extension of credit"); *Moran Foods, Inc. v. Mid-Atlantic Market Development Co.*, 476 F.3d 436, 442 (7th Cir. 2007) (no ECOA violation where creditor reviewed guarantor's list of assets and "noticed that several residences were included and so it naturally and correctly assumed that Mrs. Camp had an interest in those assets," such that "[i]t was therefore sound commercial practice unrelated to any stereotypical view of a wife's role for [creditor] to require that she guarantee the debt along with her husband"); *Silverman v. Eastrich Multiple Investor Fund, L.P.*, 51 F.3d 28, 33 (3rd Cir. 1995) ("Although the district court noted plaintiff was not a partner in Hunt's Pier, Atlantic may have justifiably required her to guaranty the loan if it determined her husband was not independently creditworthy."); *LOL Finance Co. v. F.J. Faison, Jr. Revocable Trust*, 2010 WL 3118630, *9 (D. Minn. July 13, 2010) ("A number of Courts have held that, where the property of a Guarantor is jointly owned by his or her spouse, requiring the spouse to co-sign the Guaranty does not violate the ECOA."). The Court therefore does not credit defendants' wildly optimistic legal argument that Belinda Trammell's ECOA counterclaim in the *Bama Bayou* Action is likely to relieve her of all indebtedness to SEPH. Third, defendants' contention that "Mrs. Trammell testified that they thought they were going to win the Bama Bayou case" mis-states her testimony. In saying "I just thought we were going to win with Vision Bank" (doc. 173, at 88), Belinda Trammell was not handicapping her odds of success in the *Bama Bayou* Action (which would have been self-serving and unhelpful anyway) but was rather answering questions about the January 2005 Personal Financial Statement, which she admitted signing without ever reading. Taken in context, the Court construes the cited testimony as being that Belinda Trammell paid little heed to the PFS because she believed the projects were going to succeed with Vision Bank's help.

considers several factors in determining whether the debtor possessed the requisite intent, including to whom the transfer was made, the amount of assets transferred, and the financial condition of the debtor before and after the transfer.") (citation omitted). Indeed, the AUFTA recites a non-exhaustive list of 11 factors that may be considered in determining actual intent under § 8-9A-4(a).[43] These circumstantial indicia of intent are sometimes called "badges of fraud." *See, e.g., In re Vista Bella, Inc.*, 511 B.R. 163, 194 (Bankr. S.D. Ala. 2014) ("Actual intent to hinder, delay, or defraud creditors is ordinarily established by circumstantial evidence. … That evidence is typically gathered by a court's consideration of certain badges of fraud … in Ala. Code § 8-9A-4(b)"); *In re XYZ Options, Inc.*, 154 F.3d 1262, 1271 (11th Cir. 1998) ("In determining whether the circumstantial evidence is sufficient to establish fraudulent intent, the court should investigate the transfer for the existence of badges of fraud."). "No specific combination of badges is necessary for a finding of actual intent." *Vista* Bella, 511 B.R. at 194. "[I]t is clear that actual intent to hinder, delay, or defraud is a heavily fact-dependent question." *Id.* at 195.

For more than a century, the Alabama Supreme Court has cautioned that transfers of property between family members, such as from husband to wife or from father to daughter, must undergo especially careful scrutiny. *See, e.g., Cox*, 781 So.2d at 201 ("Conveyances of property between family members in the face of a pending suit against the grantor must undergo especially careful scrutiny.") (citations omitted).[44] The Court proceeds in recognition of this

---

[43] The enumerated factors include whether "(1) The transfer was to an insider; (2) The debtor retained possession or control of the property transferred after the transfer; (3) The transfer was disclosed or concealed; (4) Before the transfer was made the debtor had been sued or threatened with suit; (5) The transfer was of substantially all the debtor's assets; (6) The debtor absconded; (7) The debtor removed or concealed assets; (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; (9) The debtor was insolvent or became insolvent shortly after the transfer was made; (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." Ala. Code § 8-9A-4(b).

[44] *See also Gurley v. Blue Rents, Inc.*, 383 So.2d 531, 535 (Ala. 1980) ("In Alabama, the fact that a conveyance took place between a husband and a wife does not raise any presumption of fraud, nor does it represent a badge of fraud. Instead, it alters the scrutiny with which the court must consider the conveyance. … It was essential that the conveyance be more closely scrutinized."); *Ryan v. Wohl, South & Co.*, 1 So.2d 292, 293 (Ala. 1941) ("Though the (Continued)

principle, particularly given that the challenged transfers here involved moving assets from parents to daughters and from husband to wife at a time when the parents/husband faced potentially crippling financial exposure for defaulted guaranties on which they had been sued.

### 3. *Actual Intent and 2011-2012 Transfers.*

During a 15-month period between January 2011 and April 2012, Charles and Belinda Trammell transferred millions of dollars in assets to their daughters (Center and Brown) and the two family LLCs. To summarize, in January 2011, the Trammells transferred the Perdido Place Condo and the Lake House from their own names into two newly-created LLCs they owned. Eleven months later, the Trammells transferred 90% membership interests in those two LLCs to Center and Brown, retaining just 10% for themselves. And in April 2012, Charles Trammell transferred more than 25,000 shares of UPS stock owned by him into the LLCs, causing the stock to be owned 45% by Center, 45% by Brown, 5% by Belinda Trammell, and just 5% by Charles Trammell, in accordance with their respective LLC membership interests. The "actual intent" element may be analyzed collectively for these three sets of transfers; however, the October 2013 transfer will be addressed separately.

Numerous badges of fraud point in the direction of an actual intent to defraud. First, all three sets of transfers were made to "insiders" or the equivalent of insiders for AUFTA purposes, because all of these assets were transferred either to family-controlled LLCs, to the Trammells' daughters, or from Charles Trammell to his wife. Under any reasonable reading, the "insider" badge of fraud is present here with respect to the 2011 and 2012 transactions.[45]

---

relationship of father and daughter is not within itself a badge of fraud, yet it is the established rule that transactions between such relatives are to be jealously watched and are to be subject to closer scrutiny than would be required of a stranger."); *Waddle v. Great Southern Phosphate Co.*, 63 So. 462, 463 (Ala. 1913) ("Where the contract is between near relations, as between husband and wife, father and son, and the like, it will be subjected to a closer scrutiny … than if the parties to it were strangers. … Such purchases are so often made a cover for a debtor's property, are so frequently resorted to for the purpose of withdrawing his property from the reach of his creditors and preserving it for his own use, and they hold forth such temptations for fraud, that they require close scrutiny.") (citation omitted).

[45]     Defendants take the position that "[t]he first and third transfers at issue were to two Family LLCs. They were not to insiders." (Doc. 176, at 10.) This contention cannot withstand scrutiny. Each LLC was owned, controlled, managed and run <u>entirely</u> by Charles Trammell, Belinda Trammell, and their two daughters at all times relevant to these proceedings. (Continued)

Second, the badge of fraud of a debtor retaining possession or control of the transferred property is present here. The evidence at trial was that nothing changed with respect to the Trammells' usage of the Perdido Place Condo or the Lake House after the transfers to the LLCs and to their daughters. They continued to use those properties like owners, and there is no indication in the record of any modification in the frequency or manner in which the Trammells utilized those properties post-transfer.[46] As for the UPS stock transferred by Charles Trammell into the LLCs in April 2012, he continued to have the benefit of possession or control over those shares even after the transfers and to use those shares to satisfy his own personal obligations. For example, trial testimony established that the settlement of SEPH's claims against Charles Trammell (and the associated attorney's fees) as to the Sundance guaranty was financed with over $180,000 worth of UPS stock that had been transferred out of Trammell's hands and into

---

Under any reasonable view of the facts, those LLCs are "insiders" for purposes of the actual fraudulent intent analysis. The AUFTA states that term "insiders" "includes … [a] relative of the debtor," "[a] partnership in which the debtor is a general partner," and "[a] corporation of which the debtor is a director, officer, or person in control." Ala. Code. § 8-9A-1(8)(a). For purposes of the "badges of fraud" analysis, there is no meaningful difference between a family-controlled partnership, a family-controlled corporation and a family-controlled LLC. All are properly viewed as "insiders" for AUFTA purposes. The Court will not create an arbitrary distinction between a family-controlled partnership and a family-controlled LLC merely because the non-exhaustive definition of "insiders" in the statute lists the former but not the latter. *See generally Uniform Fraudulent Transfer Act 1984*, § 1 at comment 7 ("[T]he word 'includes' is not limiting, however. Thus, a court may find a person living with an individual for an extended time in the same household … to have the kind of close relationship intended to be covered by the term 'insider.' Likewise, a trust may be found to be an insider of a beneficiary."); *Matter of Holloway*, 955 F.2d 1008, 1010 (5th Cir. 1992) ("[T]he UFTA's definition of 'insider' is not intended to limit an insider to the four listed subjects. Instead, the drafters provided the list for purposes of exemplification.") (citation and internal quotation marks omitted). The Court readily concludes that Trammell Orange Beach and Trammell Lake Martin had the kind of close relationship with the Trammells intended to be covered by the term "insider."

[46] In contesting this point, defendants argue, without elaboration or explanation, that "[t]he fact that Mr. or Mrs. Trammell may have used the lake house or the condo is not evidence of possession or control." (Doc. 176, at 11.) Sure it is. If the Trammells' use of the Perdido Place Condo and the Lake House was exactly the same after the transfers (when their ownership interest was reduced to just 10%) as it was before the transfers (when their ownership interest was 100%), then that fact raises a reasonable inference that the Trammells retained possession and control of those properties and that the transfers were a sham designed to thwart creditors like Vision Bank.

LLCs in which he owned only a 5% interest.  Center, Brown and Belinda Trammell had zero exposure in the Sundance matter, yet UPS stock shares nominally owned 95% by them were tapped to pay the Sundance tab.  This fact raises a strong inference of continued possession and control by Charles Trammell post-transfer.  Thus, even though the UPS stock had been nominally transferred 95% to his family members, he continued to reap the benefits of ownership by using those assets to pay liabilities that were personal to him (and later to his Estate).

Third, the badge of fraud of non-disclosure or concealment is present here.  In arguing otherwise, defendants point out that the LLC formation documents were public record, that the name "Trammell" was featured in the names of the entities, and that the deeds were recorded.  All of that is true, but the Court nonetheless finds that the Trammells' non-disclosure of these transfers to Vision Bank/SEPH constitutes a badge of fraud.  The Trammells had executed Personal Financial Statements at Vision Bank's request in January 2005 and June 2009.  In these documents, the Trammells had listed Charles Trammell's UPS stock, the Perdido Place Condo and the Lake House as assets.  In each of those Personal Financial Statements, the Trammells expressly represented that Vision Bank "may consider this statement as continuing to be true and correct until a written notice of a change is given to you by the undersigned."  Thus, the Trammells had a duty to disclose to Vision Bank material changes in the assets listed in those Personal Financial Statements.  The transfers of the two pieces of property and the UPS stock together erased 73% of the assets that the Trammells had listed on their Personal Financial Statements; however, they never breathed a word of those transfers to Vision Bank or SEPH.[47]  The non-disclosure badge favors a finding of actual intent to defraud.

A fourth badge of fraud associated with these transactions is that the Trammells had been both sued and threatened with suit before the transfers took place.  Specifically, Charles and

---

[47]     The Court reaches that figure through the following calculations:  In the June 2009 Personal Financial Statement, the Trammells listed a total of $4,505,648 in assets.  That total included $1,200,000 for the Perdido Place Condo, $1,003,000 for the Lake House, and $1,920,000 for 40,000 shares of UPS stock.  The April 2012 transfer resulted in the daughters receiving 22,592 shares of that 40,000 shares of UPS stock, or 56.48% of the original 40,000 shares listed in the PFS.  If the 40,000 shares of UPS stock were valued at $1,920,000 (as indicated on the PFS), then the 56.48% transferred to Center and Brown would be valued at $1,084,416 (1,920,000 x .5648).  Subtracting the $1,200,000 (Perdido Place Condo), the $1,003,000 (Lake House), and the $1,084,416 (UPS stock) from the total assets listed on the Personal Financial Statement leaves just $1,218,232, or 27% of the original amount.

Belinda Trammell were named defendants in the *Bama Bayou* Action filed in Mobile County Circuit Court in January 2009. Moreover, in December 2010, the Sundance loan had gone into default and Vision Bank had demanded payment from Charles Trammell on his Sundance guaranty; therefore, he had been threatened with suit as to that loan before the January 2011 transfers took place. And of course suit was actually filed as to the Sundance loan on January 24, 2011, just two days before Charles and Belinda Trammell transferred the Perdido Place Condo and Lake House to the LLCs. This extremely close temporal proximity is strong evidence of an actual intent to defraud creditors, and is a compelling badge of fraud.[48]

A fifth badge of fraud that supports a finding of actual intent to defraud in this case is that, for each of the 2011-2012 transfers, the value received by the debtor was not reasonably equivalent to the value of the asset transferred. The Court has already written to this issue extensively on summary judgment, at which time it made a specific finding "as a matter of law that the Trammells did not receive a reasonably equivalent value for any of the subject transfers." (Doc. 122, at 20.)[49] Even if that ruling were not dispositive, the Court finds that the analysis and

---

[48]    In an effort to combat this damaging inference, defendants incorrectly state in their Post-Trial Brief that "[t]here was no actual evidence of when the Sundance lawsuit was filed." (Doc. 176, at 11.) Plaintiff's Exhibit 22 is a copy of the Sundance Complaint bearing the blue PDF header generated by this District Court's CM/ECF system, and listing a filing date of January 24, 2011. Even if Plaintiff's Exhibit 22 did not establish the filing date in Sundance (which it does), the Court could and would take judicial notice of that date from official records maintained by this District Court's Clerk of Court in Civil Action 11-0038-WS-B, which would yield the same conclusion. Nor do defendants advance their cause by suggesting that this badge of fraud is attenuated because "the Trammell's [*sic*] thought they were going to win the Bama Bayou case." (Doc. 176, at 11.) As discussed *supra*, such evidence misconstrues Belinda Trammell's testimony. To the extent defendants rely on Judge Stewart's Order of October 26, 2016 in the *Bama Bayou* Action (which they also cite), that Order dated more than four years after the subject transfers says nothing about (i) whether the Trammells will ultimately win or lose the *Bama Bayou* Action, or (ii) what the Trammells reasonably believed their exposure in the *Bama Bayou* Action would be at the time of the transfers. These exhibits in no way mitigate the strong inference of actual fraudulent intent stemming from the fact that the Trammells had been sued once and Charles Trammell knew he was on the verge of being sued a second time when the challenged transfers were planned.

[49]    That finding was supported by nearly six pages of detailed legal analysis. (*See id.* at 14-20.) In summary, the Court's reasoning was as follows: (i) under Alabama law, the "value" element must be scrutinized with particular care where, as here, the transfers are made between family members; (ii) "reasonably equivalent value" is not a synonym for "consideration," and the AUFTA requires "valuable consideration" rather than merely "good (Continued)

conclusions are unchanged based on the evidence presented at trial. The uncontested evidence was that defendants Center and Brown provided no money or property to their parents in exchange for any of the assets transferred to them, and that Belinda Trammell provided no money or property to Charles Trammell in exchange for any of the assets he transferred to her. Thus, the Trammells did not receive reasonably equivalent value for the assets they transferred to their daughters (or the assets Charles Trammell transferred to Belinda Trammell), and this badge of fraud also favors imposition of § 8-9A-4(a) liability.[50]

A sixth badge of fraud is that "[t]he debtor was insolvent or became insolvent shortly after the transfer was made." Ala. Code § 8-9A-4(9). The insolvency issue is addressed in detail in Section III.D., *infra*. For the reasons set forth therein, the Court concludes that this badge of fraud also favors a finding of actual intent to defraud.

A seventh badge of fraud supporting a conclusion that the Trammells actually intended to hinder, delay or defraud their creditors with the 2011-2012 transfers is that they occurred shortly

_____

consideration;" (iii) consideration having no utility from a creditor's standpoint does not satisfy the statutory definition of "value;" (iv) emotional support or unperformed promises of future support are not a fair equivalent value under the AUFTA; (v) notions of "tax savings" and "better asset management" are not a fair equivalent value under the AUFTA; and (vi) the subject transfers had no utility, and yielded absolutely no value, for the Trammells' creditors.

[50]    In their Post-Trial Brief, defendants argue that "[t]he value that was received … shows a lack of any actual intent." (Doc. 176, at 13.) This argument is both factually and legally unpersuasive. From a factual standpoint, evidence at trial did <u>not</u> show that the Trammells made the contested asset transfers as a *quid pro quo* for their daughters to take care of them, pay their bills, drive them on errands, and so on. The Court does not find as a factual matter that the transfers were made by the Trammells in exchange for their daughters' helping them and serving as their *de facto* personal assistants. The Court likewise does not credit defendant Center's self-serving testimony that the assistance rendered by Center and Brown "was the world" to the Trammells and that the Trammells "would have paid anything or given anything" for such assistance. In its capacity as finder of fact, the Court does not credit defendants' assertion that "the Trammell family believed fair value was received" (doc. 176, at 13). From a legal standpoint, defendants' premise is flawed because the relevant badge of fraud is not whether, as defendants put it, "there <u>was</u> value received." (Doc. 176, at 13.) By statute, what matters for actual intent to defraud purposes is not whether there was value received but whether such value "was reasonably equivalent to the value of the asset transferred." Ala. Code § 8-9A-4(b)(8). For the reasons discussed *supra* and in the summary judgment order, the Court answers that question in the negative.

after a substantial debt was incurred. Vision Bank had sued Charles and Belinda Trammell under the Bama Bayou guaranties in 2009. Vision Bank had demanded payment from Charles Trammell under the Sundance guaranty in December 2010, and sued him in January 2011. And Charles Trammell had executed a settlement note in Vision Bank's favor in February 2012 to settle the Sundance matter, pursuant to which he assumed additional debt to Vision Bank. All of these factors confirm that the objected-to transfers occurred shortly before or shortly after the transferors incurred a substantial debt.[51]

The presence of these seven badges of fraud strongly favors, but does not mandate, a finding of actual intent to defraud, which turns on a subjective evaluation of the Trammells' motives. *See, e.g., In re Earle*, 307 B.R. 276, 293 n.9 (Bankr. S.D. Ala. 2002) ("The fact that PCF may have satisfied some of the objective factors in § 8-9A-4(b) does not mandate a finding of actual intent to defraud. This is in part because actual fraudulent intent requires a subjective evaluation of the debtor's motive.") (citation and internal quotation marks omitted). Here, SEPH produced other evidence of a motive to defraud creditors. Most troubling is Charles Trammell's email to his lawyer on January 20, 2011 (a month after Vision Bank had demanded payment on his Sundance guaranty and just four days before Vision Bank commenced the Sundance lawsuit against him). In that correspondence, Charles Trammell identified the Lake House as the one he "would most like to protect," and in the very next sentence wrote that "the 2nd investment in Orange Beach will be going into litigation." A plain, common-sense reading of that email is that Charles Trammell was asking his lawyer to protect the Lake House (and other assets) from Vision Bank, his creditor who he knew was about to sue him for the second time. This interpretation is further bolstered by records from that lawyer, which were rife with references to Vision Bank (such as Charles Trammell listing Vision Bank as "adverse party" on his initial intake form, notes that Bama Bayou owed $10 million and Sundance owed $3 million, identity

---

[51] In an attempt to rebut this badge of fraud, defendants say that the Trammells' only substantial debts are their Vision Bank guaranties, "all of which are dated between 2005 – 2007," more than five years before the transfers at issue. (Doc. 176, at 14.) Defendants are looking at the wrong time period. What matters temporally for the Vision Bank guaranties is when the underlying loans went into default and where Vision Bank called the loans and demanded payment from the guarantors, because that is when the debt may fairly be said to have been incurred by the guarantors. The timing of those events was in far closer proximity to the challenged transfers than defendants' argument lets on.

of Charles Trammell's litigation counsel, and the number of investors). The estate-planning lawyer consulted with litigation counsel, and notified Trammell of the risk that the proposed transfers could be set aside. Viewed in the aggregate, this evidence raises a powerful inference that the Trammells subjectively sought to transfer their assets as a means of placing them beyond the reach of creditors. When considering this evidence in conjunction with the badges of fraud discussed *supra*, it is the finding of this Court that Charles and Belinda Trammell acted with a subjective motive and actual intent to hinder, delay, or defraud creditors when they effectuated the transfers in 2011 and 2012.[52]

Because all elements of actual fraudulent transfer have been proven by a preponderance of the evidence as to the 2011 and 2012 transfers, the Court concludes that defendants are liable under Alabama Code § 8-9A-4(a) for those transfers. Judgment will be entered in SEPH's favor as to that aspect of Count I.

### 4. *Actual Intent and October 2013 Transfer of UPS Stock.*

Insofar as SEPH pursues a § 8-9A-4(a) claim for actual fraudulent transfer as to Charles Trammell's transfer of 8,798 shares of UPS stock to Belinda Trammell upon his death in October

---

[52] In so concluding, the Court has carefully considered defendants' "legitimate supervening purpose" argument against § 8-9A-4(a) liability. Defendants presented evidence at trial that the challenged transfers were done for the purpose of estate planning, on the advice of an estate-planning attorney, because Charles Trammell was gravely ill. Defendants are correct that "where there is 'significantly clear' evidence of a 'legitimate supervening purpose,' a court may find no intent to defraud even in the presence of several 'badges of fraud.'" *Earle*, 307 B.R. at 296 (citations omitted); *see also Kelly v. Armstrong*, 206 F.3d 794, 798 (8th Cir. 2000) (even where confluence of badges of fraud exists, inference of fraudulent intent may be overcome upon a showing of a legitimate supervening purpose). While estate planning may constitute a legitimate supervening purpose, the Court finds as a factual matter that estate planning was not the purpose of those transactions. There was no evidence that Charles Trammell's longstanding health problems took a turn for the worse in January 2011, so as to prompt him to engage an attorney at that particular time "to plan for his death." (Doc. 176, at 9.) Rather, the timing of the transfers, the notes in the attorney's file, the January 20 email, and the preponderance of evidence at trial shows that Charles and Belinda Trammell engaged in a systematic, aggressive campaign of shifting assets out of their hands and into family-owned LLCs as to which their daughters owned the overwhelming majority of the membership interests not as an estate-planning tool, but as a means of placing their assets beyond the reach of Vision Bank. The Court therefore finds as a factual matter that there was no legitimate supervening purpose that might dissipate the taint of actual intent to defraud, as demonstrated by the badges of fraud and other record evidence.

2013, the "actual intent" analysis stands on a different footing. These shares passed to Belinda Trammell upon Charles Trammell's death because they were held in a payable-on-death ("POD") account. There was no evidence as to when the POD designation was placed on that account, either in absolute terms or relative to Charles Trammell's execution of the Bama Bayou guaranties or the accrual of his liability to Vision Bank upon default of the Bama Bayou and Sundance loans. There was no evidence that Charles Trammell had any creditors, or could have reasonably foreseen that he was going to have creditors at the time of his death, when the POD account was established, rendering Belinda Trammell the beneficiary of those UPS shares. Given the failure of proof on this point, plaintiff has not met its burden of showing by a preponderance of the evidence that the October 2013 transfer of Charles Trammell's outstanding shares of UPS stock to Belinda Trammell was carried out "with actual intent to hinder, delay, or defraud any creditor." Ala. Code § 8-9A-4(a). The Court thus finds for defendants as to the portion of Count I addressing the October 24, 2013 transfer of 8,798 shares of UPS stock from Charles Trammell to Belinda Trammell upon the former's death.

### C. Count II: Constructive Fraudulent Transfer Claim (Ala. Code § 8-9A-4(c)).

In Count II, SEPH asserts an AUFTA claim against all defendants for constructive fraudulent transfer, in violation of Alabama Code § 8-9A-4(c).[53] The three elements of a constructive fraudulent transfer claim under § 8-9A-4(c) are that "[p]laintiff is a creditor of the debtor," "the debtor transferred an asset … without receiving a reasonably equivalent value in exchange for the transfer," and "[t]he debtor was engaged or was about to engage in a business transaction for which the remaining assets of the debtor were unreasonably small in relationship to the business or transaction." Ala. Pattern Jury Instr. Civ. § 18.21 (3d ed.).[54]

---

[53]     That section provides, in relevant part, as follows: "A transfer made by a debtor is fraudulent as to a creditor … if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor … [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction." Ala. Code § 8-9A-4(c)(1).

[54]     Both § 8-9A-4(c) and the Alabama Pattern Jury Instructions frame the third element in two alternatives. That element may be satisfied either through the "unreasonably small" formulation set forth *supra* or through a showing that the debtor "[i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." Ala. Code § 8-9A-4(c)(2). Because the section 4(c)(1) (Continued)

The creditor/debtor element has already been addressed in the context of the Count I actual fraudulent transfer analysis. For the same reasons that a creditor/debtor relationship existed as between SEPH and the Trammells for actual fraudulent transfer purposes under § 8-9A-4(a), the Court finds that a creditor/debtor relationship existed as between them for constructive fraudulent transfer purposes under § 8-9A-4(c). Similarly, the "reasonably equivalent value" element has already been discussed in the Count I analysis. For the same reasons set forth in Section III.B.3., *supra*, the Court concludes that the Trammells did not receive a reasonably equivalent value in exchange for the LLC membership interests, interests in the Perdido Place Condo and Lake House, and interests in the UPS stock shares transferred to Brown and Center, and that Charles Trammell received no reasonably equivalent value for the UPS stock shares transferred to Belinda Trammell.

There is one caveat to the foregoing "reasonably equivalent value" discussion. Recall that in January 2011, Charles and Belinda Trammell transferred ownership of the Perdido Place Condo to Trammell Orange Beach, and transferred ownership of the Lake House to Trammell Lake Martin. As to those particular transfers, the Trammells did indeed receive reasonably equivalent value. Here is why: Before the January 2011 transfers, each of Charles and Belinda Trammell owned half of each of the Perdido Place Condo and the Lake House. After the January 2011 transfers, each of Charles and Belinda Trammell still owned half of each of the Perdido Place Condo and Lake House, albeit through the vehicle of their 50% membership interest in each of the LLCs that now held the properties. The point is driven home by SEPH's accountant, Stacy Cummings. Exhibits 3 and 4 to Cummings' expert report confirm that each of Charles and Belinda Trammell's total assets remained unchanged before and after the January 2011 transfer of property to the LLCs. (Plaintiffs' Exh. 103, at 13-14.)[55] In other words, the assets the Trammells lost by transferring the real property to the LLCs were entirely, precisely counterbalanced by the corresponding increase in the value of their 50% interests in each of the

"unreasonably small" version of the test is dispositive, the Court need not decide whether plaintiff could also prevail on a section 4(c)(2) "intended to incur" theory.

[55]     Specifically, Cummings' calculations reflect that Charles Trammell's total assets were valued at $3,595,296 before and after the January 2011 transfers, and that Belinda Trammell's total assets were valued at $1,135,820 before and after those transfers.

LLCs with the addition of that real property as assets of the LLCs.  The January 2011 transfers resulted in no net loss in assets to the Trammells; therefore, the Court finds that they must have received reasonably equivalent value for those transfers, and that no viable constructive fraudulent transfer cause of action (in Counts II or III) will lie as to the January 2011 transfers of real property into the LLCs.

For all transfers other than those of January 2011, defendants' liability under § 8-9A-4(c) hinges on whether SEPH has shown by a preponderance of the evidence that the transferor "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction." Defendants contend that SEPH has not met its burden for two reasons.  First, defendants argue that the Trammells were not engaged in any "business or transaction" from 2011 to 2013 because they were both retired and lacked any management responsibility for Gulf World LLC, Bama Bayou LLC or Marine Park LLC.  That is not a fair characterization of the facts.  Evidence at trial showed that the Trammells were engaged in ongoing transactions throughout this period pursuant to Charles Trammell's membership interest in the aforementioned development LLCs, the Trammells' guaranties of Vision Bank loans taken by those development LLCs, and those LLCs' default of their repayment obligations on those loans.[56]  The Court declines defendants' legally unsupported invitation to construe the facially broad statutory phrase "business or transaction" in a crabbed manner so as to exclude the Trammells' ongoing transactions on the Bama Bayou, Marine Park and Sundance guaranties from the ambit of § 8-9A-4(c).

Second, defendants attack the "needs of the transaction" dimension of the "unreasonably small" inquiry for § 8-9A-4(c).  Again, the test is whether, as a result of the transfers, the Trammells' remaining assets were unreasonably small in relation to their ongoing transactions. The "unreasonably small" formulation "denotes a financial condition short of insolvency," where the challenged transfers "leave the transferor technically solvent but doomed to fail."  *In re*

---

[56]  For example, the Trammells received demands for payment on the guaranties and Charles Trammell participated in (*i.e.*, executed documents, made payments on) the Sundance settlement during the relevant time period.  Charles Trammell's direct involvement in these loans and the ensuing machinations belies defendants' attempt to characterize him as nothing more than a retired passive investor who was not engaged in any business or transactions.

*Fidelity Bond and Mortg. Co.*, 340 B.R. 266, 295 (Bankr. E.D. Pa. 2006).[57]  As the Uniform Fraudulent Transfer Act comments explain, the "unreasonably small" test "focuses attention on whether the amount of all the assets retained by the debtor was inadequate, *i.e.*, unreasonably small, ***in light of the needs of the business or transaction*** in which the debtor was engaged or about to engage."  *Uniform Fraudulent Transfer Act 1984*, § 4, Comment 4 (emphasis added).  Defendants posit that the foreseeable "needs of the transaction" in which the Trammells were engaged were low, reasoning that "there were 22 other guarantors with whom he could split any shortfall," amounting to a *pro rata* share of less than $500,000.  (Doc. 176, at 29-30.)  Such an argument is not persuasive.  Contrary to defendants' suggestion, the Trammells knew or should have known in January 2011 that their exposure on the guaranties ran well into the millions of dollars, in terms of principal amounts, accrued interest and collection costs.  There was no reasonable basis in law, fact or contract to foresee that the Trammells' potential liability on those defaulted loans and guaranties would be confined to 1/23 of the whole.  Rather, it was reasonably foreseeable in 2011-2013 that the needs of the ongoing transactions in which the Trammells were engaged would reach into multiple millions of dollars.[58]  The $800,000 in retained UPS stock that defendants tout in their Post-Trial Brief  (doc. 176, at 29) was facially inadequate in light of those reasonably foreseeable needs of their transactions.[59]

---

[57]     *See also In re Adelphia Communications Corp.*, 652 Fed.Appx. 19, 21 (2nd Cir. June 15, 2016) ("The test for whether assets are 'unreasonably small' focuses on reasonable foreseeability … and is satisfied if at the time of the transaction the debtor had such minimal assets that insolvency was inevitable in the reasonably foreseeable future."); *Weintraut v. Commissioner of Internal Revenue*, 2016 WL 4040793, *85 (T.C. July 27, 2016) ("for purposes of "unreasonably small asset requirement, … we must evaluate whether at the time of [the] transfers it had the ability to generate enough cash to pay its debts and remain financially stable").

[58]     By way of example, as of December 12, 2011 (when the Trammells transferred 90% of the membership interests in family-owned LLCs to their daughters), Charles Trammell faced direct personal liability for more than $1.3 million in principal and interest on the defaulted Sundance loan, more than $1.9 million in principal and interest on the defaulted Marine Park loan, and more than $4.2 million in principal and interest on the defaulted Bama Bayou loans.  And that does not even count the collection costs (including attorney's fees) for which the Trammells were contractually responsible.

[59]     Defendants' other attempts at knocking down the "needs of the transaction" amount for purposes of the "unreasonably small" analysis are similarly unavailing.  Defendants (Continued)

Notwithstanding defendants' objections, the "unreasonably small" analysis at the times of the relevant transfers is straightforward. When he transferred 45% of his 50% stake in Trammell Orange Beach and Trammell Lake Martin to his daughters in December 2011, Charles Trammell was engaged in ongoing transactions for which he faced direct personal liability in excess of $7.6 million, as compared to his remaining assets of $2.7 million. When he transferred 25,102 shares of UPS stock into the family-owned LLCs in April 2012, effectuating a transfer of 95% of those shares to his wife and daughters, Charles Trammell was engaged in ongoing transactions for which he faced direct personal liability in excess of $7.2 million, as compared to his remaining assets of $1 million. When he transferred his remaining shares of UPS stock to his wife upon his death in October 2013, Charles Trammell was engaged in ongoing transactions for which his Estate faced direct liability in excess of $9.7 million, as compared to remaining assets of $224,900. And when Belinda Trammell transferred 45% of her 50% stake in Trammell Orange Beach and Trammell Lake Martin to her daughters in December 2011, she was engaged in ongoing transactions for which she faced direct personal liability in excess of $4.7 million, as compared to her remaining assets of $391,926. In each case, the Trammells' assets following the challenged transfers were inadequate in light of the needs of the transactions in which they were engaged. Thus, in each case, the Trammells were engaged in transactions for which their assets were unreasonably small in relationship to those transactions.

------

point to trial testimony by Center and Belinda Trammell that Charles Trammell would not have believed the *Bama Bayou* Action would drag on for eight years, that they disputed liability under the guaranties, and that they thought they were going to win. (Doc. 176, at 30.) Such self-serving testimony is not credited. Besides, the test focuses on reasonable foreseeability. It was reasonably foreseeable in 2011 that the Trammells would be on the hook to Vision Bank for millions of dollars in principal, interest and collection costs, which is what motivated Charles Trammell to see a lawyer to move his assets beyond Vision Bank's reach in the first place. Any belief by the Trammells that they had no liability to Vision Bank, that liability would be limited to a *pro rata* share, that the *Bama Bayou* Action (which had already dragged on for years with no end in sight) would result in a quick and painless exoneration of the Trammells, and the like was entirely unreasonable under the circumstances. Defendants also insist that the Trammells' liabilities should be discounted for purposes of the "unreasonably small" analysis. The discounting issue is addressed in detail in Section III.D., *infra*, and does not ultimately aid defendants' cause.

Accordingly, the Court finds that defendants are liable for constructive fraudulent transfer in violation of Ala. Code § 8-9A-4(c) with respect to the December 2011 transfers of LLC membership interests, the April 2012 transfer of UPS stock, and the October 2013 transfer of UPS stock.

### D.    Count III: Constructive Fraudulent Transfer Claim (Ala. Code § 8-9A-5(a)).

In Count III, SEPH asserts an AUFTA claim against all defendants for constructive fraudulent transfer, in violation of Alabama Code § 8-9A-5(a).[60]  The parties agree that the elements SEPH must prove to establish liability on this claim are as follows: (i) SEPH is a creditor of the Trammells; (ii) SEPH's claim against the Trammells arose before the transfers were made; (iii) the Trammells made those transfers without receiving a reasonably equivalent value in exchange; and (iv) the Trammells were insolvent or became insolvent as a result of the transfers.  *Ala. Pattern Jury Instr. Civ.* § 18.20 (3d ed.).[61]

In the summary judgment Order dated December 30, 2016, this Court expressly found pursuant to Rule 56(g), Fed.R.Civ.P., that there were no genuine issues of material fact as to the first three elements, and that SEPH was entitled to judgment as a matter of law on those elements.[62]  Accordingly, the only question to be resolved at trial as to Count III is whether

---

[60]    That section provides as follows: "A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer."  Ala. Code § 8-9A-5(a).

[61]    *See also SE Property Holdings, LLC v. Center*, 2016 WL 7493623, *6 (S.D. Ala. Dec. 30, 2016) ("To prevail on Count Three, then, SEPH must prove each of the following elements: (i) that SEPH is a creditor of Charles and Belinda Trammell; (ii) that SEPH's claim against Charles and Belinda Trammell arose before the transfers were made; (iii) that Charles and Belinda Trammell made the transfers without receiving a reasonably equivalent value in exchange; and (iv) that the Trammells were insolvent at the time or became insolvent as a result of the transfers."); *Lord Abbett Municipal Income Fund, Inc. v. Southern Farms, Inc.*, 2015 WL 9474287, *8 (M.D. Ala. Dec. 1, 2015) ("Under § 8-9A-5(a), Lord Abbett must establish (1) that its claim arose before the transfers were made, (2) that RDG-II made the transfers without receiving reasonably equivalent value in exchange, and (3) that RDG-II was insolvent at the time of the transfers or became insolvent as a result of the transfers.").

[62]    "Because the summary judgment record reveals no genuine issues of material fact, the Motion is **granted** as to the following elements of Count Three: (i) SEPH's status as a creditor and the Trammells' status as debtors; (ii) the timing of SEPH's claim against the Trammells (*i.e.*, that it arose before the subject transfers were made); and (iii) that the Trammells (Continued)

SEPH has shown by a preponderance of the evidence that the Trammells either were insolvent at the time of the transfers or became insolvent as a result of them. The AUFTA provides that "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." Ala. Code § 8-9A-1(2).[63]

At trial, SEPH presented unrebutted testimony from Jennifer Corbitt as to the amounts due and owing under the Trammells' guaranties on each of the relevant transfer dates. SEPH also presented unrebutted testimony from its retained expert accountant, Stacy Cummings, concerning the absolute valuation and relative magnitudes of Charles Trammell's and Belinda Trammell's respective assets and liabilities on each of the transfer dates. That evidence, which is summarized in the findings of fact set forth *supra* at Section II.D., convincingly demonstrates that on each date, the sum of the debtor's debts was greater than all of his or her assets at a fair valuation.[64] Defendants do not quarrel with those calculations themselves, and do not offer any alternative calculations.

<hr />

made the transfers without receiving a reasonably equivalent value. Those issues having been resolved on summary judgment, they need not and will not be litigated at trial, pursuant to Rule 56(g), Fed.R.Civ.P." (Doc. 122, at 27-28.)

[63]    In its Post-Trial Brief, plaintiff invokes the presumption of insolvency that attaches under the AUFTA for "[a] debtor who is not generally paying his debts as they become due." Ala. Code § 8-9A-2(b). However, the presumption does not fit the facts at hand. Evidence presented at trial established that the Trammells routinely paid all their bills in a timely manner, that their credit report was unblemished, and that the only debts they did not pay as they became due were the disputed liabilities under the Vision Bank guaranties. In determining whether to apply the statutory presumption, courts "take into account such factors as the number of the debtor's debts, the proportion of those debts not being paid, the duration of the nonpayment, and the existence of bona fide disputes or other special circumstances alleged to constitute an explanation for the stoppage of payments." *Uniform Fraudulent Transfer Act 1984*, § 2, comment 2. At the time of the subject transfers, the Trammells were paying all their debts when they became due, excepting the Vision Bank guaranties as to which there were special circumstances (namely, the dispute as to whether such amounts were owed). No presumption of insolvency attaches under these circumstances.

[64]    None of those relative valuations are a close call; rather, the Trammells were insolvent by a margin exceeding $4 million at each relevant point in time. For example, as of December 12, 2011 (when he transferred away most of his interest in the family-owned LLCs), the sum of Charles Trammell's debts was $7,637,547, against assets fairly valued at $2,794,049. As of April 30, 2012 (when he transferred away tens of thousands of shares of UPS stock), the (Continued)

That is not to say, however, that defendants have conceded the insolvency element. To the contrary, defendants argue that SEPH's calculations of the Trammells' assets and liabilities are invalid because, as a legal matter, their liabilities should be discounted in three different ways, to-wit: (i) liabilities under the guaranties must be discounted for the probability that they will become real; (ii) liabilities under the guaranties must be discounted for the possibility that other sources may pay them; and (iii) liabilities under the guaranties must be discounted to offset the value of the collateral for the loans. (Doc. 176, at 34-43.)[65] The Court will address each purported "failure to discount" objection in turn.

First, defendants argue that SEPH's insolvency evidence should be rejected for "failure to appropriately discount the Trammell's [*sic*] guarantee liability." (Doc. 176, at 35.) Defendants theorize that the Trammells' liability in the *Bama Bayou* Action is "hotly contested" and cite Eleventh Circuit authority for the proposition that discounting of the liability is therefore necessary. *See In re Advanced Telecommunication Network, Inc.*, 490 F.3d 1325, 1335 (11th Cir. 2007) ("The 'fair value' of a contingent liability, of course, should be discounted according to

---

sum of Charles Trammell's debts was $7,273,062, against assets fairly valued at $1,003,725. And as of his death on October 24, 2013 (when he transferred away all of his remaining shares of UPS stock), the sum of Charles Trammell's debts was $9,719,361, against assets fairly valued at $224,900. Likewise, as of December 12, 2011 (when she transferred away most of her interest in the family-owned LLCs), the sum of Belinda Trammell's debts was $4,716,289, against assets fairly valued at $391,926.

[65]     In their Post-Trial Brief, defendants seemingly vacillate as to whether this is a legal issue or an accounting issue. In one breath, defendants cite authority for the proposition that an insolvency analysis is not an accounting analysis, but that the Court must make its own determination of fair market value after considering all evidence presented. In the next, defendants sharply criticize SEPH's accounting expert, Cummings, for "improperly calculat[ing] the liabilities" by not implementing the requisite discounts. (Doc. 176, at 34.) For her part, Cummings credibly testified that she relied on the opinions of counsel in determining that no discounts of offsets were appropriate in the manner proposed by defendants. The determination of whether it is likely that SEPH will prevail in the *Bama Bayou* Action, whether it is likely that others would be held liable for the Trammells' debts, and whether an offset of collateral is required appear fundamentally to be legal questions. And at any rate, defendants proffered no accounting or other expert testimony at trial to establish that such discounting is appropriate or necessary, much less to present any methodology by which defendants contend such discounting should be accomplished. There was no evidentiary development of defendants' discounting objections, other than to confirm that Cummings deemed no such discounts to be warranted.

the possibility of its ever becoming real."). A glaring defect in defendants' position is that they made no showing and advanced no argument that there is any meaningful likelihood that the Trammells will not ultimately be held liable under their guaranties in the *Bama Bayou* Action. In their Post-Trial Brief, defendants point out that they have argued in the *Bama Bayou* Action that the accrued interest and attorney's fees from the date of the foreclosure through the date of setting aside the foreclosure should be erased from the borrower and guarantor liability. (Doc. 176, at 36-37.) But they cite no principle of law or equity, much less any provision in the relevant contracts or mortgages, that might lend heft and substance to that argument. They argue that a discount is appropriate to reflect Belinda Trammell's position that her signature on several guaranties was forged, and that she has a viable ECOA defense. (Doc. 176, at 37.) As discussed *supra*, on the showing here, the Court finds these arguments unlikely to be credited in the *Bama Bayou* Action. They argue that the Trammells "thought they were going to win with the Bama Bayou case" (doc. 176, at 40), but the Court has already explained that this statement both mischaracterizes the testimony and is entirely self-serving without some underlying foundation to support that subjective belief. They reference in conclusory terms the Trammells' "defenses of fraud in the inducement and lack of consideration" with respect to their guaranties (*id.*), but the Court heard no evidence at trial to that effect as to the Trammells' guaranties.[66]

The point is simple: Defendants have presented no evidence in this case tending to show that they have a substantial probability of prevailing in the *Bama Bayou* Action. Therefore, while defendants are correct that discounting of contingent liabilities is appropriate as a general proposition, they adduced no evidence at trial that might support a conclusion that anything more than a modest discount may be warranted here. Given the Trammells' state of heavy insolvency on all relevant transfer dates, a meager adjustment to the calculated liabilities for their

---

[66] To be sure, at trial defendants attempted to present evidence that other guarantors may have viable defenses of fraud in the inducement and lack of consideration in connection with their execution of guaranties; however, they neither presented nor proffered any evidence of facts that might advance such defenses as to the specific guaranties executed by Charles and Belinda Trammell.

probability of success in the *Bama Bayou* Action (based on the evidence presented at this trial) would in no way alter the underlying conclusion of insolvency as of the relevant transfer dates.[67]

Second, defendants fault SEPH's insolvency calculations for "failure to discount the liability for whether some or all of Bama Bayou / Marine Park debt may be satisfied by another obligor." (Doc. 176, at 40.)  The record is clear, of course, that SEPH has undertaken to sue the borrowers and all guarantors in the *Bama Bayou* Action.  But the record is also clear that (i) Vision Bank made demand on all obligors many years ago, before the Trammells' transfers; and (ii) no obligor paid anything at that time, or has paid anything since.  Defendants proffered no evidence at trial that any obligor has the wherewithal to pay the Trammells' liability on their guaranties.  And the notes, guaranties, mortgages, and other loan documents expressly provide that Vision Bank is not required to collect from any other obligor before proceeding against the Trammells.  This is simply not a case in which the Trammells are legally on the hook for nothing more than any unpaid residual after all other obligors' resources are exhausted.  By the terms of their guaranties, the Trammells were responsible for the specified portion of principal and 100% of interest and collection costs.  Defendants did not show that legal or accounting principles require discounting of those figures to reflect other possible obligors.  Nor did they introduce evidence at trial that might raise the availability of other obligors as payment sources above the level of unvarnished speculation.[68]  Even if such an accounting, legal and factual showing had been made, which it was not, defendants identify no methodology for performing such discounting in this particular case.

---

[67]     Stated differently, defendants have said the Trammells have defenses to the *Bama Bayou* Action.  But they have failed to provide any information demonstrating that there is merit or substance to those defenses, specifically as to the Trammells (as opposed to assurances given to other guarantors, for example).  In effect, then, defendants are urging the Court to discount the Trammells' liabilities (and to reject SEPH's expert testimony for failure to discount those liabilities) based on mere speculation that because the Trammells have asserted defenses to the *Bama Bayou* Action, those defenses are substantially likely to succeed.  The Court cannot engage in such conjecture, nor will it reject the solvency calculations by SEPH's CPA for failure to indulge such conjecture.  And contrary to defendants' Post-Trial Brief, it was defendants' obligation to put on evidence showing that their *Bama Bayou* defenses have merit, not SEPH's burden to put on anticipatory evidence showing that they do not.

[68]     There is no indication, for example, that the *Bama Bayou* guarantors have made any demands for contribution or indemnity among themselves, much less that they have made any arrangements or reached any agreements for same.

Third, defendants contend that SEPH's insolvency analysis fails because the Trammells' liabilities were not discounted "in consideration of the substantial collateral available to satisfy some or all the guaranteed debt." (Doc. 176, at 41-42.) This argument misapprehends the calculations performed by SEPH's accountant, Cummings, which reflect that she fully considered and accounted for the value of the available collateral on the Bama Bayou loans after the foreclosure sales were set aside. As stated in Cummings' supplemental Expert Witness Report dated December 20, 2016:

> "[W]e have considered the estimated value of the assets and liabilities of Bama Bayou, LLC (including Marine Park, LLC) as of the dates of the transfers .…. The estimated value of the debt and interest associated with the [Bama Bayou] and Marine Park loans *is greater than the estimated values of the property based on the appraisals by an amount exceeding Mr. Trammell's total liability on the debt pursuant to his personal guarantees .…*"

(Plaintiff's Exh. 103, at 80 (emphasis added).) Thus, Cummings opined that, even after backing out the appraised value of the collateral from amounts owed to SEPH/Vision Bank by Bama Bayou, LLC on the dates of the Trammells' transfers, the remaining debt owed on the Bama Bayou and Marine Park loans (principal and interest only) was greater than the Trammells' total liability on that debt. What that means is that even after taking the collateral into account, the Trammells' liabilities on their Bama Bayou / Marine Park guaranties would not have been affected because the total debt owed by Bama Bayou / Marine Park would still be greater than the Trammells' debt obligations under the guaranties.[69] Thus, it is simply not true to say, as defendants do, that Cummings failed to account for the value of the Bama Bayou collateral in valuing the Trammells' liabilities in her insolvency analysis.[70]

---

[69]    In an accompanying table labeled Exhibit 16 to Plaintiff's Exhibit 103, Cummings set forth her calculations of Bama Bayou, LLC's assets and liabilities as of the effective dates of each of the Trammells' transfers. That table reflects that Cummings valued the collateral on the relevant dates using Vision Bank's annual appraisal reports from that time period. Cummings' calculations were that, even after factoring in the fair market value of the collateral, Bama Bayou, LLC's debts on the Vision Bank loans exceeded its assets by more than $19 million on each of the relevant dates, or well over $10 million more than Charles Trammell's obligations pursuant to the corresponding guaranties.

[70]    It does not appear that Cummings performed an analogous analysis with respect to the Sundance collateral. But defendants submitted no evidence as to the valuation of the Sundance collateral vis a vis the total indebtedness of Sundance LLC at any relevant time. Besides, even if his pre-settlement Sundance obligations were backed out of Charles Trammell's (Continued)

To the extent defendants would quarrel with the collateral valuations used by Cummings in her analysis, the argument fares no better. Cummings valued the Vision Bank collateral in accordance with annual post-foreclosure appraisals obtained by the bank during the relevant time frames. These appraisals were obtained not in furtherance of litigation or with a motivation to "lowball" the asset values, but rather in the ordinary course of business in order to comply with applicable banking requirements. The Court accepts the resulting valuation figures for the Vision Bank collateral – which totaled approximately $6 million on each of the relevant transfer dates – as reasonable in the context of this limited record for the limited purposes of the AUFTA solvency analysis.[71]

---

liabilities as of the December 2011 asset transfers, he remained heavily insolvent on that date, to the tune of more than $3.4 million.

[71] In so doing, the Court recognizes that defendants presented the testimony of Scott Raley at trial. Over SEPH's strenuous, multifaceted objections (which the Court took under advisement in the context of this non-jury trial), Raley opined that the Bama Bayou collateral was worth between $40 million and $45 million as of the relevant dates on which the Trammells transferred assets. Raley's testimony is not credited for purposes of the insolvency analysis for at least three independent reasons. First, insofar as defendants were offering Raley as an expert on real estate valuation, his testimony is properly excluded pursuant to Rule 37(c)(1), Fed.R.Civ.P., because defendants failed timely to disclose him as an expert. Second, to the extent that defendants would offer Raley's valuation testimony as a property owner, it is true that under Alabama law, "a landowner can testify as to the value of his property, even if he is not an expert." *Fisher v. Ciba Specialty Chemicals Corp.*, 2007 WL 2995525, *7 (S.D. Ala. Oct. 11, 2007) (citation omitted and collecting authorities). But Raley did not own the subject real property at any time. At best, Raley was a part owner of an LLC that was a part owner of another LLC that owned the property. Defendants proffer no legal authority in support of the proposition that such an attenuated relationship renders Raley a "landowner" under applicable law. Besides, that real property had been foreclosed upon and was owned by Vision Bank during the 2011 and 2013 period. Even though the foreclosure sales were later set aside, how can Raley offer a landowner opinion on valuation of property for a time period during which he did not own the property? Defendants do not say. Third, even if these significant and serious evidentiary hurdles could be overcome, the Court in its role as fact finder would not credit Raley's valuation opinions, which were not only self-serving (given his role as a defendant in the *Bama Bayou* Action and his interest getting as much "credit" as possible for the collateral to offset his own personal liabilities to SEPH), but also lacked foundation or analytical structure, such as reliance on comparables. Defendants do not attempt to justify Raley's valuation of the Bama Bayou collateral – which was seven times higher than Vision Bank's annual appraisals showed – by reference to any objective, meaningful criteria. For these reasons, the Court does not credit Raley's testimony as to the valuation of the Bama Bayou collateral at pertinent times.

When all the smoke clears, the Court is left with the conclusion that Trammells were insolvent when they transferred away large stakes in family-owned LLCs and thousands of shares of UPS stock in December 2011, April 2012 and October 2013.  Defendants have not shown that any discounting of the Trammells' calculated liabilities is appropriate for purposes of the insolvency analysis.  To the extent that any discounting might be warranted (such as to account for the low demonstrated likelihood that the Trammells will prevail in the *Bama Bayou* Action), the appropriate percentage of discounting would be modest.  But the Trammells' insolvency was so great that even after any reasonable discount of their liabilities in light of the circumstances presented here, they would remain insolvent as of each transfer date, with a fair valuation of their respective assets and liabilities.[72]  All elements of a constructive fraudulent transfer claim under Alabama Code § 8-9A-5(a) having been proven by a preponderance of the evidence, judgment will be entered in SEPH's favor, at least as to the December 2011 transfer of LLC membership interests to the Trammells' daughters, the April 2012 transfer of UPS stock to the LLCs, and the October 2013 transfer of UPS stock to Belinda Trammell.

###    E.    *Count IV: Civil Conspiracy.*

In Count IV, SEPH brings a common-law claim against all defendants for civil conspiracy.  Under Alabama law, a "civil conspiracy is a combination of two or more persons to do: (a) something that is unlawful; [or] (b) something that is lawful by unlawful means." *DGB, LLC v. Hinds*, 55 So.3d 218, 234 (Ala. 2010) (citation omitted).  Such a claim requires proof of "a concerted action by two or more people." *Luck v. Primus Automotive Financial Services, Inc.*, 763 So.2d 243, 247 (Ala. 2000).  This, in turn, requires a showing "that the claimed conspirators had actual knowledge of, and the intent to bring about, the object of the claimed conspiracy." *First Bank of Childersburg v. Florey*, 676 So.2d 324, 327 (Ala.Civ.App. 1996).  "In order to prove a conspiracy, a plaintiff may present circumstantial evidence." *Luck*, 763 So.2d at 247; *see also Eidson v. Olin Corp.*, 527 So.2d 1283, 1285 (Ala. 1988) ("By its very

---

[72]    For example, even if defendants had shown that the Trammells have a 50% chance of emerging unscathed from the *Bama Bayou* Action (and the record here does not reasonably support a percentage anywhere close to that number), and even if the Bama Bayou liabilities were accordingly reduced by 50% on each date (*i.e.*, Dec. 2011, Apr. 2012, Oct. 2013) in the Trammell insolvency calculations, the Trammells' liabilities would still exceed their assets every time.

nature, the existence of a conspiracy must often be inferred from circumstantial evidence and the relationship of the parties, as opposed to direct evidence.").

It is well settled under Alabama law that "[t]he essence of a conspiracy is an agreement, a meeting of the minds between the conspirators." *Jurich v. Compass Marine, Inc.*, 906 F. Supp.2d 1225, 1235 (S.D. Ala. 2012) (citation omitted). The Court finds by a preponderance of the evidence that Charles Trammell and Belinda Trammell formed such an agreement, and had a meeting of the minds to transfer their assets in a manner that placed them out of the reach of their creditors in connection with the Bama Bayou, Marine Park, and Sundance guaranties. While defendants maintain that there was insufficient evidence to find Belinda Trammell to be a co-conspirator, the Court finds otherwise. Belinda Trammell knew about the guaranties, the lawsuits and the potentially crippling liabilities that she and her husband faced in 2011 and 2012. She signed the Personal Financial Statements obligating her to notify Vision Bank if there were material changes in her assets reported on those statements. She attended multiple meetings with the lawyer where the ideas were hatched and executed to transfer the Trammells' assets into family-owned LLCs and transfer most of the interest in those LLCs to their daughters. She signed all the documents effectuating such transfers, only after the lawyer explained to her the meaning and effect of those documents. From the circumstantial evidence adduced at trial, the Court concludes that Charles and Belinda Trammell had an agreement and engaged in concerted action to transfer the bulk of their assets to their daughters and to newly-created family-owned LLCs with the intent to injure, delay or defraud their creditors.[73]

The Court agrees with defendants, however, that there was insufficient evidence at trial to show that defendants Tammy Center and Amy Brown were part of the Trammells' conspiracy. SEPH neither called Amy Brown to testify nor presented evidence tending to show it was more likely than not that Brown agreed with her parents to accomplish a series of fraudulent transfers or that she intended to bring such transfers about. At most, the evidence showed that Brown

---

[73] In arguing otherwise, defendants suggest that Belinda Trammell did nothing more than sign some documents and that she merely had ancillary involvement in the transactions. However, the circumstantial evidence shows her to be much more than an unwitting bystander who blindly did as she was told without understanding anything. The Court also declines to credit Belinda Trammell's self-serving denials of any conspiracy, and specifically determines that the Trammells had actual knowledge of, and the intent to bring about, the object of the conspiracy (*i.e.*, the transfer of assets beyond creditors' reach).

signed some paperwork and managed one of the LLCs. Plaintiff has not shown by a preponderance of the evidence that there was a meeting of the minds between Brown and her parents with regard to the contemplated fraudulent transfers. With respect to Tammy Center, she credibly testified that until her father died in October 2013, she knew nothing about the Vision Bank lawsuits and had never even heard of the projects for which her parents had signed guaranties. She also credibly testified that while she drove her father to his meetings with the estate-planning lawyer, she had no other involvement in the process and did not even know what her father was doing. In light of the foregoing, the Court finds that SEPH failed to prove that Tammy Center and Amy Brown had actual knowledge of, and the intent to bring about, the object of their parents' conspiracy to engage in fraudulent transfers of assets to the detriment of Vision Bank and other creditors. The Court will therefore enter judgment in favor of defendants Center and Brown as to Count IV.

In a brand-new argument unveiled for the first time in their Post-Trial Brief, defendants maintain that Count IV fails as a matter of law because AUFTA claims sound in contract, not tort, and a civil conspiracy requires an underlying tort. (Doc. 176, at 23-25.)[74] Alabama law is clear that "[a] civil conspiracy cannot exist in the absence of an underlying tort." *Goolesby v. Koch Farms, LLC*, 955 So.2d 422, 430 (Ala. 2006).[75] Defendants posit that an AUFTA claim "is essentially a contract law claim" (doc. 176, at 24), but they cite no Alabama precedents or principles for that proposition. The Court's research reveals a national split of authority as to whether a violation of the Uniform Fraudulent Transfer Act may support a cause of action for

---

[74] Because post-trial briefs were submitted simultaneously, defendants' failure to identify and articulate this argument earlier effectively deprived plaintiff of an opportunity to be heard and shifted the burden to the Court to evaluate the strength of defendants' legal assertion without the benefit of full, balanced briefing.

[75] *See also Thompson Properties 119 AA 370, Ltd. v. Birmingham Hide and Tallow Co.*, 897 So.2d 248, 267 (Ala. 2004) ("Where civil liability for a conspiracy is sought to be enforced, the conspiracy itself furnishes no cause of action. The gist of the action is not the conspiracy alleged but the wrong committed.") (citations omitted); *United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Service Workers Int'l Union AFL-CIO-CLC v. Wise Alloys, LLC*, 642 F.3d 1344, 1351 (11th Cir. 2011) ("In Alabama, civil conspiracy is not a separate cause of action, but relies on the presence of an underlying tort."); *Blake v. Bank of America, N.A.*, 845 F. Supp.2d 1206, 1214 (M.D. Ala. 2012) ("a civil conspiracy claim fails if the underlying acts do not support a tort claim").

civil conspiracy. *See, e.g., Sheehan v. Saoud*, 650 Fed.Appx. 143, 154 (4th Cir. May 24, 2016) (noting that "courts from varying jurisdictions have refused to recognize violations of the Uniform Fraudulent Transfer Act as torts," but that "a handful of courts from other jurisdictions have recognized violations of the Uniform Fraudulent Transfer Act as torts," and "some circuit courts have recognized a cause of action for civil conspiracy based on a violation of the Uniform Fraudulent Transfer Act").

Defendants identify no grounds for determining which side of the divide Alabama courts would be likely to embrace. After researching the issue independently, however, the undersigned finds that Alabama law likely recognizes a cause of action for civil conspiracy based on a violation of the AUFTA for at least three reasons. First, Alabama courts have allowed claims for conspiracy to violate the AUTFA to proceed to jury verdict. *See Wood v. Hayes*, 104 So.3d 863, 869 (Ala. 2012) (jury "found against Joni for violating the AUFTA and for conspiracy to violate the AUFTA"). Second, it appears well settled that "Alabama recognizes a cause of action for conspiracy to defraud a creditor." *A.T. Stephens Enterprises, Inc. v. Johns*, 757 So.2d 416, 419 (Ala. 2000). An AUFTA violation is a means of defrauding a creditor, so an AUFTA conspiracy would logically qualify as an actionable conspiracy to defraud a creditor in Alabama. Third, precedents from elsewhere in this Circuit support a conclusion that a cognizable claim for civil conspiracy to engage in fraudulent transfers exists. *See, e.g., Chepstow Ltd. v. Hunt*, 381 F.3d 1077, 1090 (11th Cir. 2004) (recognizing that Georgia courts authorize civil conspiracy claims where "the wrong that underlay the civil conspiracy claim was a violation of Georgia's fraudulent transfer statute"); *In re Advanced Telecommunication Network, Inc.*, 2013 WL 414654, *3 (Bankr. M.D. Fla. Feb. 4, 2013) ("The Amended Complaint properly pleads civil conspiracy against the Defendants to the extent it alleges they knowingly agreed and aided the Allens in violating the UFTA's constructive fraudulent transfer provisions.") (citation omitted); *Alliant Tax Credit Fund 31-A, Ltd. v. Murphy*, 2011 WL 3156339, *8 (N.D. Ga. July 26, 2011) ("Plaintiffs' claim for civil conspiracy … can be used to establish some of Defendants' liability for fraudulent transfers under the UFTA"). Accordingly, the Court does not credit defendants' newly raised post-trial argument that a violation of the AUFTA "would not constitute the requisite underlying act of a tortious character to serve as the basis of a conspiracy claim." (Doc. 176, at 25.)

For all of these reasons, the Court will enter judgment in favor of SEPH and against defendants Charles Trammell and Belinda Trammell (but only those two defendants) on the civil conspiracy cause of action embodied in Count IV.

## IV. Conclusions of Law: Remedy.

The only remaining question is remedy. At the Court's directive, the parties have devoted substantial briefing to the issue of what remedies should be awarded to SEPH in the event that it is successful in this fraudulent transfer action. (*See* doc. 152, at 6-8; doc. 153, at 9-21; doc. 177, at 33-35.) In its briefing, SEPH requests wide-ranging relief, including the following remedies: (i) set aside of the fraudulent transfers and attachment of those assets; (ii) a money judgment against Center in the amount of $1,581,009, against Brown in the amount of $1,581,009, against Belinda Trammell in the amount of $1,011,259, and against the LLCs in amounts of $1,628,057 (Trammell Orange Beach) and $1,833,057 (Trammell Lake Martin), based on the full value of the assets transferred to each of them at the time of the transfers; (iii) an injunction against further disposition of the assets; (iv) a money judgment on the conspiracy claim for $3,461,114 (the total value of the beach house, lake house, and UPS stock transferred to the LLCs); and (v) an award of punitive damages on the actual fraud and conspiracy claims only. For their part, defendants agree that attachment may be an appropriate remedy (although they suggest that SEPH must satisfy other procedural prerequisites first), but deny that any of the others are appropriate or even available here.[76]

The proper analytical starting place is the AUFTA itself. The statute provides, in relevant part, that "the remedies available to creditors … include: (1) Avoidance of the transfer to the

---

[76] Defendants' threshold argument is that attachment is the only available remedy because it is the only provisional remedy authorized by the AUFTA. Defendants cite no case authority from Alabama or elsewhere supporting such a narrow construction of the available remedies. The statutory text itself cannot fairly be read as foreclosing all remedies other than attachment for claims that have not been reduced to judgment. Indeed, on its face, the AUFTA specifies only one remedy that is not available prior to entry of judgment on the underlying claims, to wit: a levy of execution on the asset transferred. *See* Ala. Code § 8-9A-7(b) ("If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its proceeds."). The Court will impose no such artificial restriction on the availability of other remedies for AUFTA violation, absent a showing (which has not been made) that the AUFTA created such a restriction or that Alabama courts have interpreted it as providing for same.

extent necessary to satisfy the creditor's claim; (2) An attachment or other provisional remedy against the asset transferred or other property of the transferee …; [and] (3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure, a. An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property; b. Appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or c. Any other relief the circumstances may require." Ala. Code. § 8-9A-7(a). The AUFTA further provides that "to the extent a transfer is voidable in an action by a creditor under Section 8-9A-7(a)(1), the creditor may recover judgment for the value of the asset transferred, … or the amount necessary to satisfy the creditor's claim, whichever is less, or judgment for conveyance of the asset transferred." Ala. Code § 8-9A-8(b).

The Court readily concludes that the equitable remedy of an injunction is highly appropriate in this case. It is therefore **ordered** that defendants are **enjoined** from further disposition of any of the following assets: the Perdido Place Condo, the Lake House, a 45% membership interest held by each of Center and Brown in each of Trammell Family Orange Beach Properties, LLC and Trammell Family Lake Martin Properties, LLC, the shares of UPS stock transferred into those LLCs in April 2012, and the shares of UPS stock transferred to Belinda Trammell in October 2013. This injunction will remain in effect until such time as a final judgment has been entered in the *Bama Bayou* Action, and is intended to preserve the *status quo* dating back to when the fraudulent transfers occurred, in terms of available assets to satisfy any judgment that may be entered in SEPH's favor against Belinda Trammell and/or the Estate of Charles Trammell in the state-court proceedings.[77]

---

[77] The Court rejects defendants' argument that an injunction "is inappropriate because of the low likelihood of SEPH prevailing in the *Bama Bayou* litigation." (Doc. 153, at 16.) This Court did not try, and will not try, the *Bama Bayou* Action. Nonetheless, based on all of the evidence and arguments presented by the parties at the trial of this case, the undersigned is of the opinion that SEPH has a substantial likelihood of success on the merits in the *Bama Bayou* Action. The Court also finds that the defendants' track record of dissipating assets creates a risk of irreparable injury to SEPH if no injunction is entered; after all, a favorable judgment against the Estate and/or Belinda Trammell in the *Bama Bayou* action will be a pyrrhic victory for SEPH if defendants have liquidated or otherwise disposed of all substantial assets that could have been used to satisfy that judgment in the interim. The Court also concludes that the potential harm to SEPH outweighs any damage the proposed injunction may cause defendants, and that the injunction would not be adverse to the public interest.

As for SEPH's request for a writ of attachment to be issued against those assets, plaintiff has made no showing that an injunction is not sufficient to support its interest in preserving those assets from further dissipation or waste, or why actual court-supervised seizure of such assets would be necessary or appropriate to protect SEPH's interests pending the outcome of the *Bama Bayou* Action. On this showing, no writ of attachment will issue.

With respect to SEPH's request that the transfers be set aside, the relevant statutory provision allows for "[a]voidance of the transfer *to the extent necessary to satisfy the creditor's claim*." Ala. Code § 8-9A-7 (emphasis added). At this point, however, we do not know whether any of these assets will be "necessary to satisfy" SEPH's claims because we do not know the ultimate outcome of the *Bama Bayou* Action. If SEPH prevails against the Trammells in the *Bama Bayou* Action in an amount commensurate with SEPH's showing in this action of the Trammells' liabilities under the Bama Bayou guaranties, then the fraudulently transferred assets (beach condo, lake house, UPS stock shares, and LLC membership interests) undoubtedly would be necessary to satisfy SEPH's claim. But if SEPH does not prevail against the Trammells in the *Bama Bayou* Action, or if the amount of SEPH's judgment is substantially lower than it has forecast here, then avoidance of these fraudulent transfers would not or may not be necessary to satisfy SEPH's underlying claims against the Trammells. Again, this Court did not try the *Bama Bayou* Action. This Court made no ultimate determinations about whether the Trammells are or not liable to SEPH, and if so in what amounts, for the guaranties they executed on the Bama Bayou loans. In the absence of such an ultimate determination, avoidance of the transfers is not appropriate at this time, provided, however, that SEPH may petition this Court for post-judgment relief pursuant to Rules 60(b)(2) and 60(b)(6), Fed.R.Civ.P., at the conclusion of the *Bama Bayou* Action if it can show at that time that avoidance of the subject transfers is necessary to satisfy its claims.

The same reasoning warrants a conclusion that SEPH's requests for seven-figure money judgments against each transferee are inappropriate at this time under the AUFTA. The money judgment provision set forth at Alabama Code § 8-9A-8(b) is not a form of compensatory damages, but is instead necessitated by the structure of the Act. Where a fraudulent transfer is set aside, or voided, pursuant to § 8-9A-7, title to that property remains with the transferee and does not revest with the debtor. *See, e.g., Ex parte HealthSouth Corp.*, 974 So.2d 288, 297 (Ala. 2007) ("[I]n Alabama, a court's setting aside of a fraudulent transfer does not revest title in the

debtor. Instead, the transferee continues to own the fraudulently transferred assets; the transfer is void only as to the creditor ….”). Because the transferee continues to hold fraudulently transferred assets, even after the transfer is judicially “avoided,” the AUFTA creates a remedy for the creditor to obtain either (i) a money judgment against the transferee for the lesser of the value of the asset at the time of transfer or “the amount necessary to satisfy the creditor's claim;” or (ii) a judgment against the transferee for conveyance of the asset itself. Ala. Code § 8-9A-8(b). No judgment under § 8-9A-8(b) is available unless the transfer is voidable under § 8-9A-7(a)(1). The Court has already determined that avoidance of the transfers under § 8-9A-7(a)(1) is not warranted at this time because there has been no judgment in the *Bama Bayou* Action, such that it is neither known nor knowable whether avoidance of these transfers is “necessary to satisfy the creditor's claim.” For the same reason, the Court will not enter money judgment against the transferees on the AUFTA claims at this time; provided, however, that SEPH may petition this Court for post-judgment relief at the conclusion of the *Bama Bayou* Action if it can show at that time that avoidance of the subject transfers is necessary to satisfy its claims, thereby warranting either a money judgment against the transferee or a judgment against the transferee for conveyance of the asset itself.[78]

---

[78] A thought experiment might shed light on this reasoning. Suppose this Court did as SEPH requests, avoided the transfers, and entered million-dollar judgments against each transferee for fraudulent transfer of assets. SEPH would presumably commence efforts to collect on that judgment immediately, although it would be barred from levying execution on the transferred assets or their proceeds pursuant to Ala. Code § 8-9A-7(b) because it still would not have obtained a judgment on its underlying claims against the Trammells as debtors for breach of guaranty. Then suppose that someday (likely years from now, given the pace of the *Bama Bayou* Action) a final judgment is entered in the state-court proceedings, but that judgment is in the Trammells' favor and adverse to SEPH. (Again, this Court did not try the *Bama Bayou* Action, but carefully restricted the evidence admitted to that specifically relevant to the challenged asset transfers.) Where would that leave us? SEPH would still hold final million-dollar judgments against transferees of assets as to which the transferors had been adjudicated not to be liable to SEPH for breach of guaranty. So the Trammells would owe no money to SEPH as debtors, but SEPH would still hold (and presumably still be collecting on) enormous money judgments against Brown, Center, Belinda Trammell, and the two LLCs based on the fraudulent transfer of assets by transferors who were ultimately found not to be indebted to SEPH for breach of guaranty, such that SEPH was never entitled to those assets. The Court will not proceed in a manner that allows for the possibility of such a chaotic, inconsistent, and decidedly messy outcome, particularly given that SEPH's interests in preserving the fraudulently transferred assets from any further waste or dissipation may be adequately protected by the (Continued)

SEPH also requests a $3.4 million money judgment on its civil conspiracy claim, which it has proven as against Belinda Trammell and the Estate of Charles Trammell only. Of course, any money judgment on the conspiracy claim would be for compensatory damages. *See Purcell Co. v. Spriggs Enterprises, Inc.*, 431 So.2d 515, 523 (Ala. 1983) ("Damages must also be proved. The substance of a conspiracy action is the damage and not the conspiracy, and the damage must appear to have been the natural and proximate result of defendants' acts.") (citation omitted). But SEPH has not proven by a preponderance of the evidence that it was damaged in the amount of $3.4 million as a natural and proximate result of the Trammells' conspiracy to fraudulently transfer assets beyond its reach. Of course, if SEPH does not succeed against the Trammells in the *Bama Bayou* Action, then it will not have been damaged at all because it will not be entitled to collect anything from the Trammells. Even if SEPH prevails in that case, it has not proven damages proximately resulting from the subject conspiracy by Charles and Belinda Trammell. Although SEPH presented some evidence of dissipation of assets, it submitted no argument and pointed the Court to no specific evidence that might quantify those amounts with any reasonable degree of accuracy. At any rate, it appears that most of the transferred assets (at least, the ones not liquidated to pay SEPH in the Sundance settlement) are still available for execution and collection purposes if SEPH is successful in its civil action against the Trammells for breach of the guaranties, and all such assets have been protected from further transfer or dissipation by virtue of the injunction ordered herein. On this evidence, SEPH has not proven its damages on the conspiracy claim.

Finally, SEPH requests an award of punitive damages on Counts I and IV, the actual fraudulent transfer claim and the civil conspiracy claim. Defendants do not argue that punitive damages are legally unavailable on those claims, but they do argue that no award of punitive damages is appropriate here. The Court agrees. Punitive damages require a showing of actual injury, which SEPH has not made. *See, e.g., Purcell Co. v. Spriggs Enterprises, Inc.*, 431 So.2d 515, 523 (Ala. 1983) ("No damages, whether compensatory or punitive, may be awarded absent

_____

injunctive relief entered herein against all transferees. Certainly, despite multiple opportunities to brief this issue, SEPH has not come forward with authority or argument that might countenance its requested outcome as fair, appropriate, or even permissible under the contours of the AUFTA, given the potential that things may go awry in *Bama Bayou*.

a finding of actual injury."). Even if SEPH had shown actual injury, punitive damages are unavailable absent proof "by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." Ala. Code § 6-11-20(a). Even if SEPH had made such a showing by clear and convincing evidence (as opposed to the preponderance standard utilized by the Court throughout this Order in evaluating defendants' liability), the decision of whether or not to award punitive damages in a particular case is discretionary with the finder of fact. *See, e.g., Ex parte Lewter*, 726 So.2d 603, 606 (Ala. 1998) ("The imposition of punitive damages is entirely discretionary with the jury."); *Roberson v. Ammons*, 477 So.2d 957, 961 (Ala. 1985) ("The award of punitive damages is within the sound discretion of the jury, considering all attendant circumstances."). The Court has carefully considered all attendant circumstances, including specifically that "[t]he purpose of punitive damages is … to punish the wrongdoer and to deter the wrongdoer … from committing similar wrongs in the future." *Ex parte Vulcan Materials Co.*, 992 So.2d 1252, 1260 (Ala. 2008) (citation omitted). Upon such consideration, the Court finds in the exercise of its sound discretion that no punitive damages award is appropriate in this case to punish or deter Belinda Trammell or the Estate of Charles Trammell, based on the reprehensibility of their conduct in performing the subject transfers, the harm suffered by the plaintiff, the extent to which defendants profited from their conduct and so on.

Notwithstanding the foregoing, the Court remains concerned that the remedy of an injunction may be insufficient to protect SEPH's interests fully. Here is why: There was testimony at trial that the transferee defendants have already wasted or otherwise dissipated many tens of thousands of dollars worth of the fraudulently transferred UPS stock shares. It is unclear at this time precisely how much has been spent, whether those funds have been used to purchase any other assets that might be subject to execution if SEPH prevails in the *Bama Bayou* Action, or how large the deficiency might be (*i.e.*, the gap between (i) the valuation of those fraudulently transferred assets at the time of the transfer and (ii) the valuation of those remaining assets today). Moreover, while this Court has repeatedly stated that it is not trying the *Bama Bayou* Action, the undersigned has made specific findings of very serious, fraudulent conduct by defendants attempting to place assets beyond SEPH's reach. In the Court's view, the final remedies ordered in this case must take into account the seriousness of defendants' misconduct, must safeguard the bank's interests in full should it prevail in *Bama Bayou*, and must ensure that

defendants do not profit from their fraudulent conduct by pocketing any appreciated value in the fraudulently transferred assets in the interim.[79]

The AUFTA confers upon this Court broad authority to fashion equitable remedies, including the possibility for injunctive relief as to "other property," "[a]ppointment of a receiver to take charge of the asset transferred or of other property of the transferee," or "[a]ny other relief the circumstances may require." Ala. Code § 8-9A-7(a)(3). The Court has every intention of exercising this broad equitable authority under the statute to take all necessary and appropriate steps to ensure the foregoing objectives are met.

As a starting point, the Court **orders** that an accounting be performed to quantify exactly how much the transferee defendants have dissipated or wasted the fraudulently transferred assets (and particularly the UPS stock shares), where those dissipated assets went, what the shortfall is between the fair value of those assets at the time of the fraudulent transfer and their valuation today as a result of such dissipation / waste, and whether defendant transferees have other property whose disposition might be enjoined to cover the deficiency and protect SEPH's interests in the event it prevails in the *Bama Bayou* Action. To that end, SEPH is **ordered** to retain a CPA or other reasonably qualified individual to perform the accounting, and defendants are **ordered** to cooperate fully and promptly with all reasonable requests for information and records needed by such CPA or otherwise qualified individual to complete the accounting. SEPH must file its expert's final report documenting the conclusions of that accounting on or before **September 27, 2017**, along with a memorandum of law setting forth the additional remedies under AUFTA plaintiff believes to be appropriate in light of same. Defendants may file a response on or before **October 11, 2017**, at which time this issue will be taken under submission.

## V.    Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

---

[79]    As a matter of equity, any appreciation in the value of the fraudulently transferred assets should be available to SEPH for execution in the event of a successful outcome in *Bama Bayou*. *See generally* Ala. Code § 8-9A-8(c) (providing that money judgments based on value of the asset transferred are "subject to adjustment as the equities may require").

1.	Plaintiff has shown by a preponderance of the evidence that all defendants are liable to it on Counts I, II and III for violations of the Alabama Uniform Fraudulent Transfer Act;

2.	As a remedy for the AUFTA violations proven in Counts I, II and III, defendants are **enjoined** from further disposition of any of the following assets: the Perdido Beach Condo, the Lake House, a 45% membership interest held by each of Center and Brown in each of Trammell Family Orange Beach Properties, LLC and Trammell Family Lake Martin Properties, LLC, the shares of UPS stock transferred into those LLCs in April 2012, and the shares of UPS stock transferred to Belinda Trammell in October 2013.  This injunction will remain in effect until such time as a final judgment has been entered in the *Bama Bayou* Action;

3.	Plaintiff has shown by a preponderance of the evidence that defendants Belinda Trammell and Estate of Charles Trammell are liable for civil conspiracy, as alleged in Count IV, but has not proven actual damages resulting from same;

4.	No punitive damages will be awarded against defendants; and

5.	The Court **orders** that an accounting be performed to shed light on the dissipation of fraudulently transferred assets by the transferee defendants. SEPH must file its expert's final report documenting the conclusions of that accounting on or before **September 27, 2017**, along with a memorandum of law setting forth what, if any, additional remedies under AUFTA plaintiff believes to be appropriate in light of same.  Defendants may file a response on or before **October 11, 2017**.

DONE and ORDERED this 8th day of August, 2017.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE